UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

STEVEN DONZIGER,

                    Defendant.

---

No. 19-CR-561 (LAP)

No. 11-CV-691 (LAK)

FINDINGS OF FACT &
CONCLUSIONS OF LAW

---

**Appearances**

Rita Marie Glavin
Sareen Karla Armani
GLAVIN PLLC

Brian Paul Maloney
SEWARD & KISSEL LLP

Attorneys for United States of America


Ronald Laurence Kuby
Rhidaya Shodhan Trivedi
LAW OFFICE OF RONALD L. KUBY

Martin Garbus
OFFIT KURMAN PA

Steven Donziger

Attorneys for Defendant Steven Donziger


Reed Michael Brodsky
GIBSON, DUNN & CRUTCHER LLP

Attorneys for Non-Parties Gibson, Dunn & Crutcher LLP, Anne M.
Champion, Randy M. Mastro, Andrea E. Neuman, & William E.
Thomson

## Table of Contents

I. Introduction ................................................. 1

II. Findings of Fact ........................................... 4

a. The "Lay of the Land" ..................................... 4

b. The Trial Record & Initial Observations on Witness Credibility .................................................. 7

c. Counts IV, V, & VI: The RICO Judgment .................... 17

   1.  The RICO Judgment, the Retainer Agreements, & the Amazonia Shares ............................................ 17

   2.  Mr. Donziger's Stay Request, Judge Kaplan's April 25, 2014 Stay Order, & the Appeal of the RICO Judgment ....... 23

   3.  The Supplemental Money Judgment ...................... 29

   4.  Chevron's March 19, 2018 Contempt Application ........ 32

   5.  The May 8, 2018 Hearing .............................. 34

   6.  The Amazonia Shares & the 2011 Retainer .............. 37

   7.  The 2017 Retainer ................................... 44

   8.  The Agreement with David Zelman ...................... 51

d. Counts I, II, & III: Post-Judgment Discovery ............. 60

   1.  Chevron Seeks Post-Judgment Discovery ................ 60

   2.  Chevron Moves to Compel & Judge Kaplan's May 17, 2018 Order ...................................................... 66

   3.  Mr. Donziger's May 31, 2018 Motion & Judge Kaplan's June 1, 2018 Order ............................................. 70

   4.  Mr. Donziger's June 15, 2018 Motion & Judge Kaplan's June 25, 2018 Order ............................................. 72

   5.  Judge Kaplan's July 23, 2018 Order, Mr. Donziger's August 13, 2018 Stay Motion, & Judge Kaplan's September 25, 2018 Order ...................................................... 79

   6.  Judge Kaplan's October 18, 2018 Order & Mr. Donziger's Refusals to Comply ....................................... 86

   7.  The Protocol ........................................ 95

   8.  Contempt Findings & Coercive Fines ................. 104

9.   The Passport Order & Mr. Donziger's Emergency Motion for a Stay ................................................... 111

e. Mr. Donziger's Post-Judgment Appeals & the Court of Appeals' March 4, 2021 Opinion ...................................... 116

III.  Conclusions of Law & Additional Findings .............. 120

a. Mr. Donziger's "Structural" Issues ..................... 121

1.   Disinterested Special Prosecutors .................... 123

2.   Home Confinement ..................................... 130

3.   The Appointments Clause .............................. 131

4.   Various Discovery Requests ........................... 149

5.   Judge Kaplan's Alleged Animosity ..................... 153

6.   The "Uniqueness" of This Case ........................ 155

7.   The Court's Recusal .................................. 156

8.   Conclusion ........................................... 158

b. Collateral Bar Rule ................................... 159

1.   Legal Standards ...................................... 159

2.   Discussion ........................................... 162

A.   Application of the Collateral Bar Rule ............. 164

B.   The Protocol & the Passport Order .................. 170

3.   Conclusion ........................................... 180

c. The Criminal Contempt Charges ......................... 181

1.   Legal Standards ...................................... 181

2.   Issuance of Orders ................................... 184

A.   Counts IV & V ...................................... 185

B.   Count VI ........................................... 189

C.   Count I ............................................ 193

D.   Count II ........................................... 196

E.   Count III .......................................... 197

3.   Disobedience ......................................... 198

A.   Count IV ........................................... 198

B.   Count V ............................................ 200

C.   Count VI ......................................... 203

D.   Count I ........................................... 211

E.   Count II ......................................... 213

F.   Count III ........................................ 215

4.   Willfulness ....................................... 218

A.   Counts IV & V .................................... 219

B.   Count VI ......................................... 225

C.   Counts I & II .................................... 230

D.   Count III ........................................ 237

5.   Young & the Court's Discretion ...................... 238

IV. Conclusion ............................................ 240

LORETTA A. PRESKA, Senior United States District Judge:

## I.   **Introduction**

The events giving rise to this criminal contempt case mark the latest chapter in a sprawling legal saga--spanning multiple continents and over twenty-five years of fierce litigation-- between Defendant Steven Donziger and Chevron Corporation ("Chevron") regarding oil pollution in the Orienté region of the Ecuadorian Amazon.[1]  This case, however, is wholly unconcerned with the debate regarding any responsibility Chevron might bear for that pollution.[2]  Yet, this case is no less important to a

---

[1] The full story of Mr. Donziger's clash with Chevron has been recounted in painstaking detail elsewhere.  See generally Chevron Corp. v. Donziger, 974 F. Supp. 2d 362 (S.D.N.Y. 2014). That opinion is in evidence as Government Exhibit 1874 ("GX 1874").  When citing documents marked for identification as "Government Exhibits," the Court will use the abbreviation "GX." When citing documents marked for identification as "Defense Exhibits," the Court will use the abbreviation "DX."  Unless otherwise specified, all exhibits cited herein were admitted into evidence for their truth.

[2] See United States v. Terry, 17 F.3d 575, 576 (2d Cir. 1994) ("The actions leading to the criminal contempt conviction from which this appeal was taken lay grounded in the highly charged societal debate over abortion rights.  This appeal, however, is unconcerned with that debate.").  To be clear, this decision makes no determination regarding pollution in Ecuador, the cleanup of any such pollution, climate change, environmentalism, Mr. Donziger's long advocacy for clients seeking to raise environmental issues, the apparent high regard in which Mr. Donziger is held by various celebrities and other people who are strangers to these proceedings, and other issues that have been raised (largely by Mr. Donziger) outside the record and in various public fora outside the Court. Accordingly, any submissions addressing or based on those or any
(continued on following page)

society, like ours, that holds the rule of law among its
cardinal virtues.[3]  Indeed, at stake here is the fundamental
principle that a party to a legal action must abide by court
orders or risk criminal sanctions, no matter how fervently he
believes in the righteousness of his cause or how much he
detests his adversary.[4]

By order to show cause dated July 30, 2019 (the "Order to
Show Cause"), Judge Lewis A. Kaplan charged Mr. Donziger with
six counts of criminal contempt arising from Mr. Donziger's
refusal to comply with multiple court orders in Chevron Corp. v.
Donziger, No. 11-CV-691 (LAK) (S.D.N.Y).[5]  Contempt proceedings
involving attorneys invariably are difficult, and "[t]his case

---

(continued from previous page)
other topics beyond the narrow merits of this criminal contempt
case are irrelevant and thus played no part in the decision
reached herein.

[3] See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803)
("The government of the United States has been emphatically
termed a government of laws, and not of men."); see also
Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 646 (1952)
(Jackson, J., concurring) ("[W]e submit ourselves to rulers only
if under rules.").

[4] See, e.g., Walker v. City of Birmingham, 388 U.S. 307, 321
(1967) ("[R]espect for judicial process is a small price to pay
for the civilizing hand of the law, which alone can give abiding
meaning to constitutional freedom.").

[5] (See Order to Show Cause Why Defendant Steven Donziger
Should Not Be Held in Criminal Contempt ("Order to Show Cause"),
dated July 30, 2019 [dkt. no. 1 in 19-CR-561; dkt. no. 2276 in
11-CV-691].)  Unless otherwise specified, all docket number
citations herein refer to the docket in 19-CR-561.

is no exception."[6]  Following a five-day bench trial--and upon careful consideration of the trial record and arguments made in the post-trial briefing[7]--the Court makes the following findings of fact and conclusions of law.[8]

---

[6] United States v. Cutler, 840 F. Supp. 959, 961 (E.D.N.Y. 1994).

[7] (See Proposed Findings of Fact of the United States of America ("Sp. Pros. Br."), dated June 8, 2021 [dkt. no. 327]; Findings of Fact and Conclusions of Law as to Counts IV, V, and VI ("Def. IV/V/VI Br."), dated June 8, 2021 [dkt. no. 326]; Findings and Conclusions and Offer of Proof ("Def. I/II/III Br."), dated June 8, 2021 [dkt. no. 328].)

Mr. Donziger also filed a post-trial letter motion to dismiss on June 3, 2021.  (See Letter ("June 3 Letter MTD"), dated June 3, 2021 [dkt. no. 324]; see also Response, dated June 18, 2021 [dkt. no. 329]; Reply in Support of Motion to Dismiss ("June 25 Reply"), dated June 25, 2021 [dkt. no. 335].)

Mr. Donziger filed a second post-trial letter motion to dismiss on June 22, 2021.  (See Motion to Dismiss ("Appointments MTD"), dated June 22, 2021 [dkt. no. 330]; see also Letter Response, dated July 9, 2021 [dkt. no. 338]; Letter Reply to Response ("Appointments Reply"), dated July 19, 2021 [dkt. no. 343].)

[8] See Fed. R. Crim. P. 23(c).  At the outset, the Court notes that the proposed findings of fact filed by the Special Prosecutors, which are exceptionally detailed with generous citations to the trial record, have proven helpful in understanding the long and detailed history of the underlying civil proceedings before Judge Kaplan.  The Court stresses, however, that while it sometimes found those proposed findings illuminating, it did not adopt any proposed findings verbatim or wholesale.  The Supreme Court has criticized that practice when, unlike here, the trial judge assigns the preparation of such findings to a prevailing party.  See, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 572 (1985) (citing United States v. Marine Bancorporation, 418 U.S. 602, 615 n.13 (1974); United States v. El Paso Natural Gas Co., 376 U.S. 651, 656–57 (1964)).  Here, by contrast, the Court requested post-trial briefing from
(continued on following page)

## II. **Findings of Fact**

### a. **The "Lay of the Land"**

Although the facts surrounding the decades of underlying civil litigation between Mr. Donziger and Chevron have little (if any) significance to the legal questions before the Court in this case, the Court will nevertheless provide some high-level context to set the stage. Mr. Donziger was one of the lead plaintiffs' lawyers in a lawsuit originally filed in this District but tried in the Republic of Ecuador ("the Lago Agrio Case") alleging that Chevron's predecessor-in-interest, Texaco, Inc., had massively polluted the Amazonian rainforest through its oil operations.[9] In 2011, after years of litigation, Mr. Donziger won an $8.6 billion judgment (the "Ecuadorian Judgment") against Chevron on behalf of his Amazonian clients.[10] That success, however, was relatively short-lived.

In 2011, Chevron sued Mr. Donziger and others in the Southern District of New York, claiming that they had procured the Ecuadorian Judgment by fraud.[11] In 2014, after a lengthy

---

(continued from previous page)
both parties and adopted only those findings of fact supported by the evidence after an independent and comprehensive review of the trial record.

[9] (See GX 1874 at 1.)

[10] (See GX 1874 at 179.)

[11] (See GX 1874 at 298-99.)

bench trial, Judge Kaplan ruled in Chevron's favor.[12]  In doing

so, Judge Kaplan found that Mr. Donziger and his team had

engaged in a veritable smorgasbord of corrupt and fraudulent

acts in the Ecuadorian case, including, _inter alia_, submitting

false evidence, paying a consulting firm to "ghostwrite" a

purportedly independent expert's report, and bribing the judge

to rule in their clients' favor.[13]  Judge Kaplan's comprehensive

485-page opinion was affirmed in full by the Court of Appeals.[14]

Mr. Donziger has since been disbarred in New York State as a

result of his misconduct in the Ecuadorian proceedings.[15]

    In this case, Mr. Donziger faces six counts of criminal

contempt for disobeying multiple orders issued by Judge Kaplan.[16]

The criminal charges are premised on three of Judge Kaplan's

orders: (1) the March 4, 2014 judgment entered in Chevron's

favor (the "RICO Judgment");[17] (2) the March 5, 2019 Forensic

---

[12] (_See_ GX 1874 at 484-85.)

[13] (_See_ GX 1874 at 362-63.)

[14] _See_ _Chevron Corp. v. Donziger_, 833 F.3d 74 (2d Cir.
2016), _cert. denied_, 137 S. Ct. 2268 (2017).  That opinion is
also in evidence.  (_See_ GX 1914 at 3-129 (mandate from the Court
of Appeals, docketed at dkt. no. 1914 in 11-CV-691).)

[15] _See_ _Matter of Donziger_, 128 N.Y.S.3d 212 (1st Dep't
2020), _leave to appeal denied_, 168 N.E.3d 1152 (N.Y. 2021).

[16] (_See_ Order to Show Cause at 1-10 ¶¶ 1-21.)

[17] (_See_ GX. 1875 (dkt. no. 1875 in 11-CV-691).)

Inspection Protocol (the "Protocol");[18] and (3) the June 11, 2019 order related to Mr. Donziger's passport(s) (the "Passport Order").[19]

Also relevant to the charges are two agreements Mr. Donziger entered into related to his representation of the plaintiffs in the Lago Agrio case: (1) a January 5, 2011 retainer agreement (the "2011 Retainer");[20] and (2) a November 1, 2017 retainer agreement (the "2017 Retainer").[21] The 2011 Retainer was among four parties: (1) the individual plaintiffs in the matter <u>Maria Aguinda y Otros v. Chevron Corporation</u> (the "LAPs"), (2) El Frente de Defensa de la Amazonia ("ADF"), (3) Asamblea de Adectados por Texaco ("ADAPT") and (4) Donziger & Associates, PLLC.[22] The 2017 Retainer was between Mr. Donziger personally (<u>i.e.</u>, not his law firm) and ADF.[23]

The Order to Show Cause charges Mr. Donziger as follows:

<u>Count I</u>. For the period of March 8, 2019 to May 28, 2019, Mr. Donziger willfully violated paragraph four of the Protocol, which directed him to provide, by March 8, 2019, a sworn list of all his electronic

---

[18] (<u>See</u> GX. 2172 (dkt. no. 2172 in 11-CV-691).)

[19] (<u>See</u> GX 2232 (dkt. no. 2232 in 11-CV-691).)

[20] (<u>See</u> GX 1978-6 (2011 retainer filed to the public docket as dkt. no. 1978-6 in 11-CV-691).)

[21] (<u>See</u> GX 120 (copy of the 2017 Retainer attached to email correspondence from Randy M. Mastro to Steven Donziger).)

[22] (<u>See</u> GX 1978-6 at 1.)

[23] (<u>See</u> GX 120 at DONZIGER_107415.)

devices, communication and messaging accounts, and document management services accounts that he had used since March 4, 2012.

Count II.  For the period of March 18, 2019 to at least May 28, 2019, Mr. Donziger willfully violated paragraph five of the Protocol, which directed him to surrender, on March 18, 2019 at 12:00 p.m., to a neutral forensic expert all of his "Devices" and "Media" for imaging.

Count III.  Mr. Donziger willfully violated the Passport Order, which directed him to surrender, to the Clerk of Court by June 12, 2019 at 4:00 p.m., every passport issued to him.

Count IV.  For the period of March 4, 2014 to September 3, 2018, Mr. Donziger willfully violated paragraph one of the RICO Judgment by refusing to assign to Chevron his contractual rights to a contingent fee under the 2011 Retainer.

Count V.  For the period November 1, 2017 to May 27, 2019, Mr. Donziger willfully violated paragraph one of the RICO Judgment by refusing to assign to Chevron his contractual rights under the 2017 Retainer.

Count VI.  On December 23, 2016, Mr. Donziger willfully violated paragraph five of the RICO Judgment by assigning and pledging a portion of his own personal interest in the Ecuadorian Judgment in exchange for personal services.[24]

Below, the Court catalogues and groups the relevant facts and court orders with respect to: (1) Counts IV, V, and VI; and (2) Counts I, II and III.

b. **The Trial Record & Initial Observations on Witness Credibility**

Before diving into the charges, a discussion of the record evidence is necessary.  At trial, the Court received more than

---

[24] (See Order to Show Cause at 1-10 ¶¶ 1-21.)

160 exhibits and heard testimony from seven witnesses: (1) Anne
Champion, a partner in the law firm Gibson, Dunn & Crutcher LLP
("GDC");[25] (2) Sonia Berah, a certified Spanish-English
translator;[26] (3) Courtney Decasseres, Finance Manager in the
Clerk's Office of the Southern District of New York (the
"Clerk's Office");[27] (4) David Ng, Supervisor of Records
Management in the Clerk's Office;[28] (5) David Zelman, an
executive coach;[29] (6) William Thomson, another GDC partner;[30] and
(7) Ondrej Krehel, the court-appointed Neutral Forensic Expert
in 11-CV-691.[31]  Mr. Donziger elected not to testify in his own
defense, and he waived his right to do so in open court.[32]  The
Court draws no adverse inference against Mr. Donziger for
exercising his constitutional right.[33]  That does not, however,

---

[25] (See Trial Transcript ("Trial Tr."), dated May 10-13, 17,
2021 [dkt. nos. 311, 313, 315, 317, 319] at 71:21-188:14, 200:6-
279:13, 291:22-373:21, 383:6-485:22, 488:10-553:5.)

[26] (See Trial Tr. at 283:3-291:14.)

[27] (See Trial Tr. at 554:11-560:15.)

[28] (See Trial Tr. at 561:9-569:2.)

[29] (See Trial Tr. at 569:13-591:24, 598:20-626:2.)

[30] (See Trial Tr. at 626:10-786:18.)

[31] (See Trial Tr. at 788:15-831:1).

[32] (See Trial Tr. at 847:12-848:12.)

[33] See, e.g., Mitchell v. United States, 526 U.S. 314, 327-
28 (1999).

constrain the Court from noting that after the Special
Prosecutors spent four days presenting their case in which they
called seven witnesses, Mr. Donziger elected (as was his
constitutional right) to rest without calling a single witness.[34]

"It is the job of the factfinder in a judicial proceeding
to evaluate, and decide whether or not to credit, any given item
of evidence.  Whether, and to what extent, testimony that has
been admitted is to be credited are questions squarely within
the province of the factfinder."[35]  In this bench trial, that
responsibility falls to the Court.  "Like any other factfinder
who assesses witness credibility," the Court "is free to believe
all, some, or none of a witness's testimony."[36]  That is true
even if the Court "identifies falsity in part of a witness's
testimony."[37]  The Court bears this in mind when evaluating the
credibility of each of the witnesses.[38]

---

[34] (See Trial Tr. at 849:23-850:2 ("MR. KUBY: Unless I'm
misunderstanding -- unless I'm misunderstanding trial
proceedings, which I may well be doing, because it's been a
while since I've had a trial -- ooh, that rhymes -- the defense
rests.  THE COURT: Thank you, sir.").)

[35] United States v. Norman, 776 F.3d 67, 77 (2d Cir. 2015).

[36] Norman, 776 F.3d at 78.

[37] Hyman v. Brown, 927 F.3d 639, 661 (2d Cir. 2019).

[38] When making credibility determinations, the Court is
mindful of the following instruction commonly given to juries:

(continued on following page)

After carefully scrutinizing their testimony, the Court finds Ms. Berah, Mr. Decasseres, and Mr. Ng to be credible witnesses.  Ms. Berah's testimony was based on her education as well as her extensive experience as a federally certified English/Spanish interpreter, and she testified clearly regarding several documents that had been translated from Spanish to English.[39]  Similarly, Mr. Decasseres's testimony was informed by his more than twenty years of service in the Clerk's Office, and he delivered that testimony confidently and with no hesitation. Likewise, although the Court observed that Mr. Ng was at times a

_____

(continued from previous page)

> In making your assessment of that witness you should carefully scrutinize all of the testimony given by that witness, the circumstances under which each witness has testified, and all of the other evidence which tends to show whether a witness, in your opinion, is worthy of belief.  Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand. Consider the witness's ability to observe the matters as to which he or she has testified and consider whether he or she impresses you as having an accurate memory or recollection of these matters.  Consider also any relation a witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

1A KEVIN F. O'MALLEY, JAY E. GRENIG, & HON. WILLIAM C. LEE, FEDERAL JURY PRACTICE & INSTRUCTIONS § 15:01 (6th ed. 2021).

[39] While the Court notes that Ms. Berah was paid for her work in connection with her testimony, that fact standing alone does not alter the Court's conclusion regarding her credibility. (See Trial Tr. at 289:13-291:11.)

bit nervous,[40] his testimony showed obvious expertise and attention to detail.  Based on its observations, the Court identified no reason to doubt the veracity of Ms. Berah's, Mr. Decasseres's, or Mr. Ng's testimony.

The Court finds Mr. Krehel's testimony largely to be credible as well.  His expertise in digital forensics was patent, and his demeanor was self-assured, especially on direct examination.  Mr. Krehel provided a coherent and concise account of the actions he took pursuant to the Protocol--most notably his traveling to Mr. Donziger's apartment and his communications with Mr. Donziger as well as Chevron's counsel--and his testimony was consistent with contemporaneous documents. Although Mr. Krehel did not always deliver responsive or direct answers to counsel's questions on cross-examination, in the Court's view that unresponsiveness was driven primarily by confusion regarding what was being asked rather than by any attempt to be evasive.  Rather, Mr. Krehel was genuine in trying to communicate his understanding of his role, even though that did not always come through straightforwardly on the stand.

As for Mr. Zelman, the Court finds much of his testimony to be credible.  His demeanor was sincere and forthcoming

---

[40] Based on its observations of Mr. Ng, the Court finds that those nerves--which were present on both Mr. Ng's direct and cross examinations--were not related to the truthfulness of his testimony.

throughout his time on the stand, during both direct and cross-examination.  However, Mr. Zelman, understandably, struggled to recall numerous things that he had said, written, or done,[41] and he often relied heavily on what the documents that were put in front of him said.[42]  Many of those documents themselves are in evidence, and the Court can evaluate their thrust independently as well as alongside Mr. Zelman's testimony.  Also, the Court takes note of the fact that Mr. Zelman is a friend and admirer

---

[41] (See, e.g., Trial Tr. at 606:11-13 ("You began providing your services to Mr. Donziger prior to execution of your December 2016 agreement, correct?  A. I actually am not certain of that."); id. at 607:17-21 ("Q. Do you remember meeting with Mr. Donziger on November 1st, Mr. Zelman?  A. I don't have specific recollection, no, when we met.  But does the document suggest I did?  I'm asking a question because I really don't."); id. at 611:4-7 ("Q. Mr. Zelman, do you remember forwarding a litigation financing presentation to an individual named David Wallenstein, W-A-L-L-E-N-S-T-E-I-N?  A. I do not -- what kind of document?"); id. at 613:19-24 ("Q. Me too.  Mr. Zelman, isn't true that you at times would encourage Mr. Donziger to move away from a personal narrative and more towards a more professional one?  A. I actually don't remember the specifics of those conversations but that would be the kind of thing I might offer.").)

[42] (See, e.g., Trial Tr. at 608:19-25 ("Q. I'm not asking you when you did it, Mr. Zelman.  I am asking you if you in fact sent it before you met with Mr. Donziger on November 1st?  A. I am not trying to be difficult.  It's just that I do not have recollection.  So, if there's documentation that suggests I did, I did.  And otherwise, I really just don't know the answer to the question."); id. at 612:3-6 ("Q. Did you ever exchange emails with that individual?  A. Larry? Yes, of course, on a daily basis.  About this or about the Conscious capitalism, if you have such a document I probably did, yeah."); id. at 616:25-617:3 ("Q. Does this document make you say ah-ha.  I remember, Mr. Zelman?  A. I remember this is consistent with something that I would have said.  My memory, I don't know.").)

12

of Mr. Donziger's--which Mr. Zelman forthrightly admitted on the stand[43]--when evaluating his testimony.

That leaves only Ms. Champion and Mr. Thomson.  Mr. Donziger's counsel extensively cross-examined each of them regarding his or her potential bias against Mr. Donziger as well as his or her possible financial interests in the outcome of this case.[44]  Both Ms. Champion and Mr. Thomson were counsel for Chevron in the contentious underlying civil litigation between Chevron and Mr. Donziger.  Chevron is a major client of GDC, GDC represents Chevron on dozens of matters, and GDC has billed Chevron for millions of dollars in fees since April 15, 2019.[45] Ms. Champion, Mr. Thomson, and other GDC lawyers accompanying

---

[43] (See Trial Tr. at 624:20-625:6 ("Q. Since 2019 have you maintained a relationship with the defendant, Steven Donziger? A. Yes. . . . Q. Following your testimony yesterday when you left the courtroom, isn't it true that you hugged Mr. Donziger? A. I might have."); id. at 625:12-16 ("Q. Mr. Zelman, why did you hug, Mr. Donziger?  A. Thank you for this question.  Q. You're welcome.  A. I respect him.  I admire him.  We have a relationship I value quite dearly.").)

[44] (See Trial Tr. at 459:11-472:8 (cross-examination of Ms. Champion regarding, inter alia, her meetings with the Special Prosecutors and related topics); id. at 714:5-723:3 (cross-examination of Mr. Thomson regarding, inter alia, his meetings with the Special Prosecutors and related topics).)

[45] Reed Brodsky, counsel for Ms. Champion and Mr. Thomson, represented as much on the record at trial.  (See Trial Tr. at 5:3-7.)  In addition, to further evaluate the possible financial bias of the GDC witnesses, the Court received under seal and considered GDC's total billings to Chevron between April 2019 and the start of trial in this matter.

them spent significant amounts of time with the Special

Prosecutors preparing for trial, and GDC did not bill Chevron

for that time.[46]  Finally, Mr. Thomson testified that Chevron

paid for his first-class airfare to travel to New York to meet

with the Special Prosecutors,[47] although the trial record was

later corrected, without objection from Mr. Donziger's counsel,

to clarify that GDC (not Chevron) paid for Mr. Thomson's

travel.[48]  Additionally, the Court observed Ms. Champion's and

---

[46] (See DX I-51 (cataloguing those meetings); see also Trial Tr. at 459:14-472:7 (Ms. Champion); id. at 714:15-723:3 (Mr. Thomson).)  For context, the Court also notes that trial in this matter was adjourned at least six times.  (See Transcript of Telephone Conference, dated May 18, 2020 [dkt. no. 87] at 5:14-18; Order, dated Sept. 4, 2020 [dkt. no. 168] at 4-5; Order ("9/16/20 Order"), dated Sept. 16, 2020 [dkt. no. 172] at 4-5; Order, dated Oct. 28, 2020 [dkt. no. 196] at 11; Order, dated Nov. 7, 2020 [dkt. no. 209] at 1; Order, dated Jan. 10, 2021 [dkt. no. 242] at 4.)

[47] (See Trial Tr. at 721:24-722:11 ("Q. How many times have you flown in to prepare for your efficient, truthful, and accurate testimony?  A. This is the second time I've flown here. Q. Who paid for that?  A. Chevron pays for that.  Q. Chevron paid for your flights here; correct?  A. Correct.  Q. To meet with the private prosecutor?  A. Correct.  Q. Is your flight coach?  A. No.  Q. Business class?  A. First class.").)

[48] The following exchange at trial is illustrative:

     [MR. KUBY:] So this is what I would propose: I think by now this Court either understands that Chevron has used GDC as a buffer, insulating it from its efforts to pursue Mr. Donziger criminally, or this Court [sic] not understand that.  This Court either finds as relevant or this Court does not.

     I don't think Mr. Brodsky's submission and the Mowen affidavit will have any effect on the Court's decision; and I see no useful purpose in dragging
(continued on following page)

Mr. Thomson's demeanors shift between direct and cross examination. Although both were confident and direct in their direct testimony, they were far less forthcoming on cross. These facts are not lost on the Court, and the Court takes seriously its obligation to scrutinize the GDC witnesses' testimony and demeanor in light of their potential biases and motivations.[49]

With that said, three more observations about Ms. Champion's and Mr. Thomson's testimony are worth mentioning. First, a large portion of Ms. Champion's testimony involved reading verbatim from various documents that the Court received

---

(continued from previous page)

    either Ms. Mowen up from Dallas or poor Mr. Thomson back from L.A., burning more fossil fuels, for absolutely no purpose.

    So I would be prepared to stipulate for the record that when Mr. Thomson answered the series of questions as to who was paying for his flights, the answer is Gibson Dunn Crutcher, not Chevron. And that way Mr. Thomson's incorrect testimony doesn't linger on the record to haunt him in his career and the record is clear.

    MS. GLAVIN: Fine with the special prosecutors, your Honor.

    THE COURT: Very well, sir.

(Trial Tr. at 846:3-21.)

[49] Cf. United States v. Vaughn, 430 F.3d 518, 523 (2d Cir. 2005) ("The better course would have been for the trial judge to more specifically caution the jury to scrutinize the testimony of the cooperating witness with an eye to his motivation for testifying and what he stood to gain by testifying.").

in evidence.[50]  Of course, the Court is perfectly capable of
reading those documents for itself.  Second, another significant
chunk of each's testimony consisted of facts that can easily be
corroborated by looking to the other documentary evidence,
including docket sheets, court filings, letters, and the like.
When evaluating Ms. Champion's and Mr. Thomson's testimony, the
Court repeatedly tested their accounts against the other
evidence admitted at trial.  And third, Ms. Champion and Mr.
Thomson were both testifying pursuant to a subpoena.[51]  Even
though those subpoenas did not require Ms. Champion or Mr.
Thomson to meet with the Special Prosecutors before trial, there
is nothing inherently wrongful about preparing outside of court
to give testimony on the stand.  On balance, the Court found Ms.
Champion and Mr. Thompson to be credible witnesses.

    All in all, even though the Court heard five days' worth of
testimony--principally from the two GDC witnesses--the Court
often found the documentary evidence to be the most probative.

_____

    [50] (See, e.g., Trial Tr. at 95:11-96:9; id. at 132:12-136:2;
id. at 154:20-155:25; id. at 201:9-205:5; id. at 265:12-21; id.
at 266:20-268:13; id. at 268:24-269:6.)

    [51] (See Trial Tr. at 466:14-16 ("Q. OK. Well, you say you're
here under subpoena.  And that's accurate. Is that correct?  A.
Yes."); id. at 718:8-12 ("Q. Was it time devoted to pursuing the
client's interests?  A. It was time devoted to preparing to
respond to a subpoena that was served on me.  Q. And that
subpoena was served by the private prosecutor?  A. Yes, by the
special prosecutors.").)

Nevertheless, the Court will, as necessary, discuss witness credibility as it relates to specific testimony and factual findings.

### c. **Counts IV, V, & VI: The RICO Judgment**

On March 4, 2014, Judge Kaplan issued a 485-page opinion (the "RICO Opinion") and entered the RICO Judgment against Mr. Donziger (and others) in the underlying civil action.[52]  Counts IV, V, and VI relate to the RICO Judgment.

#### 1. **The RICO Judgment, the Retainer Agreements, & the Amazonia Shares**

Three paragraphs of the RICO Judgment are of particular importance to this case: Paragraphs One, Three, and Five. Before reciting what those paragraphs say, it is necessary first to catalogue some definitions the RICO Judgment uses.  The following definitions are relevant to the operative provisions of the RICO Judgment:

---

[52] (See GX 1874 (dkt. no. 1874 in 11-CV-691); GX 1875.)  In addition to his status as a party in the underlying civil case, Mr. Donziger also filed a notice of appearance on May 13, 2013. (See GX 1147 at 1 (dkt. no. 1147 in 11-CV-691).)  When an attorney files a notice of appearance, that attorney receives automatic notifications from the ECF system regarding anything that is posted to the docket.  (See Trial Tr. at 80:22-81:2.) The docket sheet in 11-CV-691, which is in evidence, establishes that Mr. Donziger has made numerous pro se filings in that action.  (See GX 1 (docket sheet for 11-CV-691).)

- "Amazonia" meant "Amazonia Recovery Limited, an entity registered in Gibraltar, together with its successors and assigns."[53]

- "Chevron" was defined as "Chevron Corporation and its subsidiaries and affiliates."[54]

- "Donziger" was defined as "the Donziger Defendants, and each of them, unless the text hereof otherwise provides."[55]

- The "Judgment" referred to "the judgment entered in the Lago Agrio Case on February 14, 2011 as modified by subsequent proceedings."[56]

- "Lago Agrio Case" meant "Lawsuit No. 2003-0002, entitled Maria Aguinda y Otros v. Chevron Corporation, in the Sucumbíos Provincial Court of Justice of the Republic of Ecuador and all appeals with respect to any judgment, order or decree entered therein."[57]

- "New Judgment" was defined as "any judgment or order that hereafter may be rendered in the Lago Agrio Case by any court in Ecuador in or by reason of the Lago Agrio Case, or any judgment or order issued by any other court that has recognized or enforced the Judgment or any such subsequent judgment."[58]

- The "Retainer Agreement" referred to the 2011 Retainer.[59]

---

[53] (GX 1875 at 3 ¶ 7.2.)

[54] (GX 1875 at 3 ¶ 7.4.)

[55] (GX 1875 at 3 ¶ 7.5.)  The Donziger Defendants included Mr. Donziger personally as well as The Law Offices of Steven R. Donziger and Donziger & Associates, PLLC.  (See id. at 1.)

[56] (GX 1875 at 4 ¶ 7.6.)

[57] (GX 1875 at 4 ¶ 7.7.)

[58] (GX 1875 at 4 ¶ 7.8.)

[59] (GX 1875 at 4 ¶ 7.9.)

18

The RICO Judgment uses those defined terms throughout.

Paragraph One of the RICO Judgment provides as follows:

The Court hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the Judgment or the enforcement of the Judgment anywhere in the world including, without limitation, all rights to any contingent fee under the Retainer Agreement and all stock in Amazonia. Donziger shall transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain.[60]

Notably, as its text plainly shows, Paragraph One places the responsibility for compliance on Mr. Donziger; it does not instruct Chevron to do anything.

Paragraph Three of the RICO Judgment commands that:

Donziger shall execute in favor of Chevron a stock power transferring all of his right, title and interest in his shares of Amazonia, and Donziger and the LAP Representatives, and each of them, shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment.[61]

Like Paragraph One, Paragraph Three placed the onus of compliance on Mr. Donziger, not Chevron.

Lastly, Paragraph Five orders that:

Donziger and the LAP Representatives, and each of them, is hereby further enjoined and restrained from undertaking any acts to monetize or profit from the

---

[60] (GX 1875 at 1-2 ¶ 1 (emphasis added).)

[61] (GX 1875 at 2 ¶ 3.)

> Judgment, as modified or amended, or any New Judgment,
> including without limitation by selling, assigning,
> pledging, transferring or encumbering any interest
> therein.[62]

Like the others, Paragraph Five was directed only at Mr.
Donziger.

Each of those Paragraphs was directed at ensuring that Mr.
Donziger could and would not benefit from the Ecuadorian
Judgment.[63]  The RICO Judgment operated as a "final judgment with
respect to all claims between and among Chevron, Donziger, and
the LAP Representatives," and Judge Kaplan retained jurisdiction
over the parties and the case "for purposes of enforcing and
resolving any disputes concerning" the RICO Judgment.[64]

Three property interests are particularly relevant to the
aforementioned Paragraphs: (1) a 6.3% contingent fee interest
under the 2011 Retainer (the "2011 Contingent Fee"); (2) a 6.3%
contingent fee interest under the 2017 Retainer (the "2017
Contingent Fee"); and (3) Mr. Donziger's shares in Amazonia
Recovery Limited ("Amazonia").  In the RICO Opinion, Judge

---

[62] (GX 1875 at 3 ¶ 5 (emphasis added).)

[63] (See GX 1874 at 485 ("The decision in the Lago Agrio case
was obtained by corrupt means.  The defendants here may not be
allowed to benefit from that in any way.  The order entered
today will prevent them from doing so.").)

[64] (GX 1875 at 5 ¶ 10.)  Judge Kaplan also ordered that
"Chevron shall recover of Donziger and the LAP Representatives,
and each of them, jointly and severally, the costs of this
action."  (Id. at 4 ¶ 9.)  More on that shortly.

Kaplan explained that both the 2011 Contingent Fee and the
Amazonia shares were "property" subject to Paragraph One's
constructive trust.[65]

In terms of a contingent fee, the 2011 Retainer provided as
follows:

> As compensation for its services hereunder, the Firm
> shall be entitled to an Active Lawyer Percentage of
> thirty one and one-half percent (31.5%) of the Total
> Contingency Fee Payment. The "Total Contingency Fee
> Payment" means an amount equal to twenty percent (20%)
> of all Plaintiff Collection Monies. "Plaintiff
> Collection Monies" means any amounts paid, whether in
> lump sum or installments, whether from Chevron
> Corporation (a/k/a Texaco; ChevronTexaco; Chevron),
> any other party listed as a defendant in respect of
> the Litigation (including, without limitation, his or
> its respective affiliates and successors in interest),
> or any other party added or joined to the Litigation
> from time to time as a defendant or indemnitor or
> against whom proceedings are asserted or threatened.
> Funds are considered "paid" when the monies are
> disbursed to the Plaintiffs or are available to be so
> disbursed.[66]

---

[65] (See GX 1874 at 477 ("[Donziger's] right to a contingent
fee and the fee itself are property subject to execution and
attachment and certainly to the imposition of a constructive
trust. . . .  Moreover, Donziger owns, directly or through a
nominee, shares of a Gibraltar company, Amazonia, through which
the property collected on the Judgment is to be funneled.  Those
shares too are subject to a constructive trust, as whatever
value they now or hereafter may have is a direct function of the
fraud perpetrated by Donziger." (footnotes omitted)).)

[66] (GX 1978-6 ¶ 3(a) (emphasis added).)

Put simply, Mr. Donziger's firm was entitled to collect 6.3% of any monies recovered by the LAPs.[67]  The 2011 Retainer also indicated that Mr. Donziger's law firm was to be paid, among other things, a monthly retainer.[68]

The 2017 Retainer, which unlike the 2011 Retainer was between only Mr. Donziger personally and the ADF, also granted Mr. Donziger a contingent fee interest.  As to that interest, the 2017 Retainer provided the following:

> In consideration of Mr. DONZIGER's leadership, investment, professional and collection services, as set forth above, both in the past and in the future, the FDA hereby acknowledges, confirms, and undertakes to support Mr. DONZIGER's existing contractual **INTEREST** or, alternatively, to the extent it is necessary or useful, hereby grants Mr. DONZIGER an **INTEREST** in his own right equal to Mr. DONZIGER's existing contractual **INTEREST**.  Such INTEREST, in any case, shall be understood to entitle Mr. DONZIGER to **6.3%** of any **FUNDS RECOVERED**, which are defined as any funds recovered in connection with the *AGUINDA* [i.e., Ecuadorian] CASE or the *AGUINDA* JUDGMENT, whether by court order or private out-of-court settlement, in Canada or in any other country . . . .[69]

As part of the 2017 Retainer, ADF "irrevocably acknowledge[d], confirm[ed] and undert[ook] to support Mr. DONZIGER's existing contractual INTEREST," and it also "hereby grant[ed] Mr.

---

[67] The Court arrived at the 6.3% figure by multiplying Mr. Donziger's 31.5% interest by the 20% of the total recovery against which that interest operates.

[68] (See GX 1978-6 ¶ 3(b).)

[69] (GX 120 at DONZIGER_107417.)

DONZIGER an INTEREST <u>in his own right</u> equal to his existing contractual INTEREST."[70]

As for Amazonia, Mr. Donziger testified in the underlying civil litigation that he was an Amazonia shareholder because of his contingency fee interests in the Ecuadorian Judgment.[71]  Mr. Donziger also confirmed that Amazonia's structure "was designed to reflect the contingency fee equity in the lawsuit" and that his number of shares was "the equivalent of what the contingency fee interest was before" Amazonia's creation.[72]

> 2. **Mr. Donziger's Stay Request, Judge Kaplan's April 25, 2014 Stay Order, & the Appeal of the RICO Judgment**

On March 18, 2014, Mr. Donziger filed an emergency motion before Judge Kaplan seeking (1) a stay of the RICO Judgment pending appeal, or (2) in the alternative, a temporary administrative stay.[73]  Mr. Donziger argued, among other things, that the RICO Judgment's command that he transfer forthwith and

---

[70] (GX 120 at DONZIGER_107415 (emphasis added).)

[71] (<u>See</u> Trial Tr. at 95:11-19 ("'Q. Mr. Donziger, I want to ask you a few questions about Amazonia Recovery Limited.  That's a Gibraltar company; correct, sir?  'A. Yes.  'Q. And you're a shareholder in that company; correct?  'A. That's correct.' . . .  'Q. That's because of your contingency fee interest; correct?  'A. Yes.'" (quoting from trial transcript in 11-CV-691, which was marked for identification as GX 200 but was ultimately not moved into evidence)).)

[72] (Trial Tr. 95:23-24, 96:8-9 (quoting from trial transcript in 11-CV-691).)

[73] (<u>See</u> GX 1888 (dkt. no 1888 in 11-CV-691).)

assign all of his property rights and interests traceable to the
Ecuadorian Judgment would cause him irreparable harm.[74]
Specifically, in a sworn declaration in support of his motion,
Mr. Donziger asserted that:

> I presently have no personal source of earned income
> other than income attributable to my work arising out
> of the Lago Agrio litigation.  If I am forced to turn
> over my shares in Amazonia and relinquish any interest
> I have in the Lago Agrio litigation, my law practice--
> my only means of earning a livelihood--will be
> effectively destroyed.  Even if I prevail on appeal, I
> will not be able to undo the damage to my practice
> suffered in the interim.[75]

Mr. Donziger, through his counsel, requested an expeditious
ruling so that he could, if necessary, move for a stay in the
Court of Appeals under Federal Rule of Appellate Procedure
8(a)(2).[76]

On April 25, 2014, Judge Kaplan issued an order (the "Stay
Order"), granting in part and denying in part Mr. Donziger's
motion for a stay pending appeal.[77]  In so ordering, Judge Kaplan
modified Paragraph Three of the RICO Judgment, "solely pending

---

[74] (See GX 1888 at 15-20.)

[75] (GX 1899 ¶¶ 2-3 (dkt. no. 1899 in 11-CV-691.)

[76] (See GX 1888 at 1-2.)

[77] (See GX 1901 (dkt. no. 1901 in 11-CV-691).)  During
cross-examination of the GDC witnesses at trial, Mr. Donziger's
counsel referred to the Stay Order as the "Interpretation
Order."  (See, e.g., Trial Tr. 510:15-17, 730:2-4.)

the determination of the appeal in this case," to read as

follows:

> Donziger shall execute in favor of the Clerk of this
> Court a stock power transferring to the Clerk all of
> his right, title and interest in his shares of
> Amazonia.  The Clerk shall hold the Amazonia shares
> thus transferred, and all proceeds thereof, pending
> the determination of the appeal in this case, for the
> benefit of Donziger and Chevron, as their interests
> then may appear.  Upon request by Donziger, given on
> notice to Chevron at least ten days in advance of the
> date for the proposed vote, the Clerk shall vote, or
> direct the owner of record thereof such to vote, such
> shares as directed by Donziger unless otherwise
> ordered by the Court. Donziger and the LAP
> Representatives, and each of them, shall execute such
> other and further documents as Chevron reasonably may
> request or as the Court hereafter may order to
> effectuate the foregoing provisions of this Judgment.[78]

Judge Kaplan offered the following explanation for his decision

to temporarily modify Paragraph Three:

> Allowing the shares to remain in Donziger's hands
> pending appeal would enable him to benefit from his
> fraud prior to any collections by selling the shares
> and by hiding or dissipating the sale proceeds.
> Taking the shares out of his hands now would prevent
> such a result and cause no injury to Donziger that
> could not be undone.[79]

---

[78] (GX 1901 at 32.)

[79] (GX 1901 at 15.)

Judge Kaplan denied Mr. Donziger's motion "in all other respects."[80]  Mr. Donziger did not appeal from Judge Kaplan's April 25, 2014 Stay Order.[81]

The RICO Judgment was not stayed during the pendency of Mr. Donziger's appeal.[82]  Yet, after receiving the Stay Order, Mr. Donziger still did not transfer his Amazonia shares to the Clerk of the Court--or assign to Chevron the 2011 Contingent Fee--despite Chevron's August 7, 2014 request that he do so.[83]  In an August 21, 2014 letter to Chevron's counsel, Mr. Donziger did not mince words:

---

[80]  (GX 1901 at 32.)

[81]  (See GX 1 (observing no notice of appeal related to the Stay Order).)

[82]  (See Trial Tr. 108:20-24 ("Q. Now, Ms. Champion, other than what Judge Kaplan had ordered in this April 25, 2024 [sic] decision, was there any stay of that March 4, 2014 RICO judgment while Mr. Donziger's appeal was pending in the Second Circuit? A. No.").)

[83]  (See GX 100 at DONZIGER_107402-03 (Aug. 7, 2014 Letter from Randy M. Mastro to Steven Donziger and his counsel) ("I write on behalf of Chevron Corporation to request long overdue compliance with the Court's final judgment against Steven Donziger and his law firms . . . in the above-captioned matter. . . . Donziger, of course, should have also already complied with the other aspects of the Court's judgment, including the transfer to Chevron of any of Donziger's property that is traceable to the Ecuadorian judgment.  Please tell us when Donziger will comply with the judgment in full, which should in no event be later than August 21.")  Chevron's counsel even emailed a form stock power to Mr. Donziger and his counsel On August 8, 2014.  (See GX 101 at DONZIGER_107405, 107407 (Aug. 8, 2014 email from Jefferson Bell to Richard Friedman with "CC" to Zoe Littlepage and Steven Donziger with attachment)).)

> To be clear, I have not and will not sell or otherwise
> transfer any of my shares in Amazonia, consistent with
> the district court's judgment, unless and until that
> judgment is modified by the district court or reversed
> or stayed by the U.S. Court of Appeals for the Second
> Circuit.[84]

Mr. Donziger further explained that he had not transferred the Amazonia shares because "[t]he onus was [ ] on Chevron to propose and request the form of the stock power and any other transactional documents deemed necessary to ensure compliance," which Chevron did not do.[85]

Mr. Donziger thereafter offered another reason why he was refusing to transfer the shares:

> My clients have informed me, via the Directors of
> Amazonia, that if any transfer of stock is effectuated
> by me to any entity, those shares will be divested
> immediately under the bylaws of the entity that holds
> the shares. As you know, my clients do not recognize
> Judge Kaplan's assertion of jurisdiction in this
> matter. The upshot is that a simple transfer to the
> clerk's office of my Amazonia shares would in practice
> mean the complete divestiture--and potentially
> irretrievable loss--of more than two decades of labor
> on the part of me and some of my colleagues, before
> the Second Circuit even has a chance to decide our
> appeal from Judge Kaplan's judgment.[86]

Instead, Mr. Donziger proposed that the parties "enter into a stipulation . . . during the pendency of the appeal regarding

---

[84] (GX 1986-1 at 1 (August 21, 2014 Letter from Steven Donziger to Randy M. Mastro, filed as dkt. no. 1986-1 in 11-CV-691) (emphasis added).)

[85] (GX 1986-1 at 1.)

[86] (GX 1986-1 at 2 (emphasis added).)

the disposition of the ARL shares or the proceeds from such shares should I ever receive any."[87]  Mr. Donziger sent a proposed stipulation to that effect to Chevron's counsel,[88] which Chevron refused.[89]  Even so, Mr. Donziger still did not transfer his Amazonia shares to the Clerk of the Court during the pendency of his appeal.[90]  During that same period, Mr. Donziger also did not assign to Chevron the 2011 Contingent Fee.[91]

---

[87] (GX 1986-1 at 2.)

[88] (See GX 102 at DONZIGER_107408, 107411-12 (Aug. 22, 2014 email from Steven Donziger to Randy M. Mastro along with attachment).)

[89] (See Trial Tr. 692:16-18, 693:2-3 ("Q. And did Mr. Donziger provide a stipulation, a proposed stipulation of this letter?  A. He did. . . .  Q. Did Chevron agree to that stipulation?  A. No.").)

[90] Mr. Decasseres testified that the Clerk's Office keeps detailed records cataloguing noncash collateral, which would include items such as a stock power.  (See Trial Tr. at 557:17-24 ("Q. And where would the stock filing be kept in the Clerk's Office?  A. It would be kept in the finance office in the safe.  Q. OK.  How would you determine whether the Clerk's Office received a stock filing?  A. We keep meticulous records on that. We have effectively a ledger that maintains all items that are in the vault, which is audited twice a year.").)  Mr. Decasseres completed a search of the relevant records and confirmed that the Clerk's Office did not receive a stock power or any transfer of the Amazonia shares, from Mr. Donziger or anyone else, between 2014 and 2017.  (See id. 559:14-560:9.)

[91] (See GX 2085-1 at 1-2 (dkt. no. 2085-1 in 11-CV-691) (only executing such a transfer as of September 4, 2018).)

On August 8, 2016, the Court of Appeals affirmed the RICO Opinion and the RICO Judgment in their entirety.[92]  The Court of Appeals observed that Judge Kaplan had "made extensive factual findings as to the acts undertaken by Donziger to procure the Lago Agrio Judgment" and that "[n]one of them [wa]s disputed."[93]  On November 3, 2016, the Court of Appeals issued its mandate.[94]  Mr. Donziger subsequently petitioned for a writ of certiorari, which the Supreme Court denied on June 19, 2017.[95]

### 3. **The Supplemental Money Judgment**

That same day, Chevron, through its counsel, filed a letter requesting that Judge Kaplan "reactivate [its] motion for attorneys' fees and bill of costs," which Judge Kaplan had deferred pending Mr. Donziger's appeal.[96]  In that letter, Chevron also requested that Judge Kaplan order Mr. Donziger to comply with the Paragraph Three of the RICO Judgment, which required Mr. Donziger to execute a stock power in favor of

---

[92] See Donziger, 833 F.3d at 151 ("We have considered all of the arguments of Donziger and the LAP Representatives on this appeal and have found in them no basis for dismissal or reversal.  The judgment of the district court is affirmed.").

[93] Donziger, 833 F.3d at 86.

[94] (See GX 1914 at 1.)

[95] See Donziger v. Chevron Corp., 137 S. Ct. 2268 (2017).

[96] (GX 1922 at 1 (dkt. no. 1922 in 11-CV-691).)

Chevron for the Amazonia shares.[97]  Chevron asserted that
"[t]here [wa]s no justification for Donziger's continued
violations" and asked that Judge Kaplan "order Donziger to
comply forthwith, or else face sanctions."[98]  Mr. Donziger did
not respond to that letter.[99]

On July 17, 2017, Judge Kaplan entered an order (1)
reactivating Chevron's motion for attorney's fees and (2)
directing the Clerk of the Court to tax costs.[100]  Judge Kaplan
also denied without prejudice Chevron's request to order Mr.
Donziger to comply with the RICO Judgment, reasoning that "this
aspect of [Chevron's] application may not be made by letter
motion."[101]  Judge Kaplan left open the possibility that Chevron
could pursue such relief by formal motion.[102]  Following that

---

[97] (See GX 1922 at 1.)  During the pendency of his appeal,
Judge Kaplan ordered Mr. Donziger to execute a stock power in
favor of the Clerk of the Court, but, as discussed above, he
never did so.  (See GX 1901 at 32; Trial Tr. 559:14-560:9.)

[98] (GX 1922 at 1.)

[99] (See Trial Tr. at 112:7-9 ("Q. And did Mr. Donziger file
a response with the Court to this June 19, 2017 letter to Mr.
Mastro?  A. No."); see also GX 1 (observing that the docket
sheet shows no such response was filed).)

[100] (See GX 1923 at 2 (dkt. no. 1923 in 11-CV-691).)

[101] (GX 1923 at 2.)

[102] (See GX 1923 at 2.)

order, Mr. Donziger still did not transfer to Chevron his

Amazonia shares or the 2011 Contingent Fee.[103]

On February 28, 2018, following motion practice, Judge

Kaplan entered a supplemental judgment against Mr. Donziger and

others in the amount of $813,602.71 for attorney's fees and

costs (the "Money Judgment").[104]  In an opinion accompanying the

Money Judgment, Judge Kaplan observed that Mr. Donziger

"arguably [wa]s in contempt of the final judgment of permanent

injunction."[105]  Mr. Donziger noticed an appeal from the Money

Judgment on March 28, 2018,[106] which the Court of Appeals

assigned docket number 18-855.[107]

---

[103] (See Trial Tr. at 113:21-25 ("Now, Ms. Champion, after
Judge Kaplan issued this order on July 17 of 2017, in the year
of 2017 did Mr. Donziger execute a stock power transfer to
Chevron for his interest in the Amazonia shares?  A. If he did
we did not receive it."); id. at 114:1-12 ("With respect to Mr.
Donziger's right to a contingent fee and the 2011 retainer
agreement, during the year 2014, did Mr. Donziger execute a
transfer or assignment to Chevron of his interests in that
contingent fee?  A. No.  Q. Did he do it in 2015?  A. No.  Q.
Did he do it in 2016?  A. No.  Q. Did he do it in 2017?  A.
No.").)

[104] (See GX 1962 (dkt. no. 1962 in 11-CV-691).)

[105] (See GX 1963 at 17 (dkt. no. 1963 in 11-CV-691).)

[106] (See GX 1972 (dkt. no. 1972 in 11-CV-691).)

[107] (See GX 7 (docket in Chevron Corp. v. Donziger, 18-855
(2d Cir.)); see also Trial Tr. at 632:23-633:11 ("Moving into
evidence Government Exhibit 7, which is a certified copy of the
docket sheet for Second Circuit Appeal 18-855. . . .  Q. Have
you had an opportunity, Mr. Thomson, before today to review that
docket sheet?  A. Yes, I have.  Q. Okay. And for which of the
(continued on following page)

31

#### 4. **Chevron's March 19, 2018 Contempt Application**

On March 19, 2018, Chevron moved <u>ex parte</u> (1) to hold Mr.
Donziger in contempt for failing to transfer his shares in
Amazonia as ordered in Paragraph Three of the RICO Judgment; (2)
to hold Mr. Donziger in contempt for actively conspiring to
monetize and profit from the RICO Judgment; (3) for leave to
conduct post-judgment discovery regarding the enforcement of the
RICO Judgment; and (4) for a document preservation order.[108]  The
latter two requests marked the start of the post-judgment
discovery proceedings, which underlie Counts I, II, and III.
For ease of reference, the Court will discuss those facts in a
separate section below.  The ensuing discussion in this section
will focus on Mr. Donziger's (non)compliance with Paragraphs
One, Three, and Five of the RICO Judgment.[109]

---

(continued from previous page)
three appeals you mentioned, the docket sheet for -- which is
Government Exhibit 7, is for which of those three appeals?  A.
That's for the cost award appeal, the supplemental judgment.").)

[108] (<u>See</u> GX 1966 at 11-18 (dkt. no. 1966 in 11-CV-691).)

[109] The Court, of course, recognizes that the Order to Show
Cause does not charge Mr. Donziger with criminal contempt
regarding his refusal to comply with Paragraph Three of the RICO
Judgment.  (<u>See generally</u> Order to Show Cause.)  However, the
Court also finds that, for much of the relevant period, Judge
Kaplan and the parties grouped and discussed the Amazonia shares
together with the 2011 Contingent Fee.  That is unsurprising
given Mr. Donziger's explanation that Amazonia's structure "was
designed to reflect the contingency fee equity in the lawsuit"
and that his number of shares was commensurate with his
contingency fee interest.  (Trial Tr. 95:23-24, 96:8-9 (quoting
<span style="float:right">(continued on following page)</span>

On March 19, 2018, the same day Chevron made its ex parte application, Judge Kaplan issued an order to show cause, which provided two important directives.[110]  First, Judge Kaplan ordered Chevron to serve the order to show cause and "all papers submitted in support thereof" on Mr. Donziger no later than March 20, 2018 at 5:00 p.m.[111]  And second, Judge Kaplan directed Mr. Donziger to show cause why he should not be held in contempt for failing to comply with the RICO Judgment.[112]  Judge Kaplan gave Mr. Donziger until April 20 to do so.[113]

On April 24, 2018, Mr. Donziger filed a pro se opposition to Chevron's contempt application.[114]  Mr. Donziger maintained that it was his understanding that Amazonia either no longer existed or was "entirely owned by Chevron after Chevron forced it into receivership."[115]  Mr. Donziger also appended to his opposition his August 21, 2014 letter to Chevron, which stated

---

(continued from previous page)
from trial transcript in 11-CV-691).)  Therefore, at least some discussion of the history surrounding the Amazonia shares is relevant to Counts IV and V.

[110] (See GX 1968 (dkt. no. 1968 in 11-cv-691).)

[111] (GX 1968 at 2.)

[112] (See GX 1968 at 3.)

[113] (See GX 1968 at 3.)

[114] (See GX 1986 (dkt. no. 1986 in 11-CV-691).)

[115] (GX 1986 at 1.)

that (1) Mr. Donziger would not sell or transfer his Amazonia shares and (2) Chevron had abdicated its responsibilities under the RICO Judgment of proffering the necessary documents to effectuate the transaction.[116]  As for his alleged efforts to monetize the RICO Judgment, Mr. Donziger asserted that (1) the Stay Order was "effectively the applicable order of the Court" and (2) the Stay Order specifically allowed Mr. Donziger to raise funds for case expenses and his own fees.[117]

### 5. **The May 8, 2018 Hearing**

On May 8, 2018, Judge Kaplan held a hearing regarding Chevron's contempt application and its related request for discovery.[118]  At the hearing, Mr. Donziger offered the following explanation regarding his efforts to raise funds for enforcement actions related to the Ecuadorian Judgment:

> I am allowed, if I sell the shares of my clients, to get paid for my work on this case. . . .  I'm selling, as an intermediary, the points or the aspects of the judgment that are held by my clients.  I am not selling my own shares, because that is obviously prohibited by your Honor's RICO judgment.[119]

---

[116] (See GX 1986-1 at 1.)

[117] (GX 1986 at 5.)

[118] (See GX 2010 (dkt. no. 2010 in 11-CV-691).)

[119] (GX 2010 at 18:2-3, 18:23-19:1 (emphasis added).)

Mr. Donziger repeatedly represented to Judge Kaplan that he had only been selling his clients' interests in the Ecuadorian Judgment, not his own.[120]

Regarding his failure to transfer the Amazonia shares, Mr. Donziger did not deny that he had not executed a stock power. Mr. Donziger attempted to argue that Chevron had not actively sought the transfer of the shares, but Judge Kaplan observed that, even if that were true, it did not relieve Mr. Donziger of his responsibility to execute the stock power.[121]  Mr. Donziger then made his thoughts on the issue very clear:

---

[120] (See GX 2010 at 21:5-7 ("What evidence have they presented to show I have sold a single piece of my interest? Zero.  And it hasn't happened.  I'll make that representation right now."); id. at 26:3-4 ("I'm not selling my shares; I'm selling my clients' shares."); id. at 31:5-7 ("How do we know he hasn't sold his shares?  Well, I'm a lawyer and I'm representing to you as an officer of the court right now I have not sold my shares."); id. at 31:13-14 ("[A]gain, I'm not selling my shares, I'm selling their shares."); id. at 32:18-23 ("But if there's anything that might be arguably legit about what they're seeking, it's something related to the narrow issue of am I selling my own shares.  And if you're not going to accept my representation, I can prove to you that I have not sold my own shares, and that's what it should be limited to.").)

[121] The following exchange between Judge Kaplan and Mr. Donziger is particularly salient:

MR. DONZIGER:  But I don't think we should play possum here.  I think you should ask the Chevron lawyers do they own my shares, because I don't, as far as I know, have a document that has shares on it.  However, I will be more than happy to do whatever the Court instructs, because I think this is a completely ridiculous issue.

(continued on following page)

35

But I will say this:  It doesn't matter, because they own it.  OK.  This is a fake issue.  And if they want me to sign my shares over, which they already have because this could be a public relations exercise for them, I'm happy to do it.  I am not going to sit here and be held in contempt over something that's completely meaningless, when I'm here today ready to do that.

So tell me what you want me to do.  He says he has something for me to sign.  Well, why hasn't he presented that to me?  Where is it?  I'm sitting here. He sent me an email this morning looking for

---

(continued from previous page)

THE COURT:  I instructed in 2014.  We are all waiting.

MR. DONZIGER:  Why didn't they pursue it for four years?

THE COURT:  I asked that question.  That's neither here nor there.

MR. DONZGIER:  Just so you know --

THE COURT:  You're a lawyer who says he complies with court orders.  There is a court order outstanding since 2014 that compels you to deliver an executed stock power.  I am told it has never happened.  You have not denied that.

MR. DONZIGER:  Well, that's not the end of the story, sir, OK.  In 2014 – this was the problem in 2014.  I sent them a letter saying I would be more than happy to negotiate something that would work for both of us.

THE COURT:  I read the letter, Mr. Donziger.

MR. DONZGIER:  OK.  They never responded.

THE COURT:  So what?

MR. DONZIGER:  I acted in good faith.

THE COURT:  So what?

MR. DONZIGER:  So why are they here now four years later?  Because we're winning in Canada?

THE COURT:  They won.  They got a judgment.  You made them an offer.  They blew it off.  Not the first time in legal history, not the last.

(GX 2010 at 28:1-29:5.)

36

discovery.  Why is he playing possum with me?  To make
me look foolish?  Just give me the document you want
me to sign.

Do you have it sir, I mean come on.[122]

Judge Kaplan declined to direct Mr. Donziger to sign any share

transfer paperwork on the spot, instead indicating that he would

rule on Chevron's contempt motion in due course.[123]

### 6. **The Amazonia Shares & the 2011 Retainer**

Following the May 8 hearing, Chevron presented Mr. Donziger

with two forms via email: (1) a general assignment form

transferring all of his property interests traceable to the

Ecuadorian Judgment, and (2) a specific form to transfer his

Amazonia shares.[124]  Mr. Donziger did not execute the general

assignment form.[125]  Mr. Donziger did sign Chevron's proposed

---

[122] (GX 2010 at 29:13-30:1.)

[123] (See GX 2010 at 36:16-22 ("MR. MASTRO:  Your honor, we
do have a share transfer form and assignment ready to present to
Mr. Donziger right now.  THE COURT:  Well, you can give it to
him.  I'm not going to insist that he sign it.  He is a free
actor.  Your motion is outstanding.  I imagine I'll rule on it
soon.  And you can let me know, both of you, whether it's in
that regard moot.").

[124] (See GX 114 at DONZIGER_104209-17 (May 9, 2018 email
from Anne Champion to Steven Donziger with attachments).)

[125] (See GX 2003 at 2 (dkt. no. 2003 in 11-CV-691)
("Following his statements in this regard at the contempt
hearing, Chevron provided Donziger with a general assignment for
any interest he has in the Judgment, however held . . . .
Donziger refused to execute the general assignment."); see also
id. at 13 (Ex. B.) ("Please don't send me documents late at
night to sign that implicate critical rights of my clients and
(continued on following page)

transfer form for the Amazonia shares, but he attached an additional "Addendum of Understandings."[126]  That addendum made four statements: (1) the share transfer was being executed "upon the specific threat of imposition of 'contempt of court' sanctions;" (2) Chevron had previously represented to Mr. Donziger that Amazonia had been placed into liquidation; (3) the transfer was being executed in violation of Amazonia's Articles of Association, which provided that any transfer "in violation of these Articles shall be null and void;" and (4) Mr. Donziger continued to assert that Amazonia, as an entity, was null and void.[127]

By letter dated May 10, 2018, Chevron informed Judge Kaplan of Mr. Donziger's conduct and sought contempt sanctions as well as discovery regarding Mr. Donziger's noncompliance.[128]  Chevron suggested that Mr. Donziger's attaching the "Addendum of Understandings" "effectively nullifie[d] the transfer of his

_____

(continued from previous page)
were not part of your original contempt motion. You should have raised these issues in a timely fashion when these matters were being briefed well prior to the hearing."); Trial Tr. at 139:21-23 ("Q. So he didn't execute the transfer and assignment form for all of his property interest traceable to the judgment?  A. No.")

[126] (See GX 2003-3 at 1-2 (dkt. no. 2003-3 in 11-CV-691).)

[127] (GX 2003-3 at 1.)

[128] (See GX 2003 at 2-3.)

shares in Amazonia."[129]  Chevron also maintained that Mr.
Donziger had "fail[ed] to specify in what form he holds his
contingency interest in the Ecuadorian judgment."[130]

On May 16, 2018, Judge Kaplan issued an order finding Mr.
Donziger previously to have been in civil contempt for failing
to transfer the Amazonia shares, but Judge Kaplan found that
civil contempt sanctions were inappropriate because Mr. Donziger
did execute a stock power on May 9, 2018, albeit an insufficient
one.[131]  Although Judge Kaplan noted that the "obvious purpose"
of Mr. Donziger's "Addendum of Understandings" was to negate the
transfer of the Amazonia shares, Judge Kaplan nevertheless
observed that the RICO Judgment required only the execution of a
stock power agreement without "prescrib[ing] a particular
form."[132]  Judge Kaplan cautioned, however, that Chevron could
seek an unqualified transfer of the Amazonia shares, with the
possibility of contempt if Mr. Donziger refused to execute such
a transfer.[133]

Importantly, Judge Kaplan also noted in his May 16, 2018
order that, in its most recent letter, Chevron had raised a new

---

[129] (GX 2003 at 1.)

[130] (GX 2003 at 2.)

[131] (See GX 2006 at 9, 13 (dkt. no. 2006 in 11-CV-691).)

[132] (GX 2006 at 12-13.)

[133] (See GX 2006 at 13.)

possible basis for Mr. Donziger's contempt:  Mr. Donziger's
failure to convey to Chevron the 2011 Contingent Fee, in alleged
violation of Paragraph One of the RICO Judgment.[134]  Judge Kaplan
noted that Chevron had not asserted any contempt claim based on
Paragraph One in its moving papers and declined to address such
a claim "unless and until Chevron files an appropriate
motion."[135]  Following the issuance of the May 16, 2018 order,
Mr. Donziger still did not assign to Chevron the 2011 Contingent
Fee.[136]

On June 25, 2018, at a deposition of Mr. Donziger as part
of the post-judgment discovery proceedings, Chevron presented
Mr. Donziger with a transfer form regarding the assignment of,
among other things, the 2011 Contingent Fee.[137]  Mr. Donziger did
not execute the transfer at his deposition.[138]  A few days later,

---

[134] (See GX 2006 at 14-15.)

[135] (GX 2006 at 15.)

[136] (See Trial Tr. at 150:20-151:2 ("And after Judge Kaplan
issued that opinion, that May 16th opinion, did Mr. Donziger
execute an assignment to Chevron of his right to the contingent
fee as granted in the 2011 retainer agreement?  A. Not
immediately, no.  Q. And in the next four or five weeks after
that opinion, did he execute an assignment of his contingent fee
interest?  A. No.").)

[137] (See GX 201 at 229:21-231:12 (transcript of June 25,
2018 deposition of Steven Donziger).)

[138] (See GX 201 at 231:15-20 ("This is a whole other thing I
need to look at, consider, and think about, so no, I'm not
willing to execute this document today, and if you are asking me
to execute it, I need some time and I will get back to you.").)

Chevron moved to compel Mr. Donziger to execute two documents:
(1) an unqualified transfer of his Amazonia shares and (2) a
general transfer and assignment of any and all of his interests
in the Ecuadorian Judgment, including the 2011 Contingent Fee.[139]
Mr. Donziger opposed the motion.[140]

On August 15, 2018, Judge Kaplan ordered Mr. Donziger,
among other things, to execute and acknowledge before a notary
public--and deliver to Chevron's counsel by August 21, 2018--a
transfer and assignment form assigning to Chevron the 2011
Contingent Fee.[141]  In so ordering, Judge Kaplan expressly
highlighted the RICO Opinion's holding, which Mr. Donziger did
not contest on appeal, that any "right to a contingent fee and
the fee itself are property," which was "subject to execution
and attachment" and "immediately assignable."[142]  That
"particular set of contract rights," Judge Kaplan found, "ha[d]
been subject since March 4, 2014 to Donziger's express
obligation to transfer and assign them forthwith to Chevron, an
obligation which he ha[d] disregarded for over four years."[143]

---

[139] (See GX 2047 at 3-4 (dkt. no. 2047 in 11-CV-691).)

[140] (See GX 2054 (dkt. no. 2054 in 11-CV-691).)

[141] (See GX 2072 at 9 (dkt. no. 2072 in 11-CV-691).)

[142] (GX 2072 at 7.)

[143] (GX 2072 at 8.)

41

Judge Kaplan appended the form to be completed as Exhibit 1 to the August 15, 2018 Order.[144]

On August 20, 2018, Mr. Donziger sought an extension of time to comply with Judge Kaplan's August 15 Order.[145]  Mr. Donziger stated that (1) he was "out of the country through Labor Day, with no way to access a U.S.-qualified notary" and (2) he was "not sure that a foreign notary would meet the Court's requirements."[146]  Mr. Donziger also indicated that he was "seeking adequate counsel on the issue of transferring [his] contingency interest" because his clients forbid him to make the transfer on penalty of possible termination.[147]

On August 21, 2018, Judge Kaplan granted in part and denied in part Mr. Donziger's extension request.[148]  Specifically, Judge Kaplan ordered Mr. Donziger to do the following:

> Donziger shall execute two sets of originals of the required forms on or before August 22, 2018.  He shall send one set, which need not have notarized acknowledgments, to Chevron's lead counsel no later than August 22, 2018 by overnight courier.  In order to facilitate obtaining notarized acknowledgments at a U.S. Embassy or consulate, the Court will extend his time within which to do that and to deliver fully

---

[144] (See GX 2072 at 11-13.)  Judge Kaplan had modified Chevron's proposed transfer form to focus solely on the 2011 Contingent Fee.  (See id.)

[145] (See GX 2075 at 1 (dkt. no. 2075 in 11-CV-691).)

[146] (See GX 2075 at 1.)

[147] (See GX 2075 at 1.)

[148] (See GX 2079 (dkt. no. 2079 in 11-CV-691).)

executed documents to Chevron.  Donziger shall
acknowledge his signatures on the two documents
constituting the second set of originals before a
consular official at a U.S. Embassy or consulate no
later than August 28, 2018.  No later than August 29,
2018, he shall place that fully executed,
acknowledged, and notarized set of originals in the
hands of an overnight courier for the speediest
available delivery to Chevron's lead counsel.[149]

Mr. Donziger did not comply with the express terms of that

directive.

On August 22, 2018, Mr. Donziger did send Chevron, via

email rather than overnight courier, an executed but unnotarized

assignment of the 2011 Contingent Fee.[150]  Mr. Donziger completed

clean transfer forms, but he also sent Chevron a letter setting

forth his "First Amendment-protected view" that he was only

completing the transfer forms under duress and threat of

contempt.[151]  He also stated that, although Judge Kaplan ordered

him to send the notarized forms by August 29, 2018, those

documents as well as all "originals" would "be provided as soon

as practicable, but no later than September 4, 2018."[152]  Mr.

Donziger ultimately provided Chevron with the executed and

---

[149] (GX 2079 at 5-6.)

[150] (See GX 123 at DONZIGER_106018-19 (Aug. 22, 2018 email
from Steven Donziger to Randy M. Mastro).)

[151] (See GX 123 at DONZIGER_106020-21.)

[152] (GX 123 at DONZIGER_106021.)

notarized assignment of the 2011 Contingent Fee on September 4, 2018.[153]

### 7. **The 2017 Retainer**

Backtracking slightly, at Mr. Donziger's June 25, 2018 deposition, new facts came to light:  Mr. Donziger admitted, for the first time, that he had entered into the 2017 Retainer.[154] Mr. Donziger produced the 2017 Retainer shortly thereafter.[155] Mr. Donziger indicated that it was his understanding that the 2017 Retainer superseded the 2011 Retainer.[156]  The 2017 Retainer also granted Mr. Donziger a 6.3% contingent fee interest in the

---

[153] (See GX 2085-1 at 1-2.)  In their post-trial briefing, the Special Prosecutors also reference additional facts regarding Mr. Donziger's continued refusal to transfer his shares in Amazonia after he assigned the 2011 Contingent Fee. (See Sp. Pros. Br. ¶¶ 45-51.)  The Court admitted evidence regarding that additional history at trial and will take it into account in considering, inter alia, Mr. Donziger's willfulness in failing to comply with Judge Kaplan's orders, particularly as to Counts IV and V.

[154] (See GX 201 at 28:22-29:5 ("Are you familiar with this document, Mr. Donziger, your retainer agreement from January 5th of 2011?  A. Yes.  Q. Is this agreement still operative?  A. I think there has been a subsequent agreement."); id. at 57:10-16 ("Q. Other than Exhibit 558, which is the January 2011 retainer agreement, have you signed any other agreements that give you a percentage interest in the judgment?  A. Look, I already testified to that.  There is a subsequent agreement.").)

[155] (See GX 201 at 28:19-29:20; see also GX 121 (June 29, 2018 email from Steven Donziger to Randy M. Mastro) ("My best memory is that the agreement I gave you after court is the retainer agreement I was referring to in the deposition.").)

[156] (See GX 201 at 29:17-20 ("Q. Has Exhibit 558 been terminated?  A. I think it's been superseded by the subsequent agreement."); see also Trial Tr. 201:9-23.)

Ecuadorian Judgment.[157]  Unlike the 2011 Retainer, the 2017

Retainer was between only Mr. Donziger and ADF.[158]

The 2017 Retainer was originally executed in Spanish.[159]

After receiving the document from Mr. Donziger, Chevron's

counsel provided Mr. Donziger with a certified translation of

the 2017 Retainer,[160] the validity of which he did not contest.[161]

Ms. Berah, a certified English/Spanish interpreter, testified

that the English-language version of the 2017 Retainer was, save

for a few minor changes, a true and accurate translation of the

Spanish-language version produced by Mr. Donziger.[162]

Following this revelation, Chevron filed a letter with

Judge Kaplan on July 5, 2018, asserting that additional briefing

was necessary to address the implications of the 2017 Retainer

---

[157] (See GX 120 at DONZIGER_107417; see also GX 201 at 59:12-22 ("Q. Does the agreement that you signed with the FDA in the last couple of years, the retainer agreement, give you a percentage interest in the judgment, the Ecuadorian judgment? A. Yes.  Q. What is that percentage interest in the FDA retainer?  A. It's the same percentage interest that I have always had, to the best of my knowledge, 6.3 percent.").)

[158] (See GX 120 at DONZIGER_107415.)

[159] (See GX 120 at DONZIGER_107420-23.)

[160] (See GX 120 at DONXIGER_107419.)

[161] (See Trial Tr. 210:16-18 ("Did he ever contest the English translation of that 2017 retainer agreement which is in Government Exhibit 120?  A. No, not to us, in any event.").)

[162] (See Trial Tr. at 283:4-287:10.)  Those changes did not substantively alter the agreement.  Accordingly, the Court considers the English-language version of the 2017 Retainer.

vis-à-vis the RICO Judgment.[163]  Mr. Donziger responded to that

letter, offering the following explanation:

> Nor is there anything relevant or problematic about
> the content of the most recent retainer agreement.  It
> does seek to maintain the status quo on my client's
> obligations to me following an organizational
> adjustment involving the FDA and the UDAPT where the
> groups decided to not work together.  The terms
> reflect the existing uncertainty about the exact
> operation and significance of this Court's Judgment in
> light of an ongoing litigation effort that has
> encompassed four jurisdictions outside the United
> States.  Holding the status quo seeks to prevent
> forfeiture (dissipation) of my interest entirely--a
> result that Chevron itself should be wary of, given
> that it claims ownership of my interest through this
> Court's judgment.[164]

Both Chevron and Mr. Donziger submitted supplemental briefing on

the issue.[165]  Chevron averred that Mr. Donziger's entering the

2017 Retainer warranted contempt sanctions because, "[b]y re-

committing to Donziger's enforcement efforts, and granting him a

new, valuable interest in the Ecuadorean judgment separate from

his contingent fee, the 2017 retainer agreement facilitates

Donziger's avoiding the effect of the constructive trust."[166]

Mr. Donziger countered that (1) "[t]he 6.3% contingency interest

reflected in the Nov. 2017 retainer agreement [wa]s not a 'new'

---

[163] (See GX 2050 at 1-2 (dkt. no. 2050 in 11-CV-691).)

[164] (GX 2051 at 1-2 (dkt. no. 2051 in 11-CV-691).)

[165] (See GX 2057 (dkt. no. 2057 in 11-CV-691); GX 2061 (dkt. no. 2061 in 11-CV-691).)

[166] (GX 2057 at 7 (quotation marks omitted).)

interest" distinct from the 2011 Contingent Fee and (2) "[t]he
Nov. 2017 retainer d[id] not 'circumvent the constructive
trust'" whose "precise operation and effect . . . [wa]s still
uncertain."[167]

On August 7, 2018, Judge Kaplan made two observations: (1)
Chevron's brief "raised a new and independent ground for holding
Donziger in contempt," i.e., Mr. Donziger's receipt of and
failure to assign to Chevron the 2017 Contingent Fee; and (2)
Mr. Donziger's response, which was unsworn and unaccompanied by
a declaration or affidavit, "[wa]s shot through with factual
assertions and thus contain[ed] evidentiary material."[168]  As for
Chevron, Judge Kaplan refused to consider the new contempt
allegation because Chevron had not apprised Mr. Donziger of it
in a notice of motion or order to show cause.[169]  Judge Kaplan
did note, however, that Chevron was free to file a separate
motion "charging contempt of paragraph 1" of the RICO
Judgment.[170]  Regarding Mr. Donziger, Judge Kaplan instructed
that any factual assertions he wished to make should be
supported by affidavit or declaration.[171]  Following that order,

---

[167] (GX 2061 at 3-4.)

[168] (GX 2064 at 2 (dkt. no 2064 in 11-CV-691.)

[169] (See GX 2064 at 2.)

[170] (GX 2064 at 2.)

[171] (See GX 2064 at 2.)

47

Mr. Donziger did not assign to Chevron the 2017 Contingent

Fee.[172]

On October 1, 2018, Chevron moved to hold Mr. Donziger in

contempt for, among other things, violating Paragraph One of the

RICO Judgment by failing to transfer the 2017 Contingent Fee.[173]

As part of its motion package, Chevron provided Mr. Donziger

with a transfer and assignment form for the 2017 Contingent

Fee.[174]  In response to Chevron's motion, Mr. Donziger stated in

a declaration that:

> The contingency interest stated in the updated power-
> of-attorney signed by FDA leadership in November 2017
> was not intended to grant a new interest, but to
> recognize my existing interest in any Aguinda
> recovery.  The Court has now coerced me into signing
> what I understand to be the entirety of my contingency
> interest over to Chevron.  I am not taking the
> position that the November 2017 contract is protected
> or separable from the Court's other orders with
> respect to my contingency interest.  If Chevron feels
> like it needs some additional documentation with
> respect to the November 2017 power, it should just ask
> me rather than rush to file for contempt.[175]

---

[172] (See Trial Tr. at 217:14-18 ("Now, after Judge Kaplan
filed this August 7, 2018 order, did Mr. Donziger assign to
Chevron his contingency interest as granted in the 2017 FDA
retainer agreement at that time?  A. No.").)

[173] (See GX 2089 at 2 (dkt. no. 2089 in 11-CV-691); GX 2113
at 24 (dkt. no. 2113 in 11-CV-691).)

[174] (See GX 2114-9 (dkt. no. 2214-9 in 11-CV-691); see also
Trial Tr. at 219:17-25.)

[175] (Trial Tr. at 220:12-23 (quoting GX 2122-1 ¶ 21); see
also id. at 220:24-221:1 ("Is that what Mr. Donziger stated with
respect to the November agreement?  A. Yes.").)

Mr. Donziger did not execute the requested transfer.[176]

On February 21, 2019, Judge Kaplan issued an order requiring Mr. Donziger to assign the 2017 Contingent Fee by no later than February 28.[177]  Failing that, Judge Kaplan directed each party to "file a letter . . . explaining why no such instrument ha[d] been filed."[178]  In no uncertain terms, Judge Kaplan stated:

> It was and remains Donziger's obligation to comply
> with paragraph 1 of the RICO Judgment, which of course
> requires him to assign to Chevron all of his right,
> title and interest to any contingent fee under the ADF
> agreement.  After all, the [2017 Retainer] by its
> terms granted him an "interest" equal to 6.3 percent
> of monies of which, if any are collected, the ADF
> claims to be the exclusive beneficiary.[179]

No such assignment was completed by February 28.[180]

In a March 1, 2019 letter filed by Mr. Donziger, he asserted that "yet another forced assignment of my contingency interested [sic] is unwarranted and in fact not possible."[181]  Mr. Donziger took the position that the 2017 Retainer did not

---

[176] (See Trial Tr. at 221:2-4 ("Q. Did Mr. Donziger assign his contingency interest in the 2017 retainer agreement to Chevron at that time?  A. No.").)

[177] (See GX 2165 at 3 (dkt. no. 2165 in 11-CV-691).)

[178] (GX 2165 at 3.)

[179] (GX 2165 at 2.)

[180] (See GX 1 (showing no docket entry indicating such a filing was made); see also Trial Tr. at 224:10-13.)

[181] (GX 2169 at 1 (dkt. no. 2169 in 11-CV-691).)

grant a new interest--or, in fact, "any legal interest that [he] was capable of assigning"--and he averred that "[t]here [wa]s no need for an additional assignment" because he had previously "executed two such assignments under protest based on coercive orders of this court."[182]

On May 23, 2019, in a lengthy memorandum opinion (the "Contempt Order"), Judge Kaplan adjudged Mr. Donziger to be in "willful civil contempt of paragraph 1 of the RICO Judgment by virtue of his failure to assign and transfer to Chevron all rights to any contingent fee that he now has or hereafter may obtain including without limitation all such rights under the 2017 Retainer."[183]  Judge Kaplan explained that Mr. Donziger had violated the RICO Judgment because (1) "paragraph 1 of the RICO Judgment [wa]s clear and unambiguous," (2) "it [wa]s undisputed that Donziger ha[d] not complied with his obligation to assign his rights under the 2017 Retainer," and (3) "Donziger ha[d] made no attempt to comply with paragraph 1 of the RICO Judgment in this respect."[184]  Until Mr. Donziger assigned the 2017 Contingent Fee, Judge Kaplan imposed a series of escalating coercive fines--payable to the Clerk of the Court--beginning at

---

[182] (GX 2169 at 1-2.)

[183] (GX 2209 at 69 (dkt. no. 2209 in 11-CV-691).)

[184] (GX 2209 at 36-37.)

$2,000 on May 28, 2019 and doubling "for each subsequent day during which Donziger fail[ed] fully to purge" the contempt.[185]

On May 28, 2019--the day that coercive fines were due to begin accruing--Mr. Donziger indicated to Chevron's counsel that he was "executing the assignment" and would "have it available for pickup by the end of the day."[186]  Mr. Donziger executed the required assignment form that same day and provided it to Chevron.[187]

### 8. **The Agreement with David Zelman**

Backtracking once more, beginning in October 2016--after the Court of Appeals had issued its decision affirming RICO Judgment but before it issued the mandate--Mr. Donziger began corresponding with Dallas-based executive coach David Zelman.[188] Mr. Zelman offers a signature program called the "Transitions Process," which consists of four sessions held about one month

---

[185] (GX 2209 at 69.)

[186] (GX 136 at DONZIGER_101695 (May 28, 2019 email from Steven Donziger to Andrea Neuman).)

[187] (See GX 2216-1 (dkt. no. 2216-1 in 11-CV-691); see also Trial Tr. at 230:10-19 ("Showing you what is Government Exhibit 2216-1 . . . . Q. What is this document?  A. This is an executed transfer form for the 2017 retainer agreement contingency fee. Q. What is the date that Mr. Donziger signed the form?  A. May 28th, 2019.").)

[188] (See GX 103 at DONZIGER_013461 (email correspondence between Steven Donziger and David Zelman).)

apart.[189]  Each session includes approximately four hours of
dialogue between Mr. Zelman and the client.[190]  Mr. Zelman
typically offers the Transitions Process for $15,000, although
he was sometimes willing to accept a different fee structure
(such as a contingent fee).[191]

Mr. Zelman and Mr. Donziger came to such an alternative
arrangement for Mr. Donziger to participate in Transitions
Process.[192]  On December 21, 2016, Mr. Donziger proposed the
following language to Mr. Zelman regarding their agreement to
ensure that it was acceptable:

I write to confirm our agreement regarding consulting
services you are providing to me to develop my
professional capacities with regard to the Ecuado[r]

---

[189] (See Trial Tr. at 569:17-570:11.)

[190] (See Trial Tr. at 570:6-11.)

[191] (See Trial Tr. at 571:8-20.)

[192] In addition to the coaching services for himself, Mr.
Donziger was also interested in obtaining executive coaching for
his wife.  (See GX 105 at DONZIGER_013098 ("Any chance I can
fold another person (thinking my wife) into the same deal?").)
Mr. Zelman agreed, and, on March 2, 2017, proposed language to
Mr. Donziger that would pledge to Mr. Zelman an additional
interest in the Ecuadorian Judgment from any fees that Mr.
Donziger might collect.  (See GX 109 at DONZIGER_013100 (Mar. 2,
2017 email from David Zelman to Steven Donziger).)  That
correspondence indicated that Mr. Zelman would provide Mr.
Donziger's wife, Laura Miller, with $11,000 of consulting
services in exchange for a 11/250 of an eighth of a point on any
amount recovered.  (See id.)  Mr. Zelman and Mr. Donziger
ultimately reached a different compensation arrangement for
those services, however, whereby Mr. Zelman accepted $2,000 in
cash and Ms. Miller's services in helping Mr. Zelman to develop
a TED Talk.  (See Trial Tr. at 579:15-25.)

litigation matter against Chevron, and other endeavors.

In exchange for you providing me with $14,000 worth of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected.  The amount pledged is based on a pro rata proportion of the latest investment round in the case, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron.  Your interest thus will be valued equally with this round based on an investment of $14,000. The actual amount that will be paid to you will be based on the total amount collected.  To be more specific, your amount under this agreement will be 14/250 of an eighth of a point of whatever is recovered of the total claim.

Note that I am pledging this amount out of my personal fees from this litigation.  Should my personal fees not be recovered from the Ecuador case, you will not be entitled to any recovery of the $14,000.  Should a portion of my fees be recovered, but not the full amount, your recovery will be decrease[d] on a pro rata basis equal to the overall decrease affecting my fees.

If this is acceptable to you, please send me back an email so confirming.[193]

On December 23, 2016, Mr. Donziger followed up with another

email to Mr. Zelman, containing virtually identical language.[194]

That same day, Mr. Zelman confirmed that the terms were

---

[193] (GX 105 at DONZIGER_013098 (Dec. 21, 2016 email from Steven Donziger to David Zelman) (emphasis added).)

[194] (See GX 106 at DONZIGER_013099 (Dec. 23, 2016 email from Steven Donziger to David Zelman).)

acceptable to him.[195]   There was also a cash component of Mr. Zelman's agreement with Mr. Donziger, whereby Mr. Donziger paid Mr. Zelman $2,000 of the $14,000 balance in cash.[196]

Mr. Zelman and Mr. Donziger met several times related to the Transitions Process program.[197]   Those meetings extended beyond the originally contracted-for sixteen hours over four sessions.[198]   In light of that, on March 26, 2018, Mr. Zelman emailed Mr. Donziger a proposal regarding those additional services:

> You and I agree that consistent with the terms below, I have delivered an additional $2000 worth of consulting services which entitles me to 2/250 of an eighth of a point of whatever is collected of the total claim.
>
> It is noted that you are pledging this amount out of your personal fees from the litigation.  If you do not recover your personal fees, I will not be entitled to any recovery.
>
> Please respond back that this is correct and that you agree.[199]

---

[195] (See GX 106 at DONZIGER_013099 (Dec. 23, 2016 email from David Zelman to Steven Donziger) ("Thank you for this agreement. I confirm that it is acceptable to me.").)

[196] (See Trial Tr. at 576:4-8.)

[197] (See Trial Tr. at 581:12-15.)

[198] (See Trial Tr. at 581:12-15.)

[199] (GX 110 at DONZIGER_013102 (Mar. 26, 2018 email from David Zelman to Steven Donziger) (emphasis added).)

The "terms below" referred to an earlier email from Mr. Donziger that Mr. Zelman had forwarded to himself:

> David:
>
> I write to confirm our agreement regarding consulting services you are providing to me to develop my professional capacities with regard to the Ecuador litigation matter against Chevron, and other endeavors.
>
> In exchange for you providing me with $11,000 worth of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected. The amount pledged is based on a pro rata proportion of the latest investment round in the case, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron. Your interest thus will be valued equally with this round based on an investment of $11,000. The actual amount that will be paid to you will be based on the total amount collected. To be more specific, your amount under this agreement will be 11/250 of an eighth of a point of whatever is recovered of the total claim.
>
> Note that I am pledging this amount out of my personal fees from this litigation. Should my personal fees not be recovered from the Ecuador case, you will not be entitled to any recovery of the $11,000. Should a proportion of my fees be recovered, but not the full amount, your recovery will be decreased on a pro rata basis equal to the overall decrease affecting my fees.
>
> If this is acceptable to you, please send me back an email so confirming.
>
> Thanks so much.
>
> Steven Donziger[200]

---

[200] (GX 110 at DONZIGER_013102 (Feb. 27, 2017 email forwarded from David Zelman to David Zelman).)

The same day, Mr. Donziger responded that he "[a]gree[d] in concept," although he wanted to "confirm the calculation."[201]

The next day, Mr. Donziger offered an important clarification to Mr. Zelman regarding their agreement:

> Just to be clear, I am barred by court order in the U.S. from collecting fees on the matter.
>
> It is possible that the situation in that respect could change in a settlement context, but you need to be aware of the risk to you which is high.[202]

Mr. Zelman testified that he understood "on the matter" to refer to the Ecuadorian Judgment.[203]  Mr. Zelman also testified that, before receiving that email, he was not aware that the RICO Judgment prevented Mr. Donziger from collecting fees.[204]

---

[201] (GX 110 at DONZIGER_013102 (Mar. 26, 2018 email from Steven Donziger to David Zelman).)

[202] (GX 111 at DONZIGER_013103 (Mar. 27, 2018 email from Steven Donziger to David Zelman).)

[203] (See Trial Tr. 587:24-588:5, 589:3-19.)

[204] (See Trial Tr. at 587:16-23 ("Q. Prior to Mr. Donziger sending you this email on March 27, 2018, had Mr. Donziger told you that he was barred by court order from collecting fees on the matter?  A. I don't think he ever used that language.  Q. And when you say you don't think he ever used that language, had he ever indicated to you that a court order prevented him from collecting the fees, his fees?  A. I don't believe so. I don't believe so."); id. at 617:20-618:5 ("Q. Mr. Zelman, did there come a time when Mr. Donziger informed you that he was barred by court order from collecting fees on this matter?  A. I saw an e-mail between himself and myself. I don't know what the date was but, yes.  Q. But you knew that prior to that e-mail, didn't you, Mr. Zelman?  A. That -- sorry. What did I know?  Q. That there had been a court order related to Mr. Donziger's ability to collect fees in this matter?  A. I don't think I knew that prior to that email.").)

On March 20, 2019, after obtaining access to many of these emails in the post-judgment discovery process,[205] Chevron moved to hold Mr. Donziger in contempt for violating Paragraph Five of the RICO Judgment by pledging a portion of his contingent fee interest to Mr. Zelman.[206]  In response, Mr. Donziger offered the following explanation:

> I understand how the agreement with Mr. Zelman can be seen as a monetization of my interest in the Ecuador Judgment arguably in conflict with the Court's interpretation of the terms of the RICO Judgment, although to be clear I do not concede that it is in conflict.  I did not fully appreciate this at the time these services were provided, for reasons I do not specifically recall--although I assume it was because I thought the restrictions of the RICO Injunction were linked, per the April 2014 Opinion, to the context of a collection or recovery.  Additionally, my recollection and understanding is that neither Mr. Zelman nor I ever understood the agreement to be legally binding, but rather an expression of the sentiment that his generosity in providing services to me pro bono at a critical transition point in my professional life would be matched with generosity by

---

[205] Those documents were produced by Mr. Zelman, not Mr. Donziger.  (See Trial Tr. 355:8-11 ("Q. These exhibits -- 105, 106, 109, 110, 111 -- were they provided to you at any point by Steve Donziger in the discovery process?  A. No."); id. at 583:1-14 ("Q. So Mr. Zelman, this particular email, you received a subpoena from Gibson Dunn for some documents; correct?  A. Yeah.  Q. And this is one of the documents that you produced; is that correct?  A. I would suppose so.  Q. And when you collected documents to provide to Gibson Dunn, did you review your emails and print them out?  A. Yes.  Q. Okay. And this would have been one of the emails that you've printed out or viewed; correct?  A. Yes.  Q. And provided to Gibson Dunn; correct?  A. Correct.").)

[206] (See GX 2179 at 9-17 (dkt. no. 2174 in 11-CV-691).)

me in the event I received a significant monetary
recovery.[207]

Nevertheless, Mr. Donziger maintained that "[t]he Zelman issue
[wa]s obviously de minimis."[208]

Ultimately, on April 21, 2019--while Chevron's contempt
motion was pending--Mr. Zelman emailed Mr. Donziger and notified
him that, "[d]ue to all the complications regarding our
financial arrangement, I am cancelling our deal."[209]  Mr. Zelman
informed Mr. Donziger that they had "NO agreement going forward
from this date,"[210] but Mr. Zelman confirmed that he understood
his financial agreement with Mr. Donziger to have been intact
prior to sending that correspondence.[211]  Mr. Zelman elected to
cancel the agreement after a conversation with Mr. Donziger.[212]

---

[207] (GX 2184 at 7-8 (dkt. no. 2184 in 11-CV-691).)

[208] (GX 2184 at 8.)

[209] (GX 135 at DONZIGER_119100 (Apr. 21, 2019 email from
David Zelman to Steven Donziger).)

[210] (GX 135 at DONZIGER_119100.)

[211] (See Trial Tr. at 591:17-23.)

[212] (See Trial Tr. at 590:20-591:5 ("Q. And Mr. Zelman, can
you explain the circumstances which prompted you to send this
email to Mr. Donziger on April 21st of 2019?  A. During a
conversation with Steven, he let me know that the arrangement
that we had was problematic and -- I'm sorry, what's the
question again?  Q. So what were the -- I've asked you to
explain what prompted you to send this email.  A. He told me
there was a problem that might result in something like this.
And I said that was never the intent, and let's just cancel the
agreement.").)

Mr. Zelman understood that the chances of Mr. Donziger's recovering his fees related to the Ecuadorian Judgment were "very, very low" and "a long shot."[213]  But Mr. Zelman admitted that he hoped that Mr. Donziger would be paid his fees from the Ecuadorian Judgment and that he did not, in fact, provide or even offer any services to Mr. Donziger for free.[214]

On May 23, 2019, Judge Kaplan issued the Contempt Order finding Mr. Donziger, among other things, "in willful civil contempt of paragraph 5 of the RICO Judgment by virtue of his selling, assigning, pledging, transferring or encumbering part of his putative contingent fee interest to David Zelman in exchange for approximately $11,000 worth of personal services."[215]  In making that determination, Judge Kaplan noted that Mr. Donziger's pledging a portion of his contingent fee interest to Mr. Zelman was contemptuous even under Mr. Donziger's theory that the RICO Judgment and Stay Opinion did not proscribe him from raising funds by selling interests in the Ecuadorian Judgment other than his own.[216]  With respect to that

---

[213] (See Trial Tr. at 615:17-19, 617:14-19.)

[214] (See Trial Tr. at 620:2-18.)

[215] (GX 2209 at 70.)

[216] (See GX 2209 at 42 ("Donziger was entitled to 6.3 percent of any proceeds related to the Ecuador Judgment.  He concedes that any act to monetize the Ecuador Judgment, including by attempting to transfer, sell, pledge, or assign any
(continued on following page)

contempt, as well as the others, Judge Kaplan found that Chevron was entitled to recover its reasonable attorney's fees for prosecuting the contempt applications.[217]

### d. Counts I, II, & III: Post-Judgment Discovery

At the same time Mr. Donziger and Chevron were litigating the issues surrounding Mr. Donziger's refusal to transfer his Amazonia shares, the 2011 Contingent Fee, and the 2017 Contingent Fee, another branch of the case was evolving: the post-judgment discovery proceedings.  Counts I, II, and III flow from the disputes arising out of those proceedings.

### 1. Chevron Seeks Post-Judgment Discovery

On March 19, 2018--the same day that Chevron moved to hold Mr. Donziger in contempt for failure to transfer his shares in Amazonia--Chevron also moved ex parte for, among other things, (1) a document preservation order and (2) leave to conduct post-judgment discovery.[218]  In a ruling the same day, Judge Kaplan

---

(continued from previous page)
part of that 6.3 percent interest, violated paragraph 5 of the RICO Judgment.  Thus, even on Donziger's own view concerning the effect and meaning of the Stay Opinion, he is in contempt of paragraph 5 by virtue of his commitment to pay Zelman '14/250 of an eighth of a point of whatever is recovered on the total claim' out of Donziger's 'personal fees from this litigation.'" (footnotes omitted)).)  By Mr. Donziger's own admission, "Mr. Zelman was not and never ha[d] been an investor in the [Lago Agrio] case."  (GX 2184 at 7.)

[217] (See GX 2209 at 70-71.)

[218] (See GX 1966 at 19-20.)

granted Chevron's request for a preservation order, albeit with a few modifications to the original request.[219]  As for leave to take discovery regarding the non-monetary portions of the Ecuadorian Judgment, Judge Kaplan concluded that Mr. Donziger should first be afforded an opportunity to respond to Chevron's request.[220]  Judge Kaplan gave Mr. Donziger until April 20, 2018 to respond.[221]  Importantly, however, Judge Kaplan ruled that, "to the extent the discovery is sought in aid of the enforcement of the monetary portion of the judgment, leave of court is not required."[222]

On April 16, 2018, Chevron served Mr. Donziger with three documents: (1) its "First Set of Requests for Production of Documents in Aid of the Supplemental Judgment" (the "Document Requests");[223] (2) its "First Information Subpoena in Aid of the

---

[219] (See GX 1968 at 2; see also id. at 4 ("The attached order grants, in somewhat modified form, so much of the application as seeks a preservation order.").

[220] (See GX 1968 at 4 ("[T]he Court concludes that there is no need for a determination with respect to discovery with respect to enforcement of the non-monetary portions of the judgment that is so immediate that Donziger should not be afforded an opportunity [to] respond to so much of the application as seeks discovery with respect to the alleged and possible contempts.").)

[221] (See GX 1968 at 3.)

[222] (GX 1968 at 4.)

[223] (GX 1989-1A at 1 (Ex. A to dkt. no. 1989-1 in 11-CV-691).)

Supplemental Judgment" (the "Information Subpoena");[224] and (3) a

subpoena ad testificandum for Mr. Donziger's deposition.[225]  The

Document Requests sought thirty-eight categories of documents,

including, most relevantly, the following:

> 26. ALL DOCUMENTS evidencing or relating to any
> payment, proceeds, compensation, revenue, or any other
> thing of value YOU have received, contracted to
> receive, or have been promised related to any aspect
> of YOUR involvement in the ECUADOR LITIGATION, ECUADOR
> JUDGMENT, and/or ECUADOR ENFORCEMENT ACTIONS. . . .

> 29. ALL DOCUMENTS evidencing or relating to any
> payment, compensation, revenue, or any other thing of
> value YOU have delivered, contracted to deliver, or
> have promised to any PERSON or ENTITY from any
> proceeds that may be received from the ECUADOR
> JUDGMENT or the ECUADOR ENFORCEMENT ACTIONS.

> 30. ALL DOCUMENTS evidencing or relating to any
> attempted or completed sale, assignment, or transfer
> of rights, title, claims, or interest of any proceeds
> or other interest held by YOU, whether directly or
> indirectly, in the ECUADOR JUDGMENT or the ECUADOR
> ENFORCEMENT ACTIONS, whether or not such attempt was
> successful.[226]

The Information Subpoena similarly contained thirty-one

interrogatories, including, most relevantly, the following:

> 21. Identify and describe in detail any act that YOU,
> the LAGO AGRIO PLAINTIFFS, or any PERSON acting on
> YOUR behalf or on behalf of the LAGO AGRIO PLAINTIFFS,
> has undertaken to monetize or profit from the ECUADOR
> JUDGMENT, INCLUDING by selling, assigning, pledging,

---

[224] (GX 1989-1B at 1 (Ex. B to dkt. no. 1989-1 in 11-CV-691).)

[225] (See GX 1989-1C at 1 (Ex. C to dkt. no. 1989-1 in 11-CV-691).)

[226] (GX 1989-1A at 14-15 ¶¶ 26, 29-30.)

transferring, or encumbering any interest
therein. . . .

25. Identify and describe in detail any ASSET,
payment, proceeds, compensation, revenue, or any other
thing of value YOU have delivered, contracted to
deliver, or have promised to any PERSON or ENTITY from
any proceeds received or that may be received from the
ECUADOR JUDGMENT, enforcement of the ECUADOR JUDGMENT,
or any investment in the ECUADOR JUDGMENT.[227]

Both the Document Requests and the Information Subpoena included

an instruction--consistent with Rule 26.2(b) of the Local Rules

for the Southern and Eastern Districts of New York (the "Local

Rules")[228]--requiring the production of a privilege log for any

responsive information withheld on the basis of privilege.[229]

The Document Requests and Information Subpoena were returnable

---

[227] (GX 1989-1B at 11, 13 ¶¶ 21, 25.)

[228] See S.D.N.Y LOCAL CIV. R. 26.2(b) ("Where a claim of
privilege is asserted in response to discovery or disclosure
other than deposition, and information is not provided on the
basis of such assertion, the information set forth in paragraph
(a) above shall be furnished in writing at the time of the
response to such discovery or disclosure, unless otherwise
ordered by the Court.").

[229] (See GX 1989-1A at 5 ¶ 9 ("If YOU object to a portion or
an aspect of a REQUEST, state the grounds for YOUR objection
with specificity and respond to the remainder of the REQUEST.
If any DOCUMENTS, or portion thereof, are withheld because YOU
claim that such information is protected under the attorney-
client privilege, work product doctrine, or other privilege or
doctrine, YOU are required to PROVIDE a privilege log . . . .");
GX 1989-1B at 8 ¶ 21 ("If any information called for by this
subpoena is withheld on the basis of privilege, please state the
nature of the information being claimed as privileged, the type
of privilege claimed, and all circumstances upon which you are
relying to support each claim of privilege with enough
specificity so that a court can determine the appropriateness of
the objection.").)

on or before April 27, 2018,[230] and Mr. Donziger's deposition was initially noticed for May 7, 2018.[231]

On April 24, 2018, in a pro se opposition to Chevron's contempt application, Mr. Donziger asserted that "Chevron ha[d] not met even the weakest threshold showing that discovery is warranted" because it had not offered evidence that Mr. Donziger was violating the RICO Judgment through his ongoing fundraising efforts related to the Lago Agrio Case.[232]  Mr. Donziger did not, in that submission at least, challenge Chevron's discovery requests in aid of enforcement of the Money Judgment.

Mr. Donziger did not produce any responsive documents prior to the return dates for the Document Requests and Information

---

[230] (See GX 1989-1A at 1-2; GX 1989-1B at 2.)  Specifically, the Information Subpoena requested the responses be provided within 10 days of Mr. Donziger's receipt of the subpoena.  (See GX 1989-1B at 2.)

[231] (See GX 1989-1C at 2.)

[232] (See GX 1986 at 8-9.)

Subpoena.[233]  He did not provide a privilege log either.[234]

Instead, on April 30, 2018, Mr. Donziger sent a letter to

Chevron, asserting blanket objections to the Document Requests

and Information Subpoena.[235]

Specifically, Mr. Donziger asserted eight "General

Objections," including: (1) discovery was not appropriate at

that time because the Money Judgment was on appeal; (2)

Chevron's requests were "unduly burdensome;" (3) Chevron's

requests were overbroad and irrelevant because they "swe[pt]

---

[233] (See Trial Tr. at 241:23-242:1 ("Q. Now, did Mr.
Donziger produce any document or record to Chevron in response
to their discovery requests by April 30th of 2018?  A. No.");
see also GX 201 at 47:16-48:7 ("Q. And what's the volume of
documents that you are withholding?  A. Well, it is a few
hundred pages, but if Judge Kaplan were to order me to produce
everything that you are asking for, it obviously would be a lot
more than that.  Q. And so what is the difference between the "a
lot more" and the few hundred pages?  Because I'm not sure I'm
following your train of thought.  A. The difference is I have
not searched for documents responsive to every request in your
subpoena.  I mean, some of them, in my personal opinion, would
be impossible to do.").)

[234] (See Trial Tr. at 267:17-20 (quoting from GX 201 at
48:17-22) ("Q. So these documents that you searched for, found,
and are withholding on the basis of privilege, you have not
produced a privilege log for those documents; correct?  "A.
That's correct."); id. at 269:11-17 ("Q. And had Mr. Donziger
produced any privilege log to you at least as of his deposition
on June 25th, 2018?  A. No.  Q. Did Mr. Donziger ever produce a
privilege log to Chevron with respect to documents he was
withholding on privilege grounds?  A. No."); id. at 296:4-6 ("Q.
Had Mr. Donziger produced any privilege log as of August 15 in
2018?  A. No.").)

[235] (See GX 112 at DONZIGER_103538-47 (Apr. 30, 2018 email
from Steven Donziger to Randy M. Mastro, with attached letter).)

broadly past what [wa]s necessary to establish a clear picture
of [Mr. Donziger's] available assets and net worth;" and (4)
many of the requests were objectionable because they called for
the production of information protected by the attorney-client
privilege, work-product doctrine, or common-interest
privilege.[236]  Mr. Donziger also stated that his "financial
situation [wa]s not much more complicated than that of an
average household" and proposed that, instead of responding to
Chevron's discovery requests, he would provide "a short summary
of [his] financial condition and assets, backed up by supporting
documents."[237]  Mr. Donziger suggested that he and Chevron's
counsel "meet and confer . . . to better identify any areas of
dispute prior to the hearing before the district court scheduled
for May 8."[238]  Importantly, Mr. Donziger did not object to
Chevron's discovery requests on First Amendment grounds.

### 2. Chevron Moves to Compel & Judge Kaplan's May 17, 2018 Order

On May 4, 2018--following two meet and confers at which Mr.
Donziger indicated that he would not produce discovery materials

---

[236] (GX 112 at DONZIGER_103539-41.)

[237] (GX 112 at DONZIGER_103540.)

[238] (GX 112 at DONZIGER_103539.)

absent a court order[239]--Chevron moved to compel Mr. Donziger to
comply with the Document Requests and the Information
Subpoena.[240]  Mr. Donziger filed a pro se opposition to that
motion, asserting the following primary contention:

> [T]he issues are moot or potentially moot because I am
> preparing to post a supersedeas bond that will stay
> all proceedings on the Court's Supplemental Judgment
> (Dkt. 1962) pending resolution of my lodged appeal.
> If I am unsuccessful in the appeal, the bond will be
> used to satisfy the Supplemental Judgment.
> Accordingly, Chevron will soon be fully protected and
> there will remain no basis for discovery into my
> assets, or those of any other person, in aid of
> enforcement of the Supplemental Judgment.  Because
> Chevron's discovery requests are now proceeding
> entirely and exclusively on the aid-of-enforcement
> basis, those requests should be suspended forthwith
> and withdrawn as soon as the bond is posted.[241]

Mr. Donziger also asserted that he had "individual relevance,
overbreadth, and undue burden objections to Chevron's various
requests."[242]  In lieu of complying with Chevron's requests, Mr.
Donziger reiterated his proposal that he "provide Chevron with a

---

[239] (See Trial Tr. at 242:16-22 ("Q. Did the meet and confer
occur on May 4th, the day Chevron filed this motion?  A. Yes.
Before we filed the motion.  Q. Do you remember what Mr.
Donziger said to you during that meet and confer?  A. He said
that he would not produce documents without a court order.").)

[240] (See GX 1989 (dkt. no. 1989 in 11-CV-691).)

[241] (GX 2002 at 1 (dkt. no. 2002 in 11-CV-691).)

[242] (GX 2002 at 2.)

descriptive summary or guidance as to [his] relatively simple financial condition, backed up by documentation."[243]

On May 17, 2018, Judge Kaplan issued an order granting, in part, Chevron's motion to compel.[244]  In so ordering, Judge Kaplan divided Chevron's requests into two buckets: (1) requests "directed to identifying assets with respect to which the judgment may be enforced and related matters," which Judge Kaplan denominated the "Money Judgment Discovery;" and (2) requests targeting information regarding Mr. Donziger's alleged noncompliance with Paragraph Five of the RICO Judgment, which Judge Kaplan denominated the "Paragraph 5 Compliance Discovery."[245]  Judge Kaplan found that Chevron was "entitled to appropriate Paragraph 5 Compliance Discovery," but he deferred "ruling on the specific discovery requests" until an evidentiary hearing could be held.[246]  As for the Money Judgment Discovery,

---

[243] (GX 2002 at 2.)  Mr. Donziger also indicated that he could possibly "begin a rolling production of the most relevant non-privileged responsive documents during this time period," but he submitted "that it would be most efficient to focus on the summary first, and then begin rolling production as deemed necessary."  (Id. at 3 n.1.)

[244] (See GX 2009 at 3 (dkt. no. 2009 in 11-CV-691).)

[245] (GX 2009 at 1.)

[246] (GX 2009 at 2-3.)

Judge Kaplan found Mr. Donziger's objections to be "almost entirely without merit."[247]

Judge Kaplan made three findings related to the Money Judgment Discovery requests. First, Judge Kaplan found that "[d]iscovery [wa]s entirely appropriate," rejecting as "frivolous" Mr. Donziger's theory "that Chevron should not be permitted to conduct discovery for the purpose of enforcing the money judgment because" of Mr. Donziger's pending appeal.[248] Judge Kaplan noted that Mr. Donziger had not posted a supersedeas bond "in the months since the money judgment was entered" or otherwise demonstrated why he should be entitled to a stay of the post-judgment proceedings.[249] Second, Judge Kaplan determined that Mr. Donziger's "contention that the discovery requests [we]re unduly burdensome [wa]s entirely unsubstantiated" and that Mr. Donziger's suggestion that Chevron was entitled only to a summary of his financial condition and assets was meritless.[250] And third, Judge Kaplan rejected as frivolous Mr. Donziger's argument that he "should not be

---

[247] (GX 2009 at 2.) Judge Kaplan did make a few minor alterations to the discovery requests in the Document Requests and the Information Subpoena. (See id. at 3 (striking request number 15 in the Document Requests); id. at 4-5 (Schedule A & Schedule B).)

[248] (GX 2009 at 2.)

[249] (GX 2009 at 2.)

[250] (See GX 2009 at 2.)

compelled to furnish documents and information that [we]re within his control but not in his immediate physical possession."[251]  In light of those determinations, Judge Kaplan ordered Mr. Donziger to sit for a deposition and to comply with the Document Requests and the Information Subpoena by June 15, 2018.[252]

### 3. Mr. Donziger's May 31, 2018 Motion & Judge Kaplan's June 1, 2018 Order

On May 31, 2018, Mr. Donziger filed a pro se motion seeking two things.[253]  First, Mr. Donziger sought a declaratory judgment that the RICO Judgment did not preclude the beneficiaries of the Ecuadorian Judgment "from raising funds to cover litigation fees and expenses."[254]  Second, Mr. Donziger requested dismissal under Rule 12(b)(6) and (f) of the related portions of Chevron's March 19, 2018 contempt application.[255]  In support of his motion, Mr. Donziger asserted, inter alia, that "[a]s long as any expense funding does not specifically assign, commit, or otherwise leverage interests specific to those three individuals"--one of

---

[251] (GX 2009 at 2.)

[252] (See GX 2009 at 3.)

[253] (See GX 2018 (dkt. no. 2018 in 11-CV-691).)

[254] (GX 2018 at 1.)

[255] (See GX 2018 at 1-2.)

whom was Mr. Donziger--"there is no violation of Paragraph 5" of the RICO Judgment.[256]

On June 1, 2018, Judge Kaplan ordered Mr. Donziger to produce some Paragraph 5 Compliance Discovery by June 15, 2018.[257]  Judge Kaplan ordered those documents produced in anticipation of a June 28, 2018 evidentiary hearing regarding Mr. Donziger's alleged contempt of Paragraph Five of the RICO Judgment involving conduct with Elliott Management Corporation.[258]  Judge Kaplan "continue[d] to reserve judgment" regarding Paragraph 5 Compliance Discovery matters other than those involving the alleged "attempt to obtain funding from the Elliott Group."[259]  Mr. Donziger's pending motion for declaratory relief and to dismiss Chevron's contempt motion, filed the day before, did not affect Judge Kaplan's ruling; Judge Kaplan indicated that he would address "that motion in due course."[260]

---

[256] (GX 2018 at 11.)

[257] (See GX 2020 at 2 (dkt. no. 2020 in 11-CV-691).)

[258] (See GX 2020 at 1.)  In its contempt application, Chevron alleged that Mr. Donziger solicited an investment from Elliott to fund litigation expenses in exchange for an interest in the proceeds from the Ecuadorian Judgment should any enforcement action prove successful.  (See GX 1966 at 5.) Chevron suggested that those actions violated Paragraph Five of the RICO Judgment.  (See id. at 14-16.)

[259] (GX 2020 at 2.)

[260] (See GX 2020 at 1 n.1.)

### 4. **Mr. Donziger's June 15, 2018 Motion & Judge Kaplan's June 25, 2018 Order**

On June 15, 2018, Mr. Donziger produced only eighteen pages of documents, including one record listing his bank accounts as well as records related to two different LLCs.[261]  Mr. Donziger sent Chevron's counsel a letter, which responded to some requests, asserted supplemental objections to others, and indicated that for others he was "still collecting responsive materials."[262]  Mr. Donziger raised, for the first time, the following First Amendment objection to the Document Requests and Information Subpoena:

> After careful review of materials potentially responsive to your Requests, I have concluded that the forced production of many of these materials in this context would violate First Amendment associational rights of me and others.  Specifically, it would be using the authority of the court to authorize intrusion and infiltration into the organizational and operational practices and strategies of a targeted social and political advocacy group by an avowed opponent of that group, and . . . would likely give

---

[261] (See GX 118 at DONZIGER_012136-53; see also Trial Tr. at 255:17-256:4 ("Did Mr. Donziger provide Chevron with some documents in response to the discovery requests that he had been ordered to comply with on that day?  A. He did provide about -- I think it was about 18 pages worth of documents.  Q. I am going to show you what is Government Exhibit 118.  Just go through the pages of this exhibit.  What is Government Exhibit 118?  A. This is the production that Mr. Donziger made in the middle of June.  Q. In response to Chevron's discovery requests?  A. Exactly.").)  These documents were filed with the Court in redacted form, consistent with counsels' agreement, to protect Mr. Donziger's private banking information.  (See Trial Tr. at 256:5-22.)

[262] (GX 119 at DONZIGER_103456 (June 15, 2018 letter from Steven Donziger to Anne Champion et al.).)

>           rise to reprisals, harassment and economic extortion
>           by your client against group members in retaliation
>           for their associational activity.[263]

Mr. Donziger also asserted renewed relevance and undue burden

objections, averring that the "Requests sweep drastically beyond

the legitimate scope of inquiry," which, in Mr. Donziger's view

and contrary to Judge Kaplan's order, pertained only to the

"present whereabouts and extent of assets potentially available

to satisfy the judgment."[264]   Mr. Donziger did not submit a

privilege log in advance of his limited production and

supplemental objections,[265] despite indicating in a June 7, 2018

email to Chevron's counsel that he would do so.[266]

---

[263] (GX 119 at DONZIGER_103457.)  Mr. Donziger applied this objection to several specific requests as well.  (See id. at DONZIGER_103460, 103463.)

[264] (GX 119 at DONZIGER_103457.) Mr. Donziger also applied this objection to several specific requests.  (See id. at DONZIGER_103460, 103462-63.)

[265] (See Trial Tr. at 269:11-17 ("Q. And had Mr. Donziger produced any privilege log to you at least as of his deposition on June 25th, 2018?  A. No.  Q. Did Mr. Donziger ever produce a privilege log to Chevron with respect to documents he was withholding on privilege grounds?  A. No."); id. at 296:4-6 ("Q. Had Mr. Donziger produced any privilege log as of August 15 in 2018?  A. No.").)

[266] (See GX 116 at DONZIGER_104173 (June 7, 2018 email from Steven Donziger to Anne Champion et al.) ("It also appears that even the so-called Money Judgment Requests may tread into privileged material in some respects, and with my objections I have specifically preserved my right to withhold privileged documents, which I will do if necessary.  I will of course provide an appropriate log and articulated bases for any such assertion of privilege upon any such withholding that may be
                                        (continued on following page)

73

Also on June 15, 2018, Mr. Donziger moved for a protective order on First Amendment free-association grounds.[267]  Mr. Donziger sought the following:

> [A]n order precluding any discovery in these post-judgment proceedings (including discovery sought from third-parties) that would tend to reveal the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of the teams of individuals and organizations that directly and indirectly oppose Chevron in the Ecuador Litigation . . . and/or more broadly engage in Ecuador Litigation-related advocacy . . . . [268]

Mr. Donziger maintained that a protective order was necessary "to prevent discovery in this case from turning into a private 'blank warrant' allowing Chevron to intrude and infiltrate itself into the First Amendment-protected political activities, associations, speech, operational practices, and strategic deliberations of Mr. Donziger and others."[269]  Specifically, Mr. Donziger asserted that Chevron would seek to cut off funding for

---

(continued from previous page)
necessary."); see also Trial Tr. at 253:23-25 ("When Mr. Donziger referred to an appropriate log, what did you understand him to mean?  A. Privilege log.").)

[267] (See GX 2026 (dkt. no. 2026 in 11-CV-691).)

[268] (GX 2026 at 2.)

[269] (GX 2026 at 1.)

the Lago Agrio Case and prevent supporters from associating with that case, the litigation team, or its supporters.[270]

At Mr. Donziger's June 25, 2018 deposition, Mr. Donziger confirmed that he had withheld numerous responsive documents on First Amendment grounds as well as because he had then-pending motions before Judge Kaplan.[271]  Mr. Donziger also refused to answer myriad questions on First Amendment grounds, again citing

---

[270] (See GX 2026 at 19.)

[271] (See, e.g., GX 201 at 44:3-8 ("Q. What's the volume of the documents that you reviewed, approximately?  A. There is a fair number of documents that I have withheld from you guys on the basis of privilege or First Amendment issues or of the pending motions."); id. at 47:9-15 ("I did a fair amount of searching and document gathering and I have more documents that you are seeking that I don't believe is appropriate to turn over at this point given the sort of outstanding legal issues that need to be resolved by the Court."); id. at 49:9-18 ("Q. So you are withholding non-privileged documents on the basis of a First Amendment objection?  A. I didn't say that.  Q. I'm just asking if you are or you aren't.  A. I don't know.  I would have to give that a think.  I do know that some of the documents, many of the documents, are being withheld on First Amendment grounds."); id. at 69:22-70:5 ("Q. And is the summary that you looked at a document that you produced or one that you just reviewed?  A. No, I did not produce, and the reason I didn't produce it is because I believe it is First Amendment protected, subject to the resolution of our pending motion for a protective order."); id. at 231:21-232:15 ("Q. Okay. In terms of cleaning up a little bit where we are on these document issues, so any documents that you've withheld as privileged either from Mr. Rizack's production or your own, you said you had your own group of documents that were privileged, are you willing to produce those pursuant to the 502 or do you intent to provide a log, and, if so, by when?  A. Well, I don't know the answer to that question. . . .  I think with regard to my documents, I could provide a log, but I think a lot of them are being withheld not on privilege grounds but on First Amendment grounds.").)

his pending motion for a protective order.[272]  Mr. Donziger

likewise confirmed that he had withheld certain documents due to

privilege.[273]  Notwithstanding those assertions, Mr. Donziger

still had not submitted a privilege log.[274]

---

[272] (See, e.g., GX 201 at 17:10-18 ("Q. Have you, since
March of 2014, have you raised money in connection with the
Ecuador litigation for any clients other than the FDA?  A. I'm
going to decline to answer on the grounds that that is First
Amendment protected, and I have a pending motion, as you know,
for a protective order on First Amendment grounds . . . ."); id.
at 63:2-13 ("Q. What is your role in the Canadian case, if any?
A. How does that relate to the deposition?  Q. It relates to
whether monies you are receiving are for compensation of work
done in Canada or something else.  A. Well, I get the retainer
for a variety of different pieces of work that I do, but I'm not
going to get into that on First Amendment grounds and because of
the pending motion."); id. at 68:23-69:5 ("Q. And other than
fundraising and preparing accountings for you and your firm, any
other functions Ms. Sullivan was hired to perform?  A. I'm not
going to answer that question.  That is First Amendment
protected."); id. at 81:3-13 ("Q. How much you're paid?  A. That
would implicate First Amendment considerations.  Q. Can you
define for me this First Amendment objection?  Because you seem
to apply it to financial documents, all kinds of documents.  So
I'm not understanding it. Can you describe it for the record,
please?  A. No, I'm not going to describe it.  Read it.  I have
a 24-page motion."); id. at 100:19-22 ("Q. When were the monies
that were paid to you on January 24th of 2018 raised?  A. No,
nice try. Beyond the scope, First Amendment protected.").)

[273] (See GX 201 at 44:3-8 ("Q. What's the volume of the
documents that you reviewed, approximately?  A. There is a fair
number of documents that I have withheld from you guys on the
basis of privilege or First Amendment issues or of the pending
motions.").)

[274] (See GX 201 at 48:17-22 ("Q. So these documents that you
searched for, found, and are withholding on the basis of
privilege, you have not produced a privilege log for those
documents; correct?  A. That's correct."); Trial Tr. at 269:11-
17 ("Q. And had Mr. Donziger produced any privilege log to you
(continued on following page)

That same day, Judge Kaplan denied--with an opinion to follow--Mr. Donziger's motions (1) for a declaratory judgment and to dismiss Chevron's contempt application and (2) for a protective order.[275]  Two days later, Judge Kaplan issued a memorandum opinion explaining his reasoning.[276]

Judge Kaplan denied the first motion for three reasons.[277] First, Judge Kaplan found that the motion was "entirely without merit on procedural grounds alone."[278]  Second, Judge Kaplan determined that the motion was "nothing more than an untimely and baseless effort to obtain reconsideration" of Judge Kaplan's order to hold an evidentiary hearing on Chevron's contempt application.[279]  And third, Judge Kaplan determined that "events may have overtaken" the motion, pointing specifically to the entry of a judgment enjoining the defaulting defendants

---

(continued from previous page)
at least as of his deposition on June 25th, 2018?  A. No.  Q. Did Mr. Donziger ever produce a privilege log to Chevron with respect to documents he was withholding on privilege grounds? A. No.").)

[275] (See GX 2037 (dkt. no. 2037 in 11-CV-691).)

[276] (See GX 2045 (dkt. no. 2045 in 11-CV-691).)

[277] (GX 2045 at 17-19.)

[278] (GX 2045 at 17.)

[279] (GX 2045 at 18.)

(including ADF and several of the LAPs) from monetizing or profiting from the Ecuadorian Judgment.[280]

Judge Kaplan also thoroughly rejected the motion for a protective order, applying both the governing standard for a protective order and substantive First Amendment law.[281] Specifically, Judge Kaplan denied the motion for the following reasons: (1) Mr. Donziger waived or forfeited his First Amendment argument by not timely raising it; (2) Mr. Donziger had not shown good cause sufficient to warrant the issuance of a protective order; (3) Mr. Donziger failed to present competent evidence that he would suffer a cognizable injury absent a protective order; (4) Mr. Donziger lacked standing to assert the First Amendment rights of the third parties on whose behalf he sought relief, some or all of whom may also have lacked a connection to the United States sufficient to entitle them to the First Amendment's protections; and (5) even setting all that aside, Mr. Donziger's First Amendment claims still failed on the merits.[282]

---

[280] (GX 2045 at 18-19.)

[281] (See GX 2045 at 20-35.)

[282] (See GX 2045 at 20-35.)

5. **Judge Kaplan's July 23, 2018 Order, Mr. Donziger's August 13, 2018 Stay Motion, & Judge Kaplan's September 25, 2018 Order**

After Judge Kaplan denied the motions, Chevron's counsel emailed Mr. Donziger to request that he "produce all documents withheld from production on the bases of the objections made" in his motions.[283]  Mr. Donziger responded that he was "getting organized" and "gathering materials," but he indicated that he would respond by the end of the day on June 26, 2018.[284]  He did not do so.[285]  Three days later, Chevron's counsel followed up on her prior email and asked Mr. Donziger to "[p]lease confirm you will produce all other documents responsive to Chevron's requests by no later than Wednesday."[286]  Mr. Donziger did not produce those documents save for two exceptions.

In the weeks following Judge Kaplan's June 25, 2018 opinion, Mr. Donziger produced only two additional documents to Chevron: (1) the 2017 Retainer, which he provided following the

---

[283] (GX 149A at DONZIGER_103596 (June 26, 2018 email from Anne Champion to Steven Donziger).)

[284] (GX 149 at DONZIGER_103595 (June 26, 2018 email from Steven Donziger to Anne Champion).)

[285] (GX 149 at DONZIGER_103595 (June 27, 2018 email from Anne Champion to Steven Donziger) ("Hi Steven, I don't believe you responded to my email of Monday night (attached), which you said you would respond to by the end of the day yesterday.  Can you please advise?  Thanks.").)

[286] (GX 146 at DONZIGER_103569 (June 29, 2018 email from Anne Champion to Steven Donziger et al.).)

June 28, 2018 evidentiary hearing;[287] and (2) a document from Mr.
Donziger's clients granting him a special power of attorney so
that he could raise funds for the Lago Agrio Case's litigation
expenses, which Mr. Donziger produced on July 5, 2018.[288]

On July 23, 2018, Judge Kaplan issued an order directing
Mr. Donziger, by August 15, 2018, to produce to Chevron certain
Paragraph 5 Compliance Discovery, including (1) all documents
described in Document Request Nos. 18, 21, 22 and 29, and (2)
"full and complete answers" to paragraphs 21 through 25 of the
Information Subpoena.[289]  Judge Kaplan also ruled that Chevron
was "free to conduct discovery against non-parties with respect

---

[287] (See GX 120 at DONZIGER_107414 ("Steve, please confirm
that this is the agreement that you gave me after court . . .
and that it is the document you represented to the Court after
yesterday's hearing is your latest retention agreement with the
Frente.").)

[288] (See GX 122 at DONZIGER_103216 (July 5, 2018 email from
Steven Donziger to Anne Champion et al.).)  Mr. Donziger
produced that document in its original Spanish-language form.
(See id. at DONZIGER_103217-19.)  Chevron obtained a certified
translation of that document.  (See GX 122-T at 1-4 (English-
language translation of GX 122); see also Trial Tr. at 278:5-12
("Q. Did Chevron get a translation of this document?  A. We did.
Q. Showing what's Government Exhibit 122-T.  Have you had an
opportunity to review this document before today?  A. Yes.  Q.
Is this the translation to English of the document Mr. Donziger
had provided, which is in Government Exhibit 122?  A. Yes.").)
Mr. Donziger did not contest that translation, (see id. at
278:13-16), and Ms. Berah testified that GX 122T was, "[w]ith
several minor details," a true and accurate translation of GX
122, (id. at 288:3-6).  Accordingly, the Court considers the
English-language version of this document.

[289] (GX 2056 at 2 (dkt. no. 2056 in 11-CV-691).)

to Donziger's compliance or non-compliance with the judgment."[290]
The next day, Chevron's counsel reached out to Mr. Donziger
regarding the outstanding discovery:

> I am writing to follow up on my June 29 email below
> requesting that you "produce all other documents
> responsive to Chevron's requests by no later than
> Wednesday," July 4. With the exception of the
> document you provided on July 5, we have not received
> any of the documents you agreed at your deposition to
> search for and produce. You have also failed to
> produce the "hundreds" of documents withheld on First
> Amendment grounds, despite the fact that Judge Kaplan
> has ruled that claim to be without merit.[291]

Two days later, on July 26, 2018, Mr. Donziger filed a pro se
notice of appeal from (1) Judge Kaplan's June 27, 2018 order
denying his motions for a declaratory judgment, to dismiss
Chevron's contempt application, and for a protective order; and
(2) the July 23, 2018 order directing him to comply with certain
portions of the Documents Requests and Information Subpoena.[292]
The Court of Appeals assigned that appeal docket number 18-
2191.[293]

---

[290] (GX 2056 at 2.)

[291] (GX 146 at DONZIGER_103569 (July 24, 2018 email from
Anne Champion to Steven Donziger).)

[292] (See GX 2060 at 1-2 (dkt. no. 2060 in 11-CV-691).)

[293] (See GX 8 (docket in Chevron Corp. v. Donziger, 18-2191
(2d Cir.)); see also Trial Tr. at 640:7-16 ("Q. Mr. Thomson,
have you had an opportunity before your testimony today to
review this docket sheet for Second Circuit Appeal 18-2191? A.
Yes, I have. Q. And what docket sheet is this for, as it
relates to Mr. Donziger's appeals between February 28 of 2018
(continued on following page)

On August 13, 2018, two days ahead of Judge Kaplan's August 15 deadline to produce more documents, Mr. Donziger moved before Judge Kaplan for a stay of post-judgment discovery pending his appeal.[294]  Mr. Donziger asserted that (1) Judge Kaplan's forcing Mr. Donziger to produce discovery without ruling on the scope of the RICO Judgment was "a clear violation of due process;" and (2) Judge Kaplan's "refusal to offer protective and/or injunctive relief necessary to protect the associational rights of [him]self and others under the First Amendment [wa]s unconstitutional."[295]  For the first time, Mr. Donziger indicated that he would be willing to risk contempt sanctions to protect the First Amendment rights he was asserting.[296]  Judge Kaplan's August 15 deadline came and went without Mr. Donziger's producing any more documents or a privilege log.[297]

_____

(continued from previous page)
and September 30th of 2019?  A. This is the docket sheet for the second appeal.  Q. The appeal --  A. From the four interlocutory orders.").)

[294] (See GX 2067 (dkt. no. 2067 in 11-CV-691).)

[295] (GX 2067 at 1.)

[296] (See GX 2067 at 3 ("Even if I am forced to go into contempt in order to protect against this outcome, the threat still remains regarding Chevron's ongoing attempts to obtain the discovery from non-parties; additionally, the harm of enduring a contempt citation from this Court is significant in its own right.").)

[297] (See Trial Tr. at 295:25-296:6 ("Did he provide any response to Chevron to the compliance discovery request he had
(continued on following page)

As a result, on August 16, 2018, Chevron moved to compel Mr. Donziger to comply with its discovery requests.[298]  Chevron cited the following: (1) Mr. Donziger refused to respond to discovery "based on First Amendment objections [Judge Kaplan] ha[d] overruled;" (2) Mr. Donziger concealed material financial information from discovery, including a bank account "from which hundreds of thousands of dollars were paid to him and to co-conspirators;" (3) Mr. Donziger produced only twenty-two pages of documents and admitted "to withholding 'a few hundred pages'" of discovery based on his already-rejected First Amendment contentions; and (4) Mr. Donziger confessed to not having conducted a search for documents responsive to Chevron's requests.[299]  Chevron also asserted that Mr. Donziger had waived any claims of privilege by not preparing a privilege log.[300]  Chevron requested that Judge Kaplan "order Donziger to comply fully with Chevron's document requests and to present his

---

(continued from previous page)
been ordered to produce by that date?  A. No.  Q. Had Mr. Donziger produced any privilege log as of August 15 in 2018?  A. No.").)

[298] (See GX 2073 (dkt. no. 2073 in 11-CV-691).)

[299] (GX 2073 at 2-3.)

[300] (See GX 2073 at 4.)

electronic devices for forensic imaging, with the images to be lodged with the Court."[301]

Mr. Donziger filed a pro se opposition to Chevron's motion to compel as well as a "reiterated motion to stay" discovery pending his appeal.[302]  Mr. Donziger did not contest that he had withheld responsive documents, instead simply stating that he "ha[d] not and w[ould] not destroy or otherwise fail to maintain any documents or materials in accordance with the preservation order entered by the Court."[303]  Regarding Chevron's allegations related to privilege, Mr. Donziger asserted the following:

> I have noted privilege claims as appropriate (and to
> the best of my understanding as a sole practitioner)
> throughout the process, and my entire cooperation with
> Chevron's discovery up to the present has been "under
> the 502," pursued as part of a good faith effort to
> reduce litigation burdens on the parties and the
> Court.  While we have not yet reached a stage where
> specific claims of privilege are necessary (including
> in this motion, which rests on the necessity of an
> overall stay of discovery pending appeal), undersigned
> maintains and preserves all applicable claims of
> privilege and protection--which claims are necessary,
> of course, to protect not only undersigned's interests
> as an attorney but the interests of many clients who
> are not before the Court.[304]

Finally, Mr. Donziger maintained that "Chevron's request that forensic images be taken of [his] electronic devices [wa]s

---

[301] (GX 2073 at 3.)

[302] (See GX 2077 (dkt. no. 2077 in 11-CV-691).)

[303] (GX 2077 at 4.)

[304] (GX 2077 at 3 (emphasis added).)

drastically intrusive and unreasonable, supported by no evidence
whatsoever, and must be denied."[305]  For those reasons, Mr.
Donziger averred that "Chevron's latest motion to compel should
be denied or held in abeyance without any consideration as to
its contents."[306]

On September 25, 2018, Judge Kaplan issued an order denying
Mr. Donziger's motion for a stay of post-judgment discovery
pending appeal.[307]  Judge Kaplan found Mr. Donziger's motion to
be "frivolous for a host of reasons," including: (1) Mr.
Donziger had not posted a supersedeas bond or applied for a stay
of enforcement of the Money Judgment, which Chevron had every
right to enforce pending his appeal; (2) precedent made clear
that a district court is free to permit discovery in aid of
enforcing its orders; (3) Mr. Donziger's "conclusory papers in
support of this motion offer[ed] no colorable ground for
supposing that" Judge Kaplan's order denying the motion for a
declaratory judgment and the motion for a protective order was
vulnerable to reversal on appeal; and (4) Mr. "Donziger's claims
of irreparable injury [we]re unsubstantiated."[308]  In so ruling,

---

[305] (GX 2077 at 4.)

[306] (GX 2077 at 2-3.)

[307] (See GX 2088 (dkt. no. 2088 in 11-CV-691).)

[308] (GX 2088 at 2-3.)

Judge Kaplan again rejected Mr. Donziger's First Amendment objection to discovery.[309]

Mr. Donziger did not seek relief from this order from the Court of Appeals, whether by requesting a stay or petitioning for a writ of mandamus.[310]  Nor did he produce any further documents during 2018.[311]  At that time, Chevron's motion to compel remained pending.

### 6. Judge Kaplan's October 18, 2018 Order & Mr. Donziger's Refusals to Comply

On October 18, 2018, Judge Kaplan granted Chevron's motion to compel "in its entirety."[312]  Judge Kaplan observed that his prior order requiring Mr. Donziger to respond to certain discovery requests by August 15, 2018 "remain[ed] in effect and ha[d] not been stayed" and that Mr. Donziger "[wa]s obliged to

---

[309] (See GX 2088 at 3.)

[310] (See GX 7 (no docket entries seeking emergency relief); GX 8 (same); see also Trial Tr. at 654:11-20 ("Q. And in the time period that I had focused you on during the course of your direct, which would be February 28th of 2018 to September 30th of 2019, did Mr. Donziger ever seek a stay in the Second Circuit?  A. No, he did not.  Q. Did he ever seek mandamus relief in that time period in the Second Circuit?  A. No, he did not.  Q. Did he ever seek expedited briefing in the Second Circuit?  A. No, he did not.").)

[311] (See Trial Tr. at 301:24-302:3 ("Ms. Champion, after Judge Kaplan issued this order denying Mr. Donziger's request for a stay pending his appeal, did Mr. Donziger produce any additional discovery to you in 2018?  A. No.").)

[312] (GX 2108 at 2 (dkt. no. 2108 in 11-CV-691).)

comply with it in each and every respect on pain of contempt."[313]
Judge Kaplan also made three other rulings.  First, Judge Kaplan
held that, given Mr. Donziger's repeated failures to comply with
Federal Rule of Civil Procedure 26(b)(5) and S.D.N.Y. Local
Civil Rule 26.2, he "ha[d] waived or forfeited any claim of
privilege to responsive documents and information that otherwise
might have applied."[314]  Second, Judge Kaplan ordered Mr.
Donziger to sit for another deposition.[315]  And third, Judge
Kaplan ruled that, "[g]iven Donziger's stonewalling of post-
judgment discovery," it was proper that his "electronic devices
be imaged and examined for any responsive documents that
Donziger ha[d] not thus far produced under appropriate
safeguards of the interests of all parties."[316]  Mr. Donziger did
not seek <u>any</u> relief from that order: he did not appeal, seek a

---

[313] (GX 2108 at 2.)

[314] (GX 2108 at 2.)  In light of that finding, Judge Kaplan
ordered Mr. Donziger to "comply fully with the outstanding
discovery requests forthwith without withholding any responsive
documents or information on privilege grounds."  (<u>Id.</u>)

[315] (GX 2108 at 2.)

[316] (GX 2108 at 2.)  Judge Kaplan directed the parties to
confer with an eye towards identifying a third party to whom Mr.
Donziger would produce his devices for imaging.  (<u>Id.</u> at 2-3.)

stay of his obligation to comply, or file petition for a writ of

mandamus.[317]

On October 25, 2018, Mr. Donziger emailed Chevron's counsel

to announce his "anticipated course of action regarding Judge

Kaplan's order regarding the motion to compel that waived all of

[his] privileges."[318]  He declared:

> As you know, I have yet to receive a ruling from the
> court regarding your client's original motion to hold
> me in contempt filed in March of this year.  This is
> highly unusual and violates my due process rights,
> among other problems . . . .
>
> As a result, I presently see no choice other than to
> go into contempt until I can get a ruling on the most
> basic issues that are driving what I believe to be
> your entirely inappropriate, over-broad, intrusive,
> and constitutionally infirm discovery rampage
> targeting financial supports and others of the
> Ecuadorians that is clearly designed to dry up funding
> for the case and to intimidate those who support both
> the litigation and the broader corporate
> accountability campaign (what you call a "pressure"
> campaign) against your client Chevron.
>
> I don't want to go into contempt, but I genuinely feel
> that the court has given me no choice in light of its
> failure to rule, which is obviously designed to shield
> its many problematic decisions from appellate review.
> I will be apprising Judge Kaplan of my position as
> soon as I can.[319]

---

[317] (See GX 7 (no docket entries seeking emergency relief);
GX 8 (same); Trial Tr. at 655:10-16 ("Q. Did Mr. Donziger notice
an appeal from this October 18, 2018 order?  A. No, I don't
believe so.  Q. Did he seek mandamus relief?  A. No, he did not.
Q. Did he seek a stay?  A. No, he did not.").)

[318] (GX 129 at DONZIGER_102936 (Oct. 25, 2018 email from
Steven Donziger to Anne Champion et al.).)

[319] (GX 129 at DONZIGER_102936.)

Chevron's counsel confirmed receipt of the email, noting that Mr. Donziger had "refused to engage on any substantive issue" during a meet and confer set up to discuss the imaging of his devices and a possible date for his court-ordered deposition.[320]

That same day, Mr. Donziger filed a letter informing Judge Kaplan that he "w[ould] be unable to comply with the order dated October 18, 2018 directing [him] to produce a potentially massive quantity of confidential and privileged documents and communications to Chevron."[321]  Instead, Mr. Donziger accused Judge Kaplan of undertaking a "transparently abusive strategy of silence and non-action" by "refus[ing] to address the key issue underlying Chevron's original contempt motion for over six months."[322]  Mr. Donziger asserted that the post-judgment discovery "ha[d] zero basis to proceed if there [wa]s no colorable contempt case against [him],"[323] and he reiterated his already-twice-rejected position that the discovery requests "work[ed] a clear violation of the First Amendment right to association."[324]  Mr. Donziger concluded by requesting Judge

---

[320] (GX 129 at DONZIGER_102935 (Oct. 25, 2018 email from Anne Champion to Steven Donziger).)

[321] (GX 2118 at 1 (dkt. no. 2118 in 11-CV-691).)

[322] (GX 2118 at 2.)

[323] (GX 2118 at 2-3.)

[324] (GX 2118 at 3 n.1.)

Kaplan to rule on Chevron's pending Elliott-Management-related
contempt motion:

> If the Court really thinks that a prohibition on
> litigation finance was so clear after April 2014 that
> I can be held in contempt thereof, it should make such
> a finding directly, which would allow me to seek
> appellate review. Because the Court refuses to do
> this, I apparently must take a contempt sanction in
> this second-layer discovery context, try to
> consolidate it with the pending appeals, and trust
> that the Second Circuit will be able to appreciate it
> all in totality and in the larger and deeply
> disturbing context of these post-judgment proceedings
> generally.  I would urge the Court to rule on these
> critical issues or hold me in contempt and thereby
> allow me to appeal to the Second Circuit.[325]

Absent such a ruling, Mr. Donziger maintained that "Chevron
would succeed in gaining near wholesale access to [his]
confidential, privileged, and protected documents, without any
legitimate basis."[326]

On October 26, 2018, Chevron submitted a letter attaching
its proposed forensic protocol for imaging and examining Mr.
Donziger's devices and accounts and a memorandum of law in
support of its proposed protocol.[327]  Almost two weeks later, Mr.
Donziger filed another letter, reasserting his view that
"discovery in these post-judgment proceedings has been
illegitimate from the start" because Judge Kaplan "ha[d] refused

---

[325] (GX 2118 at 3.)

[326] (GX 2118 at 3.)

[327] (See GX 2119 (dkt. no. 2119 in 11-CV-691); GX 2120 (dkt.
no. 2120 in 11-CV-691).)

to rule for over six months" on Chevron's Elliott-Management-related contempt motion.[328]  Mr. Donziger then reiterated the course of action he explained in his October 25, 2018 letter:

> While I could make countless other objections to the abusiveness and disingenuousness of Chevron's protocol and desired search (and attack) methodology, any and all objections are pointless or at least premature at this point in light of my intended course of action, as I openly informed the Court on October 25, 2018. There I indicated that my position is that I am not ethically able to comply with the Court's order to produce mountains of confidential and privileged material to Chevron under a wholly improper purported privilege waiver ruling and before the Court has even ruled on the core issue in Chevron's original contempt motion.  If the Court is unwilling to rule on the legal basis of Chevron's motion and continues to refuse to allow me to assert any privilege whatsoever, I intend to openly and ethically refuse to comply with any production order and to take an immediate appeal of any resulting contempt finding the Court issues against me.[329]

Mr. Donziger concluded by stating that, should he lose his appeal, "the terms and scope of an appropriate protocol genuinely calculated to protect my legitimate privacy interests and the integrity of my data can be negotiated at that point in time."[330]  Mr. Donziger also purported to "reserve all rights and objections."[331]

---

[328] (GX 2131 at 1 (dkt. no. 2131 in 11-CV-691.)

[329] (GX 2131 at 2 (citation omitted).)

[330] (GX 2131 at 2.)

[331] (GX 2131 at 2.)

On November 26, 2018, Judge Kaplan issued an order

responding directly to Mr. Donziger's October 25, 2018 letter:

> Donziger's letter motion overlooks or ignores so much
> that already is of record in prior decisions by this
> Court and elsewhere that no purpose would be served by
> a point-by-point refutation, the preparation of which
> could serve only to delay that which he seeks to have
> expedited.  It suffices to say that the contempt
> motions now before the Court will be decided in due
> course, bearing in mind that this is not the only case
> on the Court's docket.[332]

Judge Kaplan denied Mr. Donziger's request.[333]

On January 8, 2019, Judge Kaplan held a hearing to address

Chevron's proposed protocol for examining Mr. Donziger's

electronic devices and media accounts.[334]  At the hearing, Mr.

Donziger repeatedly asserted his "foundational objection" to the

post-judgment proceedings:

> MR. DONZIGER:  This is the problem:  You have not
> ruled on the key issue in this post-judgment
> proceeding, which is what is the scope of the Court's
> order with regard --
>
> THE COURT:  Mr. Donziger.  Mr. Donziger.
>
> MR. DONZIGER:  What?

---

[332] (GX 2133 at 2 (dkt. no. 2133 in 11-CV-691).)

[333] (GX 2133 at 2.)

[334] (See GX 2149 at 2:9-13 (dkt. no. 2149 in 11-CV-691)
("The main reason I asked you to come in has to do with the
proposed protocol for the examination of the defendant's
electronic devices and storage media because I think there's a
problem, at least one problem, with what Chevron has
proposed.").)

THE COURT:  You know that.  I know that.  Mr.
Mastro knows that, and everybody else does.  Now, get
to the subject of the terms of this protocol or don't.

MR. DONZIGER:  I have a foundational objection,
which I reiterate right now.  In terms of the
specifics of the protocol, what I would ask this Court
to do is to hold off until this issue can be decided
by the Appellate Court.

THE COURT:  Denied.

MR. DONZIGER:  OK.  Well, hold off at least until
you can rule so we know what the precise scope of
whatever the post-judgment RICO injunction is.

THE COURT:  Mr. Donziger, I'm not delaying it.
I'm acting deliberately.  It's taking some time.  I'm
doing that in an effort to be sensitive to concerns
you've raised.  I am not putting everything on hold.
No way.  No how.  I've made that clear over and over
again.  Now, either address the protocol or don't.

MR. DONZIGER:  Is there a sense from the Court as
to when we might see a ruling in this?

THE COURT:  When it's ready, you'll be among the
first to know.

MR. DONZIGER:  Because while this issue has been
pending decision, Chevron has subpoenaed many people,
I'd say 20 people, I've lost track, and conducted a
series of depositions that I think, as you know, I've
made myself clear, are entirely inappropriate and are
designed to dry up funding for legitimate advocacy and
dry up our ability to advocate.

What I'm trying to point out is the fact the
Court hasn't ruled -- and I recognize you have
whatever concerns you have and to the extent you're
being careful, I appreciate it, but the fact the Court
hasn't ruled --

THE COURT:  And surprising as this may be to you,
Mr. Donziger, this isn't my only professional
responsibility.

MR. DONZIGER:  I know.  Well, I -- let me just say this: For this team here, it's the majority of their work and they have been deposing dozens of people and damaging the case, and there's no -- in my opinion, there's no legal basis because the Court has yet to rule --

THE COURT:  I know in your opinion there's no legal basis.  You are mistaken.  That's my ruling.  I know you don't like it.

MR. DONZIGER:  Well, for there to be discovery in this context, I'm talking about the discovery that's going on as well as what I would call the big enchilada, which is asking me to turn over my entire digital life to them, there has to be a plausible basis, legal basis, from which the Court can hold me in contempt, and in light of the April 2014 order, the clarification order --

THE COURT:  There is no clarification order.[335]

MR. DONZIGER:  Well, whatever you want to call what you issued on April 25, 2014 which laid out the terms of fundraising for this case.

THE COURT:  I disagree with you.

MR. DONZIGER:  There's no -- in my opinion, there's no legitimate basis for which to find me in contempt.  Therefore, there's no legitimate basis for discovery.

THE COURT:  Mr. Donziger, I know your opinion.  I know your opinion.  I know.  I've ruled on your opinion.  You lost.[336]

When Mr. Donziger again tried to raise his foundational objection, Judge Kaplan explained that Mr. Donziger did not have a stay:

---

[335] (See supra note 77.)

[336] (GX 2149 at 10:8-12:21.)

> I don't care about your foundational objection.  You
> don't in this court.  The foundational objection I
> have ruled against.  They have a right to conduct
> appropriate discovery as far as I'm concerned.  <u>I know
> you have an appeal pending in the Second Circuit</u>.  I
> know their brief is due sometime in March.  That's the
> way it goes.  <u>You don't have a stay</u>."[337]

Despite Judge Kaplan's plain articulation that Mr. Donziger was obligated to comply with court orders pending his appeals, Mr. Donziger still did not seek emergency relief from those unstayed orders from the Court of Appeals.[338]

### 7. **The Protocol**

On March 5, 2019, Judge Kaplan issued the Protocol to govern the collection, imaging, and examination of Mr. Donziger's devices and accounts for information responsive to Chevron's discovery requests.[339]  The Protocol recognized two forensic experts: (1) a court-appointed Neutral Forensic Expert and (2) an expert retained by Chevron ("Chevron's Forensic Expert").[340]  By order that same day, Judge Kaplan appointed

---

[337] (GX 2149 at 13:20-14:1 (emphasis added).)

[338] (<u>See</u> GX 7 (no docket entries seeking emergency relief); GX 8 (same); <u>see also</u> Trial Tr. at 654:11-20 ("Q. And in the time period that I had focused you on during the course of your direct, which would be February 28th of 2018 to September 30th of 2019, did Mr. Donziger ever seek a stay in the Second Circuit?  A. No, he did not.  Q. Did he ever seek <u>mandamus</u> relief in that time period in the Second Circuit?  A. No, he did not.  Q. Did he ever seek expedited briefing in the Second Circuit?  A. No, he did not.").)

[339] (<u>See</u> GX 2172 (dkt. no. 2172 in 11-CV-691).)

[340] (<u>See</u> GX 2172 at 1 ¶¶ 1-2.)

Ondrej Krehel, COO and founder of the digital forensics and incident response firm LIFARS LLC, to serve as Neutral Forensic Expert.[341]  Mr. Krehel worked at Judge Kaplan's direction, not Chevron's or Mr. Donziger's.[342]

Two other portions of the Protocol are particularly germane to this case: Paragraph Four and Paragraph Five.  Paragraph Four provides, in relevant part, as follows:

> Within three (3) business days of entry of this Protocol, defendant Steven Donziger ("Donziger") shall provide to both the Neutral and Chevron's Forensic Experts via email a representation listing under penalty of perjury all devices he has used to access or store information or for communication since March 4, 2012--including, but not limited to, personal computers, tablets, phones, and external storage devices, such as external hard drives and thumb drives -- (the "Devices"), indicating for each of the Devices whether he has possession, custody, or control of the Devices and, if not, stating the reasons why that is so, i.e., whether they were destroyed, lost, etc. and the present location of the Devices.  Additionally, Donziger shall produce under penalty of perjury a list of all accounts -- including, but not limited to, email accounts (including web-based email accounts);

---

[341] (See GX 2170 at 1 (dkt. no. 2170 in 11-CV-691); see also Trial Tr. at 788:17-18, 21-24 ("Q. Mr. Krehel, where do you work? A. LIFARS, LLC. . . .  Q. What is LIFARS? A. Digital forensics and incident response firm.  Q. And what is your role with LIFARS? A. I am a digital forensic lead and I'm also COO and founder.").)

[342] (See GX 2170 at 1-2 ¶ 2; Trial Tr. at 791:6-17 ("Going back to Government Exhibit 2170, your appointment as the neutral forensic expert, at whose direction did you understand you were working as the neutral forensic expert?  A. I work under direction of a court and Honorable Judge Kaplan.  Q. Did you work at Chevron's direction?  A. No.  Q. Did you work at Steven Donziger's direction?  A. No.  Q. Did you work at Gibson Dunn's direction?  A. No.").)

accounts (including web- or cloud-based) related to
any document management services, such as Dropbox; and
accounts related to any messaging services, such as
WhatsApp, Facebook Messenger, instant messages, etc. –
Donziger has used since March 4, 2012 (the "Media"),
indicating whether he presently has the ability to
access those accounts and, if not, stating the reasons
why that is so.[343]

Paragraph Five of the Protocol provides, in relevant part:

> The Neutral Forensic Expert shall take possession of
> Donziger's Devices and have access to his Media for
> the purpose of making a mirror image of those Devices
> and Media.  The Devices shall be surrendered to the
> Neutral Forensic Expert at Donziger's address at 245
> West 104th Street, #7D, New York, NY 10025.  The
> Neutral Forensic Expert shall take possession,
> custody, and control of the Devices and transport them
> directly to its offices for the imaging described
> herein.  The devices shall be surrendered to the
> Neutral Forensic Expert at 12:00 pm at 245 West 104th
> Street, #7D, New York, NY 10025 on March 18, 2019.  At
> no time shall Chevron's Forensic Expert have access to
> the original Devices or to live Media accounts absent
> further Court order.[344]

In plain terms, those paragraphs required Mr. Donziger to do two

things: (1) to email to Mr. Krehel and Chevron's Forensic Expert

a listing of his devices and accounts and (2) to provide, only

to Mr. Krehel, his devices and access to his accounts for

imaging.[345]  Mr. Donziger was given three days to do the former

and almost two weeks to complete the latter.[346]

---

[343] (GX 2172 at 1-2 ¶ 4.)

[344] (GX 2172 at 2 ¶ 5 (emphasis added).)

[345] (See GX 2172 at 1-2 ¶¶ 4-5.)

[346] (See GX 2172 at 1-2 ¶¶ 4-5.)

Also on March 5, 2019, Judge Kaplan issued an opinion describing how the Protocol was to operate.[347]  Judge Kaplan explained that the Protocol had "four principal steps": (1) "[f]orensic imaging (i.e., copying) of the devices and media;" (2) "[g]eneration of reports indexing persons and entities named on the images from which the experts and the parties can assess whether to exclude or include documents in the subsequent analysis;" (3) "[f]orensic analysis of the devices and media for evidence of spoliation and recovery of any destroyed files, to the extent possible;" and (4) "[s]earching the documents for responsive documents."[348]  Judge Kaplan then clarified that the Protocol "require[d] that the first, second, and third steps be carried out solely by a court appointed neutral expert," with Chevron's expert and counsel becoming "involved only in the fourth step."[349]  Judge Kaplan indicated that "the protocol limits counsel's involvement in this process to the greatest

---

[347] (See GX 2171 (dkt. no. 2171 in 11-CV-691).)

[348] (GX 2171 at 9 (underline added).)

[349] (GX 2171 at 9.)  Judge Kaplan went on to explain that "[t]he Chevron forensic expert's limited involvement in the search process, to the extent that is permitted by the protocol, is intended to give the neutral expert the benefit of the Chevron forensic expert's understanding of the case to identify more accurately and efficiently documents responsive to the document requests."  (Id. at 9-10.)  Judge Kaplan continued, noting that "[t]he involvement of counsel for Chevron likewise is intended to ensure that responsive documents are identified and produced."  (Id. at 10.)

degree possible in light of Donziger's legitimate privacy interests."[350]

Additionally, Judge Kaplan addressed what he termed "Donziger's Pot Pourri of Rehashed Arguments."[351]  Judge Kaplan, again, rejected Mr. Donziger's First Amendment contention, pointing out that Mr. Donziger lacked standing, had forfeited the claims, and that the claims were "entirely without merit" even if they could be asserted.[352]  As for Mr. Donziger's assertion that Chevron's Elliott-Management-related contempt application provided the only basis for post-judgment discovery, Judge Kaplan found that assertion to be "false" because, among other reasons, it ignored (1) the existence of the unstayed Money Judgment that Chevron was entitled to enforce and (2) that a district court has discretion to order discovery in aid of enforcing orders that it has issued.[353]  And Judge Kaplan again rejected Mr. Donziger's privilege contentions because Mr. Donziger, through his conduct, had "forfeited any  privilege he might otherwise have had."[354]  Mr. Donziger did not seek any

---

[350] (GX 2171 at 10.)

[351] (GX 2171 at 11 (emphasis omitted).)

[352] (GX 2171 at 11-12.)

[353] (See GX 2171 at 12-13.)

[354] (GX 2171 at 14.)

emergency relief from complying with the Protocol from the Court

of Appeals.[355]

Mr. Donziger did not comply with Paragraph Four of the

Protocol's directive to provide a sworn list of his devices and

accounts by March 8, 2019.[356]  Indeed, in a March 11, 2019 email

to Mr. Krehel, Mr. Donziger made his intentions crystal clear:

> Judge Kaplan for the last year has been allowing
> largely unfettered post-judgment discovery targeting
> 25 or more people connected to me or the Ecuador case
> under the auspices of a motion that should have been
> resolved many months ago.  Until it is resolved, I
> have very limited options to seek appellate review.
> While I naturally think the motion should be decided
> in my favor, even that is beside the point: it must be
> decided, period, before I can ethically release
> confidential and constitutionally-protected personal
> and client documents to Chevron, and certainly before
> I can allow my entire hard drive and online accounts
> to be effectively seized and mirrored.

---

[355] (See GX 7 (no docket entries seeking emergency relief);
GX 8 (same); see also Trial Tr. at 656:13-20 ("Q. Did Mr.
Donziger notice an appeal from this order which is Government
Exhibit 2172?  A. No, he did not.  Q. Did Mr. Donziger seek a
stay of this order with the Second Circuit?  A. No, he did not.
Q. Did he seek mandamus relief with the Second Circuit?  A. No,
he did not.").)

[356] (See Trial Tr. at 792:22-792:5 ("Q. And Mr. Krehel, with
respect to this list that Mr. Donziger was directed to provide
to you of his devices and accounts within three business days of
entry of this protocol, did that occur?  A. No.  Q. You did not
receive a list from Mr. Donziger of his devices and/or his
accounts within three days of the business days of entry of the
protocol?  A. That is correct, I did not."); GX 132 at
DONZIGER_105214 (Mar. 11, 2019 email from Ondrej Krehel to
Matthew Burke) ("Per the Court's Order provided to me, I (Ondrej
Krehel) or LIFARS general mailbox did not receive the listing #1
or #2 from Mr. Donziger.").)

I have explained this to Judge Kaplan on repeated
occasions beginning almost one year ago. . . .  I
clearly have stated that I will voluntarily go into
civil contempt of the legally unfounded orders in
order to obtain proper appellate review.  Judge Kaplan
and Chevron have known this <u>long before</u> starting the
pointless process of having you appointed and crafting
a review protocol, etc.  <u>So I hope you have not
cleared your schedule to work on this matter, because,
as Chevron knows, I will not be producing documents
until my due process rights are respected</u>.

This matter will presumably return to Judge Kaplan on
yet another contempt motion sometime soon.  At some
point Judge Kaplan will find me in contempt and I will
appeal.  As I have also made clear to Chevron and the
court, if the appellate court ultimately affirms Judge
Kaplan's merits ruling on the authorizing motion and
his overall handling of the post-judgment proceedings,
then I will cooperate with the order of the court as
is my obligation as a citizen and resident of New
York.  Until such time, you should not expect to hear
from me.[357]

Mr. Donziger refused to comply based on positions that he had

raised several times and that Judge Kaplan had rejected,

including only days earlier.[358]

    Mr. Donziger did not surrender his devices for imaging on

March 18, 2019 as Paragraph Five directed.[359]  That day, Mr.

Krehel arrived in the lobby of Mr. Donziger's apartment building

at around 11:50 a.m. to take possession of Mr. Donziger's

---

[357] (GX 133 at DONZIGER_101980 (Mar. 11, 2019 email from
Steven Donziger to Ondrej Krehel) (emphasis added).)

[358] (<u>See</u> GX 2171 at 11-15.)

[359] (<u>See</u> Trial Tr. at 800:22-24 ("Q. Okay. Did Mr. Donziger
provide you with any devices at all that day?  A. No.").)

devices.[360]  Mr. Krehel asked the building's doorman to call Mr.

Donziger, and the doorman did so several times with no answer.[361]

Mr. Krehel then emailed Mr. Donziger at 12:15 p.m. indicating

that he was in the lobby, that the doorman had called Mr.

Donziger to no avail, and that Mr. Krehel and his associates

would wait in the lobby until 12:30 p.m.[362]

    Mr. Krehel remained in the lobby and eventually encountered

Mr. Donziger around 1:00 p.m. as Mr. Donziger walked into the

lobby carrying a cup of coffee.[363]  Mr. Krehel and Mr. Donziger

conversed, and Mr. Donziger indicated that he would not

surrender any of his devices for imaging.[364]  During that

---

[360] (See Trial Tr. at 796:8-797:5.)

[361] (See Trial Tr. at 796:23-25 ("We entered the lobby of
the building, asked the doorman to call Mr. Donziger. Doorman
called multiple times Mr. Donziger phone, and no one answer.").)

[362] (See GX 134 at DONZIGER_101970-71 (Mar. 18, 2019 email
from Ondrej Krehel to Steven Donziger); see also Trial Tr. at
797:20-25 ("Q. And who did you send that email to?  A. I sent
this email to Mr. Donziger, and I believe attorneys were cc'd as
well.  Q. When you say "attorneys," do you mean the attorneys of
Gibson Dunn or someone else?  A. Correct, Gibson Dunn.").)

[363] (See Trial Tr. at 798:4-12 ("Q. Did you eventually see
Mr. Donziger?  A. Yes.  Q. Approximately what time did you see
Mr. Donziger?  A. Around 1 p.m.  Q. And can you tell us what
happened?  A. Mr. Donziger walked into the building with coffee
in his hand.  Q. I'm sorry, he had what in his hand?  A.
Coffee.").)  Mr. Krehel identified Mr. Donziger in open court.
(See id. at 801:14-802:6.)

[364] (See Trial Tr. at 798:14-17 ("Q. Can you tell us what he
said to you and you said to him.  A. From my recollection, Mr.
Donziger told me that he will not surrender any devices, and
                             (continued on following page)

conversation, Mr. Donziger also told Mr. Krehel that he possessed an iPhone and a MacBook Air.[365]  After speaking with Mr. Donziger, Mr. Krehel left Mr. Donziger's apartment building sometime between 1:00 and 1:15 p.m.[366]  Later that day, Mr. Krehel emailed Chevron's counsel, copying Mr. Donziger, confirming that Mr. Donziger had not provided any devices but had said that he possessed an iPhone and a MacBook Air.[367]  As of trial, Mr. Donziger still had not surrendered any devices or accounts to Mr. Krehel for imaging.[368]

---

(continued from previous page)
that basically we will not receive any devices that day from him.").)

[365] (See Trial Tr. at 798:18-19, 800:2-8 ("Q. Did you ask him about any devices that he had?  A. Yes, I did. . . .  Q. And did Mr. Donziger give you a response?  A. Yes, he did.  Q. What do you recall him saying to you?  A. To my recollection he mentioned that he has an iPhone and MacBook Air and potentially he might have had some other devices but he mentioned that they would not be related matter.  They would be more like a storage devices.").)

[366] (See Trial Tr. at 800:17-21 ("Q. Now, approximately what time did you leave the apartment building, the 245 West 104?  A. Most likely on or around one p.m. or 1:15 p.m.  Q. After you spoke with Mr. Donziger?  A. Correct.").)

[367] (See GX 134 at DONZIGER_101970 (Mar. 18, 2019 email from Ondrej Krehel to Andrew Neuman).)

[368] (See Trial Tr. at 803:23-804:6 ("Q. Did Mr. Donziger ever surrender any devices to you, Mr. Krehel, for imaging?  A. No.  Q. He didn't do it in June?  A. No.  Q. Didn't do it in July?  A. Correct.  Q. And as you sit here today, has that happened?  A. Did not happen.").)

## 8. **Contempt Findings & Coercive Fines**

On March 20, 2019, Chevron moved to hold Mr. Donziger in contempt for violating Paragraphs Four and Five of the Protocol by (1) failing to provide Mr. Krehel and Chevron's Forensic Expert with a listing of his devices and accounts and (2) refusing to surrender his devices and accounts to Mr. Krehel for imaging.[369]  On April 8, 2019, Mr. Donziger filed a pro se response to Chevron's contempt application.[370]  Mr. Donziger reiterated his intent to suffer contempt sanctions:

> [A]s I have made clear, my responses have been limited by the fact that it is my intention to go into voluntary contempt as a matter of principle rather than submit to the review process prior to achieving any appellate review.  Accordingly, I have not dedicated my limited time and resources to articulating challenges to the bewilderingly and unnecessarily complex review protocol drafted by Chevron and ordered, in essentially the same form, by the Court.[371]

Mr. Donziger again raised First Amendment concerns and claimed that the Protocol "merely disguise[d] a de facto authorization for Chevron to rifle through my files largely as it wishes."[372]

---

[369] (See GX 2175 (dkt. no. 2175 in 11-CV-691); GX 2176 (dkt. no. 2176 in 11-CV-691).)

[370] (See GX 2184 at 4-6.)

[371] (GX 2184 at 4-5.)

[372] (GX 2184 at 5.)

Mr. Donziger concluded by claiming that he "ha[d] relentlessly sought appellate review and w[ould] continue to do so."[373]

On May 23, 2019, Judge Kaplan issued the Contempt Order finding Mr. Donziger to be, among other things, "in willful civil contempt" of Paragraph 4 of the Protocol.[374]  Judge Kaplan noted that Mr. Donziger had "made no effort whatever to comply, as [wa]s evident from his anticipatory refusal to do so."[375]  Until Mr. Donziger complied with Paragraph Four of the Protocol, Judge Kaplan ordered that:

> [Mr. Donziger] shall pay a coercive civil fine to the Clerk of Court with respect to May 28, 2019 and each subsequent day from that date until the date on which he fully purges himself of this contempt by doing so. The amount of the coercive fine shall begin at $2,000 for May 28, 2019 and shall double for each subsequent day during which Donziger fails fully to purge himself of this contempt.[376]

On May 28, 2019, Mr. Donziger filed a notice of appeal of the Contempt Order.[377]  The Court of Appeals assigned that appeal docket number 19-1584.[378]

---

[373] (GX 2184 at 11.)

[374] (See GX 2209 at 70.)

[375] (GX 2209 at 63.)

[376] (GX 2209 at 70.)

[377] (See GX 2211 (dkt. no. 2211 in 11-CV-691).)

[378] (See GX 9 (docket in Chevron Corp. v. Donziger, 19-1584 (2d Cir.)); see also Trial Tr. at 646:22-647:9 ("Q. Mr. Thomson, what appeal is this docket sheet for?  We can scroll through the
(continued on following page)

On May 29, 2019, Judge Kaplan issued another order finding Mr. Donziger to be in "willful civil contempt" of Paragraph Five of the Protocol.[379]  Judge Kaplan noted that he had "inadvertently failed to dispose fully of Chevron's motion to hold Donziger in contempt" in the Contempt Order.[380]  Until Mr. Donziger complied with Paragraph Five of the Protocol, Judge Kaplan ordered that:

> [Mr. Donziger] shall pay a coercive civil fine to the Clerk of Court with respect to June 3, 2019 and each subsequent day from that date until the date on which he fully purges himself of this contempt by doing so. The amount of the coercive fine shall begin at $2,000 for June 3, 2019.  It shall double for each subsequent day during which Donziger fails fully to purge himself of this contempt until the fine, so calculated, would reach or exceed $100,000, at which point it would become $100,000 for that and each subsequent day that Donziger fails to purge fully the contempt.[381]

Judge Kaplan also indicated that "[n]othing herein forecloses the possibility of . . . granting additional coercive relief,

---

(continued from previous page)
second page, you can look at it.  A. Well, it's the docket sheet for the appeal from the district court's contempt order dated May 24, 2019.  Q. Sir, did you say dated May 24th?  A. I believe that's right, but I could be wrong.  The date of the order.  The date of the appeal was May 28th.  Q. If you could take a look at docket entry number 2.  Oh, let me take a look.  I see.  You're looking at docket entry number 3.  A. May 23.  Q. The opinion was May 23rd.  A. Correct.").)

[379] (See GX 2219 at 1 (dkt. no. 2219 in 11-CV-691).)  Judge Kaplan issued a corrected version of that order on June 4, 2019. (See GX 2222 (dkt. no. 2222 in 11-CV-691).)

[380] (GX 2219 at 1; GX 2222 at 1.)

[381] (GX 2219 at 1; GX 2222 at 1.)

106

including increased fines and other measures, in the event the civil contempt herein is not fully purged."[382]  Mr. Donziger did not notice an appeal from that order.[383]

On May 29, 2019, Mr. Donziger sent an email to Mr. Krehel attaching a declaration related to his devices and accounts.[384] In that declaration, Mr. Donziger asserted that he had and used the following devices and accounts: (1) a MacBook that he had used since 2012; (2) an iPhone, although he had used other phones since 2012 that had either been lost, damaged, or replaced; (3) the applications WhatsApp, Signal, and Telegram; (4) two email accounts, although he may have used others for which he no longer possessed login or password information; (5) Dropbox to access files posted by others; and (6) Twitter.[385]  On June 5, 2019, Mr. Donziger emailed Mr. Krehel an updated

---

[382] (GX 2222 at 1.)

[383] (See Trial Tr. at 648:6-9 ("Q. With respect to this order or civil contempt finding which is in Government Exhibit 2219, following that finding, did Mr. Donziger notice an appeal from that order?  A. No, he did not.").)

[384] (See GX 138 at DONZIGER_105038-40 (May 29, 21019 email from Steven Donziger to Ondrej Krehel and attachment).)

[385] (See GX 138 at DONZIGER_105039-40; see also GX 2230-1 (dkt. no. 2230-1 in 11-CV-691) (same document).)

declaration that expanded on the information provided in his May 29 declaration.[386]

On June 5, 2019, Judge Kaplan issued an order directing Chevron and Mr. Donziger to appear on June 10, 2019 "to resolve any remaining disagreement" related to whether Mr. Donziger had purged his contempt related to Paragraph Five of the Protocol.[387] Judge Kaplan explained that Mr. Donziger held "the keys in his pocket, figuratively speaking, with respect to any coercive fines imposed upon him," which Judge Kaplan indicated would "be avoided" if Mr. Donziger complied.[388]  Prior to the hearing, Chevron filed a statement with Judge Kaplan, alleging that Mr. Donziger had not complied with either Paragraph Four or Paragraph Five of the Protocol and indicating that more stringent coercive compliance measures--such as the surrender of his passport, the seizure of his devices by the Marshals, or even civil imprisonment--might be necessary.[389]

At the June 10, 2019 hearing, Mr. Donziger stated that his "bank accounts [we]re frozen" and that he did not "have

---

[386] (See GX 140 (June 5, 2019 email from Steven Donziger to Ondrej Krehel with attachments); GX 2230-2 (dkt. no. 2230-2 in 11-CV-691) (same document as declaration attached to email).)

[387] (GX 2223 at 1 (dkt. no. 2223 in 11-CV-691).)

[388] (GX 2223 at 1.)

[389] (See GX 2229 at 1-2, 7-8 (dkt. no 2229 in 11-CV-691).)

resources to pay the fines."[390]  As for his alleged

noncompliance, Mr. Donziger maintained that he intended to

comply with Paragraph Four of the Protocol but Paragraph Five

was a different story.[391]  Mr. Donziger did not dispute that he

had not complied with Paragraph Five, instead maintaining that

directive "implicate[d] core constitutional rights for [himself]

and many people associated with this case" and that complying

would prevent him from being able to vindicate those rights.[392]

Mr. Donziger also asked Judge Kaplan not to order the surrender

of his passport, which, in his view, "would essentially render

[him] a nullity as an advocate."[393]  If Judge Kaplan was inclined

to rule differently, however, Mr. Donziger indicated that he

would "voluntarily surrender" his passport until he could "deal

with it at the Second Circuit."[394]

        Regarding the coercive sanctions, Judge Kaplan was frank

with Mr. Donziger:

        You have the ability to get yourself out of whatever
        box you're in by complying with my orders.  And the

_____

        [390] (GX 2352 at 14:20-21, 15:1-2.)

        [391] (See GX 2352 at 7:21-8:1 ("MR. DONZIGER: That's not
true.  I have a draft affidavit that I sent in good faith to
Chevron to work with them to get in compliance.  I intend to get
in compliance on paragraph 4.  THE COURT: What about paragraph
5?  MR. DONZIGER: That's a separate issue.").)

        [392] (GX 2352 at 8:2-4, 8:13-16.)

        [393] (GX 2352 at 15:21-16:4.)

        [394] (GX 2352 at 16:6-9.)

> United States Supreme Court says, absent a stay, you
> have an obligation to do that, and if you do not
> discharge that obligation, you do it at your own risk.
> And that's been clear to you for a very long time.
> And you disregard order after order.[395]

When Mr. Donziger again tried to argue that complying with

Paragraph Five "implicate[d] core First Amendment rights," Judge

Kaplan responded:

> So you keep saying. I've heard that record played
> many times before. Now, let's end it. I'm not going
> to listen to it anymore. You've been fully heard on
> it. You have briefed it. I have issued an opinion on
> it. You appealed from that opinion. You filed a
> brief in the Second Circuit. It hasn't been
> calendared for argument. You never sought a stay of
> it. There it is.
>
> You're welcome to go on to the Second Circuit and see
> what happens. But you take your chances in doing
> so.[396]

At the end of the hearing, Judge Kaplan reiterated that Mr.

Donziger had the "keys in his pocket," so to speak:

> Look, Mr. Donziger, just so it's entirely clear, these
> coercive fines that I have imposed I have made clear
> will evaporate if, as, and when you are in full
> compliance. They will be gone. I'm not sure I had to
> do that, but I have made that commitment. But every
> day that goes by -- and indeed your statements here
> this morning suggest to me that they're a waste of
> time and that if these orders are to be enforced it's
> going to take more than I've done up to now.
>
> Now, you would be well advised, so far as paragraph 4
> is concerned, to work out your problems with Chevron
> and take care of at least that part of it, which you
> don't seem to be as upset about as the rest. And you
> did manage to finally comply with an order that's been

---

[395] (GX 2352 at 16:24-17:5.)

[396] (GX 2352 at 18:25-19:8.)

outstanding for five years in respect of the
assignment.  We may come to a very hard place on
paragraph 5 for you.  But that's where we are.  And
I'm being totally straight with you.[397]

Prior to adjourning, Judge Kaplan confirmed that the coercive

fines related to Paragraphs Four and Five of the Protocol were

running simultaneously and that the fines were cumulative.[398]

### 9. <u>The Passport Order & Mr. Donziger's Emergency Motion for a Stay</u>

On June 11, 2019, Judge Kaplan issued the Passport Order,

which imposed additional coercive sanctions on Mr. Donziger for

his refusal to comply with the Protocol.[399]  Specifically, Judge

Kaplan ordered the following:

Donziger, on or before June 12, 2019 at 4 p.m., shall
surrender to the Clerk of the Court each and every
passport issued to him by each and every nation to
have issued a passport to him, the Clerk to retain
possession thereof unless and until this Court
determines that Donziger has complied fully with
paragraphs 4 and 5 of the Protocol.[400]

---

[397] (GX 2352 at 20:8-23.)

[398] (<u>See</u> GX 2352 at 20:24-21:6 ("MR. DONZIGER: May I just
ask a very quick question about something you just said.  On
what basis are the fines running?  Under lack of compliance with
paragraph 4 or under lack of compliance with paragraph 5 or
both?  THE COURT: Both.  MR. DONZIGER: So there are simultaneous
fines running in your mind?  THE COURT: Simultaneous and
cumulative.").)

[399] (<u>See</u> GX 2232 at 1-2.)

[400] (GX 2232 at 2.)

111

Judge Kaplan also made clear that "[a]ll [Mr. Donziger] need do to obtain release of his passport(s) is to comply fully with the Court's orders."[401]

That same day, Judge Kaplan issued another order denying Mr. Donziger's motion to vacate the May 29, 2019 contempt finding regarding his disobedience of Paragraph Five of the Protocol.[402]  Judge Kaplan rejected the argument that Mr. Donziger's notice of appeal of the Contempt Order had divested Judge Kaplan of jurisdiction to impose the contempt sanctions.[403] Judge Kaplan concluded by noting that the denial was "without prejudice to any application by Donziger for a stay pending appeal made in full compliance with the Federal Rules of Civil and Appellate Procedure and the Local Rules of this Court, including but not limited to Local Civ. R. 7.1."[404]

On June 12, 2019, Mr. Donziger filed a pro se "Emergency Motion" seeking to stay the fines and other contempt sanctions pending his appeal of the Contempt Order as well as possible appeals of (1) Judge Kaplan's June 4, 2019 order finding Mr. Donziger in contempt of Paragraph Five of the Protocol and (2)

---

[401] (GX 2232 at 2.)

[402] (See GX 2233 at 2 (dkt. no. 2233 in 11-CV-691).)

[403] (See GX 2233 at 1-2.)

[404] (GX 2233 at 2.)

the Passport Order.[405]  Mr. Donziger requested "an immediate administrative stay of all fines and coercive orders to allow for resolution of the instant motion and if necessary an emergency stay motion to the Second Circuit."[406]  Mr. Donziger asserted that his motion "implicate[d] [his] fundamental constitutional rights and the fundamental rights of thousands of Indigenous peoples in Ecuador, whose lives truly hang in the balance."[407]  Mr. Donziger also indicated that he would not comply with the Passport Order:

> I am not able to comply with the Court's deadline of 4 p.m. today in the Passport Order on account of this pending motion for emergency relief and the severe and irreparable harm as articulated in this motion. Indeed, I am still working to understand the nature and scope of the harm potentially imposed by the Passport Order, which issued just 24 hours ago. . . . In the last 24 hours I have prepared this emergency stay motion to Your Honor, and I am immediately turning to the task of preparing an emergency stay to the Circuit in the event Your Honor denies this motion.  I will also continue to try to understand the present situation I am in and make considered decisions about the necessary next steps.[408]

On June 25, 2019, Mr. Donziger filed a <u>pro se</u> declaration in support of his emergency motion, in which he represented that he would "agree to submit [his] devices to a neutral forensic

---

[405] (<u>See</u> GX 2234 at 1 (dkt. no. 2234 in 11-CV-691).)

[406] (GX 2234 at 1.)

[407] (GX 2234 at 1-2.)

[408] (GX 2234 at 15 n.6.)

expert for imaging so long as the expert is directed not to allow any access to the images by anyone until the appeal is decided."[409]

On June 28, 2019, Judge Kaplan suspended the accumulation of the coercive fines because "it d[id] not appear that the further accumulation of monetary . . . sanctions . . . [wa]s likely to have the desired effect."[410]  In that same order, however, Judge Kaplan made clear that "[n]othing herein forecloses the possibility of the Court granting additional coercive relief, including increased fines and other measures, in the event all civil contempts are not fully purged."[411]

On July 2, 2019, Judge Kaplan issued an order granting in part and denying in part Mr. Donziger's motion for a stay pending appeal.[412]  Specifically, Judge Kaplan granted a stay pending appeal of the portions of the Protocol requiring or permitting disclosure of information to Chevron, subject to two conditions: (1) Mr. Donziger was required to file his opening brief before the Court of Appeals no later than July 31, 2019

---

[409] (GX 2250 at 3-4 (dkt. no. 2250 in 11-CV-691).)  Mr. Donziger even suggested that he planned "to retain an expert to perform the imaging anyway in order to demonstrate my willingness to comply with any and all Court orders once my appellate rights have been respected."  (Id. at 4 n.3.)

[410] (GX 2252 at 1 (dkt. no. 2252 in 11-CV-691).)

[411] (GX 2252 at 1.)

[412] (GX 2254 at 3 (dkt. no. 2254 in 11-CV-691).)

and to file any reply no later than fourteen days after Chevron filed its opposition; and (2) Mr. Donziger was instructed not to oppose any motion to expedite any of his appeals.[413]  Judge Kaplan denied the motion "in all other respects" and clarified that Mr. Donziger "remain[ed] obligated to comply fully with paragraphs 4 and 5 of the Protocol and to surrender his passport(s) to the Clerk as previously directed."[414]

Mr. Donziger did not file his opening brief until September 9, 2019, more than one month late.[415]  In the interim, Mr. Donziger did not request any extension of the July 31 deadline from Judge Kaplan.[416]  Nor did he seek a stay from the Court of Appeals,[417] despite his June 12th representation that he was "immediately turning to the task of preparing an emergency stay to the Circuit in the event" Judge Kaplan denied his stay

---

[413] (GX 2254 at 3.)

[414] (GX 2254 at 3.)

[415] (See GX 9 at 12 (dkt. no. 48); GX 317 at 32 (Sept. 9, 2019 appellate brief filed by Mr. Donziger); see also Trial Tr. at 349:11-14 ("Q. Ms. Champion, did Mr. Donziger file his appellate brief and appendix in support of his appeal from the May 23rd, 2019, decision by July 31st, 2019?  A. No.").)

[416] (See Trial Tr. at 349:15-18 ("Q. Did Mr. Donziger apply to Judge Kaplan asking for an extension on this condition that he file his appellate brief by July 31st of 2019?  A. No.").)

[417] (See GX 7 (observing no motions to stay); GX 8 (same); GX 9 (same).)

motion.[418]  Finally, Mr. Donziger still did not produce his

devices to Mr. Krehel for imaging[419] or surrender his passport to

the Clerk of the Court.[420]

### e. **Mr. Donziger's Post-Judgment Appeals & the Court of Appeals' March 4, 2021 Opinion**

Three Second Circuit appeals are relevant to these

proceedings: (1) Mr. Donziger's appeal of the Money Judgment

("Appeal No. 18-855");[421] (2) his appeal of Judge Kaplan's

decision denying Mr. Donziger's motion to dismiss Chevron's

---

[418] (GX 2234 at 15 n.6.)

[419] (See Trial Tr. at 803:23-804:6 ("Q. Did Mr. Donziger ever surrender any devices to you, Mr. Krehel, for imaging?  A. No.  Q. He didn't do it in June?  A. No.  Q. Didn't do it in July? A. Correct.  Q. And as you sit here today, has that happened?  A. Did not happen.").)

[420] Mr. Ng, supervisor of records management in the Clerk's Office for the Southern District of New York, testified to the following: (1) the Clerk's Office takes possession of physical items such as passports; (2) if a passport is surrendered, the Clerk's Office would place it in a sealed envelope and indicate on the docket that a sealed document was placed in the vault; (3) the docket sheet (GX 1A) did not reflect that Mr. Donziger had surrendered a passport; and (4) no other Clerk's Office records indicated that Mr. Donziger had surrendered a passport to the Clerk's Office.  (See Trial Tr. at 561:11-566:25.) Moreover, at his initial appearance to answer the criminal contempt charges, Mr. Donziger requested that the Court permit him to keep his passport and clear any travel plans with Pretrial Services.  (See id. at 831:22-832:3 ("But what I would propose, because I don't think this is a normal kind of case, given the long history of my particular role in this case, is to allow me to keep my passport for me to propose when I want to travel to another place that I would inform the Court or inform pretrial services or whatever the process is, get permission to go for a certain period of time and be allowed to return.").)

[421] (See GX 7; Trial Tr. at 632:23-633:11.)

contempt motion, his motion for a declaratory judgment, and his motion for a protective order ("Appeal No. 18-2191");[422] and (3) Mr. Donziger's appeal from the Contempt Order ("Appeal No. 19-1584").[423]  On Mr. Donziger's motion, the Court of Appeals consolidated Appeals Nos. 18-855, 18-2191, and 19-1584.[424]  In connection with those appeals, Mr. Donziger did not seek a stay of Judge Kaplan's orders, petition the Court of Appeals for a

---

[422] (See GX 8; Trial Tr. at 640:7-16.)

[423] (See GX 9; Trial Tr. at 646:22-647:9.)

[424] (See GX 7 at 14, 16 (dkt. nos. 69, 74, 117); GX 8 at 8, 10 (dkt. nos. 36, 40, 81); GX 9 at 11-12 (dkt. nos. 50, 56); see also Trial Tr. at 641:16-21 ("Q. Mr. Thomson, what relationship, if any, was there between appeal 18-855 and appeal 18-2191?  A. The two appeals were consolidated on Mr. Donziger's motion.  Q. And what does that mean?  A. It means they were to be considered at the same time as part of the same proceeding."); id. at 648:17-24 ("Q. You mentioned Mr. Donziger's opening brief in the consolidated appeal. What relationship, if any, did case number 19-154, which is reflected in docket sheet for Government Exhibit 9, what relationship, if any, did that appeal have with consolidated appeals 18-855 and 18-2191?  A. Mr. Donziger moved in the Second Circuit to have the Court of Appeals consolidate the appeals so they were all decided together in the same proceeding.").)

writ of mandamus, or request expedited briefing.[425]  To the

contrary, Mr. Donziger sought at least two extensions.[426]

On September 9, 2019, Mr. Donziger filed his opening brief

in the consolidated appeal before the Court of Appeals.[427]

Crucially, that brief did not, in any way, challenge: (1) the

Contempt Order's finding regarding Mr. Donziger's noncompliance

with Paragraph Four of the Protocol; (2) the Contempt Order's

finding regarding Mr. Donziger's failure to assign the 2011

Contingent Fee or the 2017 Contingent Fee; (3) the Contempt

Order's finding regarding Mr. Donziger's pledging a portion of

his contingent fee interest to Mr. Zelman; (4) the May 29, 2019

contempt finding regarding Mr. Donziger's noncompliance with

Paragraph Five of the Protocol; (5) the legal foundation of the

Protocol; or (6) the legal foundation of the Passport Order.[428]

---

[425] (See GX 7 (observing no docket entries seeking such
relief); GX 8 (same); GX 9 (same); see also Trial Tr. at 654:11-
20 ("Q. And in the time period that I had focused you on during
the course of your direct, which would be February 28th of 2018
to September 30th of 2019, did Mr. Donziger ever seek a stay in
the Second Circuit?  A. No, he did not.  Q. Did he ever seek
mandamus relief in that time period in the Second Circuit?  A.
No, he did not.  Q. Did he ever seek expedited briefing in the
Second Circuit?  A. No, he did not.").)

[426] (See GX 7 at 14 (dkt. nos. 63, 69); GX 8 at 8 (dkt. no.
36); GX 9 at 13 (dkt. no. 86).)

[427] (See generally GX 317.)

[428] (See GX 317 at 8 (statement of the issues); id. at 9-31
(substantive arguments); see also Trial Tr. at 650:2-653:10
(described some of the issues that Mr. Donziger did and did not
challenge on appeal).)

Instead, Mr. Donziger's brief focused <u>almost exclusively</u> on Judge Kaplan's contempt finding regarding Mr. Donziger's fundraising for the Lago Agrio Case by selling interests in the Ecuadorian Judgment other than his own.[429]

On March 4, 2021, the Court of Appeals issued its opinion resolving Appeals Nos. 18-855, 18-2191, and 19-1584.[430]  The Court of Appeals affirmed the Money Judgment (Appeal No. 18-855) and dismissed as moot Appeal No. 18-2191.[431]  As for Appeal No. 19-1584, the Court of Appeals affirmed Judge Kaplan's orders in every respect, save for one exception.[432]  The Court of Appeals reversed the "contempt finding as to Donziger's sale of interests in the Ecuadorian Judgment <u>other than of interests in his contingent share of that judgment</u>" and, accordingly, vacated "the supplemental judgments awarding Chevron . . . compensatory sanctions related to that erroneous finding and attorneys' fees."[433]  In doing so, the Court of Appeals stressed the narrowness of its ruling:

> <u>Lest this Opinion be taken as somehow vindicating Donziger</u>, it is important to put our holding in

---

[429]  (<u>See</u> GX 317 at 8 (statement of the issues); <u>id.</u> at 9-31 (substantive arguments).)

[430]  <u>See</u> <u>Chevron Corp. v. Donziger</u>, 990 F.3d 191 (2d Cir. 2021).

[431]  <u>Donziger</u>, 990 F.3d at 214.

[432]  <u>Donziger</u>, 990 F.3d at 214.

[433]  <u>Donziger</u>, 990 F.3d at 214.  (emphasis added).

context.  Our ruling today has no effect on, and does
not in any way call into question, the district
court's thorough and fully persuasive fact findings
and legal conclusions, which we have already affirmed
in full, establishing Donziger's violations of law
and ethics that added up to a pattern of racketeering
in violation of the RICO statute.  Nor does it
question in any way the district court's conclusions
that Donziger acted in contempt of the Injunction
that resulted from the RICO Judgment in numerous
ways.  <u>Indeed, except with respect to the very
specific alleged violation of the Injunction
discussed in this Opinion, Donziger does not even
attempt to challenge the district court's findings of
his contumacious conduct</u>.[434]

Thus, the Court of Appeals remanded for "the district court to

determine the fees reasonably expended to secure the contempt

findings affirmed on appeal, and for any further proceedings

consistent with this Opinion."[435]

**III.  <u>Conclusions of Law & Additional Findings</u>**

The Court will first address the arguments raised by Mr.

Donziger in his post-trial briefing regarding what he describes

---

[434] <u>Donziger</u>, 990 F.3d at 212–13 (emphasis added).  Despite
Federal Rule of Civil Procedure 11's requirements, it is
exceedingly difficult to square the Court of Appeals' language
with Mr. Donziger's trial counsel's claim that "Mr. Donziger's
core contentions as to the unlawfulness of that discovery
process have now been affirmed by the Second Circuit."
(Memorandum of Law in Support of Motion to Dismiss and For
Discovery in Support Thereof ("Vindictive Pros. MTD"), dated
Apr. 12, 2021 [dkt. no. 259] at 8 (emphasis omitted).)  As the
quoted language above unequivocally shows, the Court of Appeals
did no such thing.

[435] <u>Donziger</u>, 990 F.3d at 215.

as threshold "structural" issues underlying this case.[436]  Next, the Court will turn to Mr. Donziger's contention that the Court erroneously imposed the collateral bar rule at trial.[437] Finally, the Court will consider whether the Special Prosecutors have sustained their burden of proof on the criminal contempt charges.

### a. **Mr. Donziger's "Structural" Issues**

Mr. Donziger asserts that, "[a]s a threshold issue, this case has been riddled with structural decay as to warrant immediate dismissal on all charges."[438]  Mr. Donziger raises nine specific points and proposes nine related paragraphs of factual findings.[439]  Mr. Donziger also offers many of these same arguments in a separately-filed, citationless letter seeking both (1) dismissal of the criminal contempt charges and (2) the Court's recusal.[440]  Given the significant overlap among the arguments raised in Mr. Donziger's post-trial briefing and his letter motion, the Court will address them together.

---

[436] (See Def. I/II/III Br. at 1-3; see also id. at 3-13 ¶¶ 1-9 (proposing findings of fact on these issues).)

[437] (See Def. I/II/III Br. at 18.)

[438] (Def. I/II/III Br. at 1.)

[439] (See Def. I/II/III Br. at 1-13.)

[440] (See June 3 Letter MTD at 1-3.)

Before addressing those arguments, however, it is necessary
to make two observations.  First, many of these contentions will
be familiar to anyone who has followed this case.  Indeed,
almost none of the arguments Mr. Donziger advances are, in any
meaningful sense, "new."  As will be shown below, the
overwhelming majority have been considered and rejected by the
Court before, some as many as three or even four times.
Accordingly, many of these arguments for dismissal are properly
construed as motions to reconsider the Court's past orders, and
the bar for reconsideration is rightfully a high one.[441]  And
second, much of the "evidence" on which Mr. Donziger relies--
including news articles as well as other out-of-court statements
and documents--is not really "evidence" at all, <u>i.e.</u>, it is not
part of the evidentiary record at trial.  Indeed, almost all of
it is hearsay--much of it unsworn to boot--which would not
properly be considered for the truth of any matters asserted.[442]

---

[441] See <u>Shrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d
Cir. 1995) ("The standard for granting such a motion is strict,
and reconsideration will generally be denied unless the moving
party can point to controlling decisions or data that the court
overlooked--matters, in other words, that might reasonably be
expected to alter the conclusion reached by the court.").

[442] See FED. R. EVID. 801(c) ("'Hearsay' means a statement
that: (1) the declarant does not make while testifying at the
current trial or hearing; and (2) a party offers in evidence to
prove the truth of the matter asserted in the statement."); <u>id.</u>
802 ("Hearsay is not admissible unless any of the following
provides otherwise: a federal statute; these rules; or other
rules prescribed by the Supreme Court.").

Consequently, the Court considers these arguments in light of the evidence actually admitted at trial.

## 1. Disinterested Special Prosecutors

Mr. Donziger first asserts that the Special Prosecutors, who are private attorneys affiliated with the law firm Seward & Kissel LLP ("Seward") and, later, with Glavin PLLC, are not "disinterested" as required by Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987).[443]  In Young, the Supreme Court, "exercising [its] supervisory power," held that "counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order."[444]  Contrary to what Mr. Donziger's counsel implies,[445] Young did not hold that the Constitution requires the appointment of a disinterested prosecutor.[446]

---

[443] (See Def. I/II/III Br. at 1.)

[444] Young, 481 U.S. at 790 (emphasis added).

[445] (See Def. I/II/III Br. at 13 ¶ 9 (arguing that Young "renders the entire proceeding a constitutional nullity").)

[446] The separate opinions filed by Justices Blackmun and Powell confirm that understanding.  See Young, 481 U.S. at 814-15 (Blackmun, J., concurring) ("I would go further, however, and hold that the practice--federal or state--of appointing an interested party's counsel to prosecute for criminal contempt is a violation of due process."); see also id. at 826 (Powell, J., concurring in part and dissenting in part) ("Here, the error is not of constitutional dimension.").

To support his <u>Young</u>-based contention, Mr. Donziger points
to the following: (1) the Special Prosecutors' failure to
disclose immediately that Chevron had been a Seward client as
recently as 2018; (2) Seward's "substantial oil and gas industry
practice" and other indirect ties to Chevron or the oil
industry; (3) Ms. Glavin's service, along with the Court and
more than 100 others (including Judges of this Court and of the
Court of Appeals), on the Board of Directors of the Fordham Law
Alumni Association ("FLAA Board"); and (4) Ms. Glavin's
involvement as a government lawyer in an unrelated prosecution
of Senator Ted Stevens.[447]  None advances the ball.

Mr. Donziger has already asserted, at least twice before,
that the Special Prosecutors are not disinterested.[448]  The Court
rejected that contention both times, finding that (1) Seward's
former relationship with Chevron did not merit disqualification
under <u>Young</u> because (a) Chevron was no longer Seward's client,
(b) Seward's work for Chevron, which involved the preparation of
corporate forms, was entirely unrelated to this case, and (c)
Seward's work for Chevron was <u>de minimis</u>, amounting to only two
matters billed at a total of about $30,000 (<u>i.e.</u>, less than 0.1%

---

[447] (<u>See</u> Def. I/II/III Br. at 1-2, 8 ¶¶ 5-6.)

[448] (<u>See</u> Motions on Behalf of Steven Donziger for Various
Relief ("Def. Pretrial Motions"), dated Feb. 27, 2020 [dkt. no.
60] at 17-24; Vindictive Pros. MTD at 9-10.)

of Seward's annual revenue);[449] and (2) "the theory that Seward

has a financial conflict based on its clients' ties to Chevron"

and other energy companies was "wholly unconvincing" and "far

too attenuated to justify relief."[450]  Because Mr. Donziger

identifies no material facts or legal authority that the Court

overlooked, the Court adheres to its prior rulings.[451]

Although Mr. Donziger does not appear to have argued

previously that Ms. Glavin's service on the FLAA Board somehow

makes her "interested" under Young--he instead raised that fact

in support of one of a flurry of motions to recuse the Court[452]--

that service does not in any way relate to any "interest"

arising from the underlying civil case.[453]  Further, even though

---

[449] (See Memorandum & Order ("Pretrial Motion Order"), dated
[dkt. no. 68] at 16-20; see also Memorandum & Order ("Vindictive
Pros. Order"), dated May 6, 2021 [dkt. no. 297] at 21 (refusing
to reconsider that ruling in a repackaged form).)  As for the
timing of the disclosure, the Court found that "Mr. Donziger
ha[d] not demonstrated any prejudice from the timing of the
Seward/Chevron disclosure that would justify outright
dismissal."  (Pretrial Motion Order at 20 n.7.)

[450] (Pretrial Motion Order at 15-16; see also Vindictive
Pros. Order at 21 (refusing to reconsider that ruling in a
repackaged form).)

[451] See Shrader, 70 F.3d at 257.

[452] (See Notice of Motion ("Vindictive Pros. Notice"), dated
Apr. 12, 2021 [dkt. no. 258] at 1.)  The Court has already
concluded that service on the FLAA Board "provide[d] no basis
for [the Court's] recusal."  (Vindictive Pros. Order at 25.)

[453] By striking contrast, the private attorneys appointed in
Young were counsel for the party that was the beneficiary of the
(continued on following page)

125

it is unclear if Mr. Donziger previously alleged past misconduct by Ms. Glavin while she was a senior government attorney, that allegation, again, has no nexus whatsoever to 11-CV-691 or to Chevron.  Moreover, the only "evidence" Mr. Donziger marshals related to the <u>Stevens</u> case is out-of-court statements and documents,[454] none of which the Court may consider for the truth of any matters asserted in them.[455]  Because Mr. Donziger's theories have nothing to do with any purported connection between the Special Prosecutors and Chevron--the beneficiary of

_____

(continued from previous page)
very court order the contemnor was accused of violating.  <u>See</u> <u>Young</u>, 481 U.S. at 790.

[454] Specifically, Mr. Donziger cites a special counsel's investigation report filed related to <u>Stevens</u> (the "Stevens Report") as well as a newspaper article.  (<u>See</u> Def. I/II/III Br. at 8 n.7; <u>see also</u> Ex. B to June 25 Reply ("Stevens Report"), dated Mar. 15, 2012 [dkt. no. 335-3] (appending filing from Stevens to reply letter in support of motion to dismiss).)  The Stevens Report identified failures on the part of the <u>trial team</u> to turn over exculpatory evidence to Senator Stevens under <u>Brady</u> <u>v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and <u>Napue v. Illinois</u>, 360 U.S. 264 (1959). (<u>See</u> <u>Stevens</u> Report at 497-503.)  As the report recognizes, however, Ms. Glavin was the then-Principal Deputy Assistant Attorney General, not a member of the trial team.  (<u>See</u> <u>id.</u> at 44.)  Further, the report indicates that although Ms. Glavin "participated directly in <u>Stevens</u>" on several issues--such as reviewing filings--that participation did not extend to "<u>discovery or Brady issues</u>."  (<u>Id.</u> at 101-02 (emphasis added).)

[455] <u>See</u> FED. R. EVID. 802.

the court orders Mr. Donziger stands accused of violating--they do not merit disqualification under Young.[456]

Nonetheless, Mr. Donziger maintains that "the evidence produced at trial robustly validates the [Young] argument made by the defense 18 months ago seeking disqualification of the private prosecutors and at this point renders the entire proceeding a constitutional nullity."[457]  Mr. Donziger maintains that Chevron is "financing and largely driving" his prosecution, pointing to (1) the time that several GDC lawyers, two of whom were witnesses at trial, spent with the Special Prosecutors preparing for trial and (2) the fact that one GDC witness (Mr. Thomson) testified that Chevron had paid for his travel to New York to meet with the Special Prosecutors,[458] testimony later corrected at trial to reflect that GDC had paid for his travel.[459]  "Because the Court refused to disqualify the deeply 'interested' private prosecutors . . . before jeopardy

---

[456] Again, that stands in glaring contrast to Young, where the appointed prosecutors were current counsel to the beneficiary of the order the contemnor was accused of violating. See Young, 481 U.S. at 790.

[457] (Def. I/II/III Br. at 13 ¶ 9.)

[458] (Def. I/II/III Br. at 10-13 ¶ 8; see also June 3 Letter MTD at 2 ("We previously argued that the Court has shown a remarkable reluctance to investigate the facts of what was obviously a Chevron-orchestrated and Chevron-financed prosecution--the first corporate prosecution in U.S. history.").)

[459] (See supra notes 47-48 and accompanying text.)

attached," Mr. Donziger avers, "the only remedy available at this stage is to dismiss this case."[460]

Mr. Donziger's contention lands wide of its target for at least two reasons.  First, in several ways, it is simply factually inaccurate.  For example, the Special Prosecutors are paid for their work by the federal judiciary (not Chevron),[461] and this case was initiated by Judge Kaplan (not Chevron) based on Mr. Donziger's refusal to comply with several court orders over a period of years.[462]  Even more fundamentally, however, Mr. Donziger misapplies Young's rule.  Young requires only a disinterested prosecutor,[463] not disinterested witnesses.[464]  That makes sense.  It is hardly uncommon for a witness to have some interest in the outcome of a case, and juries are routinely instructed that they may consider, among other things, a

---

[460] (Def. I/II/III Br. at 13 ¶ 9.)

[461] (See Order, dated Aug. 18, 2020 [dkt. no. 129] at 1.) For each paid invoice, the Special Prosecutors are required to disclose certain information, including the billing totals and hours expended.  (See Order, dated July 22, 2020 [dkt. no 108] at 3.)

[462] (See Order to Show Cause at 1-10 ¶¶ 1-21.)

[463] Again, that requirement flows from the Supreme Court's exercise of its supervisory authority, not the Constitution. See Young, 481 U.S. at 790.

[464] See Young, 481 U.S. at 804 ("A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution.").

witness's interest, bias, or prejudice when evaluating a
witness's testimony.[465]  Potential bias or interest are proper
topics for cross examination precisely so that the factfinder
can properly assess credibility and truthfulness.[466]  Mr.
Donziger plainly availed himself of his right to cross-examine
the GDC witnesses for potential bias or interest at trial,[467] and
the Court considered that evidence in evaluating the witnesses'
credibility and the truthfulness of their testimony.  But Mr.
Donziger offers absolutely no legal authority--and the Court is
aware of none--that would authorize him to impute to the Special
Prosecutors any interest or bias that the GDC witnesses may
have.

        In short, the evidence adduced at trial does not require
that the Special Prosecutors be disqualified under Young.  And,
as discussed above, the Court has already considered and

---

        [465] See, e.g., United States v. Brutus, 505 F.3d 80, 88 n.6
(2d Cir. 2007) (approving the Seventh Circuit's pattern
instruction, which states that when evaluating testimony the
jury may consider "any interest, bias, or prejudice the witness
may have").

        [466] See, e.g., Delaware v. Van Arsdall, 475 U.S. 673, 678-79
(1986) ("[E]xposure of a witness' motivation in testifying is a
proper and important function of the constitutionally protected
right of cross-examination.").

        [467] (See Trial Tr. at 459:11-472:8 (cross-examination of Ms.
Champion regarding, inter alia, her meetings with the Special
Prosecutors and related topics); id. at 714:5-723:3 (cross-
examination of Mr. Thomson regarding, inter alia, his meetings
with the Special Prosecutors and related topics).)

rejected the other grounds Mr. Donziger claims evidence that the Special Prosecutors are not disinterested.  The Court will not dismiss the criminal contempt charges on that basis.

## 2. **Home Confinement**

Second, Mr. Donziger asserts that his pretrial condition of home confinement is "unprecedented" and "is in and of itself punishment."[468]  Since his initial appearance in August 2019, Mr. Donziger has sought to have the home confinement condition of his pretrial release eliminated or modified no fewer than five times.[469]  The Court rejected each of those efforts, finding that Mr. Donziger was a flight risk based, <u>inter alia</u>, on his extensive ties to Ecuador and the possibility that he faced imprisonment for the first time.[470]  Mr. Donziger twice appealed those determinations to the Court of Appeals,[471] which

---

[468] (Def. I/II/III Br. at 2 (emphasis omitted).)

[469] (<u>See</u>, <u>e.g.</u>, Letter Motion, dated Nov. 4, 2019 [dkt. no. 30] at 1; Letter Motion, dated Dec. 3, 2019 [dkt. no. 39] at 1; Transcript of Telephone Conference ("May 18 Tr."), dated May 18, 2020 [dkt. no. 87] at 9:12-13; Letter Motion, dated May 20, 2020 [dkt. no. 77] at 1; Letter Motion, dated Dec. 17, 2020 [dkt. no. 227] at 1.)

[470] (<u>See</u>, <u>e.g.</u>, Transcript, dated Aug. 6, 2019 [dkt. no. 18] at 27:6-24; Transcript of Oral Argument, dated Nov. 25, 2019 [dkt. no. 44] at 12:7-13:3; May 18 Tr. at 13:8-14:1; Order, dated May 29, 2020 [dkt. no. 82] at 1; Order, dated June 3, 2020 [dkt. no. 90] at 1-3; Order, dated Dec. 31, 2020 [dkt. no. 237] at 11-12.)

[471] (<u>See</u> Notice of Appeal, dated Dec. 4, 2019 [dkt. no. 46] at 1; Amended Notice of Appeal, dated June 9, 2020 [dkt. no. 92] at 1.)

unanimously affirmed this Court's orders.[472]  Mr. Donziger
identifies absolutely no legal authority--and, again, the Court
is aware of none--that would require the Court to dismiss the
contempt charges on the basis of Mr. Donziger's dispute about
the twice-affirmed conditions of his pretrial release.

### 3. **The Appointments Clause**

Next, Mr. Donziger avers, for the second time, that the
Special Prosecutors are not supervised by the Department of
Justice ("DOJ").[473]  On the first day of trial, Mr. Donziger's
counsel moved to dismiss the contempt charges on that basis,
asserting that the defense had "learned through a letter from
the Department of Justice" that it "was declining to exercise
any supervision over the prosecutor in this case."[474]  In
response, the Court instructed counsel that it would "accept
your papers when you're ready," directed counsel to confer
regarding a briefing schedule, and indicated that it would rule
on the motion "when the briefs [we]re in."[475]  Later that day,
Mr. Donziger, through counsel, filed a three-page letter motion

---

[472] (See Mandate, dated Feb. 18, 2020 [dkt. no. 61] at 1;
Mandate & Amended Summary Order, dated Apr. 26, 2021 [dkt. no.
307] at 6.)

[473] (See Def. I/II/III Br. at 2; see also June 3 Letter MTD
at 1-2.)

[474] (Trial Tr. at 37:16-19.)

[475] (Trial Tr. at 37:22-25.)

131

to dismiss, along with two exhibits.[476]  Mr. Donziger's counsel
did not, however, append or otherwise include the letter that he
claimed to have received from the DOJ.[477]

On the record the next day, the Court informed Mr. Donziger
and his counsel that it could not rule on the motion until the
defense filed the letter that it claimed to have received from
the DOJ.[478]  Mr. Donziger, through his counsel, filed a
supposedly responsive document on May 13, 2021.[479]  Only, the
document was not a "letter" from the DOJ.  Rather, it was an

---

[476] (See Motion to Dismiss, dated May 10, 2021 [dkt. no.
302].)

[477] The first exhibit was an April 2, 2021 letter from Mr.
William W. Taylor to John. P. Carlin, Acting Deputy Attorney
General, requesting that Mr. Carlin review Mr. Donziger's
prosecution.  (See Ex. A. to Motion to Dismiss, dated Apr. 2,
2021 [dkt. no. 302-1] at 21-22.)  The second was the case
caption from United States v. Cutler, 840 F. Supp. 959 (E.D.N.Y.
1994).  (See Ex. B to Motion to Dismiss, dated Jan. 7., 1994
[dkt. no. 302-2] at 1.)

[478] (See Trial Tr. at 193:3-16 ("THE COURT: All right.
Before we get started, Mr. Garbus, we have your motion based on
the U.S. Department of Justice's notification.  But the motion
doesn't have the notification on it.  MR. GARBUS: I believe we
sent since then, I think, the documents late yesterday.  And I
think what the document is, is a letter from a lawyer in
Washington to the U.S. Attorney.  And then I believe there's a
phone conversation.  THE COURT: There is no letter from DOJ in
the package.  So I can't rule on it until I see what they say.
MR. GARBUS: I understand that.  THE COURT: All right.  So this
is being put aside until I receive whatever other documents you
have.  MR. GARBUS: Thank you.").)

[479] (See Declaration of Martin Garbus in Support and
Supplement of Motion to Dismiss ("Garbus Decl."), dated May 12,
2021 [dkt. no. 303].)

email message from John P. Carlin--sent to Mr. William Taylor,
then forwarded to Mr. Donziger, and thereafter forwarded to Mr.
Donziger's counsel--saying only that "the Department declines to
intervene in the federal-court initiated contempt
proceedings."[480]  Contrary to Mr. Donziger's counsel's
representation, that email does not state that the DOJ refused
to exercise any authority over the Special Prosecutors or that
it could not do so.[481]

On the record on May 17, 2021, the Court informed Mr.
Donziger's counsel of what it saw as a "double hearsay" problem
related to the email[482] and also noted that the email simply did
not say that the Special Prosecutors were not subject to DOJ

---

[480] (Ex. C to Garbus Decl. ("Carlin Email"), dated May 7,
2021 [dkt. no. 303-1] at 1.)

[481] See In re Giuliani, 146 N.Y.S.3d 266, 269 (1st Dep't
2021) ("Under the Rules of Professional Conduct, the prohibition
against false statements is broad and includes misleading
statements as well as affirmatively false statements.").

[482] (See, e.g., Trial Tr. at 850:25-851:6 ("First, the
communication that you reference is not a formal memorandum or
even a letter from the Department of Justice; it's an email
message that appears to be from Mr. John P. Carlin, whom the
Court understands to be the current acting deputy attorney
general.  But the message wasn't sent to you; it was sent to a
Mr. William Taylor, who then forwarded it to Mr. Donziger.  So
in my view, this is a double hearsay problem."); id. at 852:1-6
("Counsel, counsel, it doesn't matter what you have done.  What
matters is what was the result.  And the reason I deferred
consideration of your motion is that we did not have any direct
admissible evidence of a policy or a decision by the DOJ.  So
far as I can see, we are still in that situation, because all we
have is this double hearsay email.").)

supervision.[483]  Mr. Donziger's counsel responded by pointing to

steps the defense had taken to acquire more information or to

obtain discovery from the United States Attorney's Office for

the Southern District of New York ("USAO").[484]  The Court

---

[483] (See, e.g., Trial Tr. at 856:2-9 ("I don't understand how requests for discovery from the government rise to the level of constituting some kind of constitutional impediment here.  I understood your original motion to be arguing that to the extent the Department of Justice said that it was not planning [sic] and would not exercise any supervisory authority over the prosecution in this case, that it might present a problem. Turns out that's not what it said."); id. at 856:24-857:3 ("And that's exactly my point, sir.  To the extent that the DOJ has said that this prosecutor is wholly unsupervised, that they will take no action and they say they have no action, that's one thing.  But that's not what any of these documents says.").)

[484] (See, e.g., Trial Tr. at 851:17-20 ("After we left court, we did three things fundamentally at your request to try and get further information about this prosecution and about the things that are referred to in the Carlin letter."); id. at 852:23-853:7 ("We have tried since then to get testimony from the Department of Justice.  We have tried to get testimony from the U.S. Attorney's Office to deal with that very letter.  And that was the function of this motion.  What we had done since we got that letter is all we could do.  We made a number of constitutional arguments.  You indicated repeatedly that we did not have the facts to support those arguments.  We then made every attempt we could, and we will exchange and hand up today documentation from the U.S. Attorney's Office."); id. at 855:6-9 ("All right. To the extent I can discern after a quick read, it appears that your letter, Mr. Garbus, was essentially a request for discovery on various topics from the United States Attorney's office."); id. at 855:22-24 ("No, it's not. What it is, is about Mr. Bannon's interpretation of your rulings, which preclude him from giving me information."); id. at 856:13-15 ("We made that request for discovery.  And if you look at Mr. Bannon's letter, you will see at page 3 how he interprets your ruling."); id. at 857:4-6 ("The way to find out the further information is to get information from the U.S. Attorney's Office and DOJ, and we have tried to do that.").)

informed Mr. Donziger's counsel that a request for discovery was

not a substitute for actual evidence that the Special

Prosecutors were not subject to supervision.[485]  After adhering

to its prior rulings regarding Mr. Donziger's not being entitled

to discovery,[486] the Court then denied the motion to dismiss,

finding that Mr. Donziger's "moving papers ha[d] given the Court

absolutely no basis on which to conclude that the special

prosecutors are not subject to any control or supervision

whatsoever by the Executive Branch."[487]

Undeterred, Mr. Donziger filed a second post-trial letter

motion to dismiss the contempt charges on Appointments Clause

grounds, relying heavily on the Supreme Court's recent decision

---

[485] (See, e.g., Trial Tr. at 856:10-12 ("To the extent that
there is something somewhere that says that, tell me now.  A
request for discovery is no substitute for that."); id. at
857:7-12 ("THE COURT: But we don't have it.  MR. GARBUS: Pardon
me?  THE COURT: But we don't have it, so that's where we are.
MR. GARBUS: We made a motion for discovery early on.  THE COURT:
It was already denied more than once.").)

[486] (See Trial Tr. at 857:21-858:1 ("THE COURT: The requests
for discovery which you rely on and which Mr. Bannon references
were denied because the defense had not made an adequate showing
of its entitlement to this discovery.  MR. GARBUS: Yes. And we
had --  THE COURT: I adhere to that ruling."); id. at 858:15-20
("Mr. Garbus, you have the -- the defense has asked for this
discovery more than once.  I have denied it more than once as
not being a proper request.  To the extent that you are asking
for reconsideration now, reconsideration is denied because you
have not proffered any fact or law which the Court
overlooked.").)

[487] (Trial Tr. at 858:22-859:1.)

in United States v. Arthrex, Inc., 141 S. Ct. 1970 (2021).[488]
There, the Court determined that the appointment of
Administrative Patent Judges ("APJs") to the Patent Trial and
Appeal Board ("PTAB") was inconsistent with their being inferior
officers under the Appointments Clause because Congress
insulated APJs' patentability "decisions from review and their
offices from removal."[489]  Mr. Donziger avers that "[t]he same
constitutional principles necessarily limit appointments under
Fed. R. Crim. P. 42(a)(2)" and it therefore "follows that the
appointment of the private prosecutor here exceeded the district
court's constitutional authority" meaning that "the prosecutor's
actions pursuant to that appointment cannot stand."[490]  Mr.
Donziger further asserts that "[a] proper constitutional
foundation is a question of this Court's subject-matter
jurisdiction," and he accuses the Court of abdicating its duty
to assure itself of its own jurisdiction.[491]

    Mr. Donziger's Appointments Clause contention fails for
myriad reasons, which the Court catalogues below.

    First, Mr. Donziger's theory about subject-matter
jurisdiction is simply wrong.  Mr. Donziger's Appointments

---

[488] (See Appointments MTD at 1-4.)

[489] Arthrex, 141 S. Ct. at 1986.

[490] (Appointments MTD at 2.)

[491] (Appointments MTD at 4.)

Clause challenge has absolutely nothing to do with subject-matter jurisdiction, which relates to this Court's power to adjudicate this case.[492]  District courts "have original jurisdiction . . . of all offenses against the laws of the United States,"[493] and federal law gives federal courts the power to punish and adjudicate criminal contempts.[494]  Mr. Donziger's Appointments Clause argument, which he raises as a defense to his prosecution for contempt, has no effect on the Court's power to adjudicate this case.[495]

---

[492] See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (describing "subject-matter jurisdiction" as "the courts' statutory or constitutional power to adjudicate the case"); Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.").

[493] 18 U.S.C. § 3231.

[494] See 18 U.S.C. § 401.  Even absent that statutory authority, the Supreme Court has long recognized that federal courts have the inherent authority to adjudicate contempts.  See Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831 (1994) ("Courts thus have embraced an inherent contempt authority as a power necessary to the exercise of all others." (cleaned up)); Ex parte Robinson, 86 U.S. 505, 510 (1873) ("The power to punish for contempts is inherent in all courts . . . .  The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.").

[495] See Freytag v. Comm'r, 501 U.S. 868, 893 (1991) (Scalia, J., concurring in part and concurring in the judgment) ("Appointments Clause claims, and other structural constitutional claims, have no special entitlement to review.").  That conclusion is buttressed by the Court of Appeals' conclusion that an Appointments Clause challenge to an
(continued on following page)

Second, because Mr. Donziger's Appointments Clause claim is non-jurisdictional, Mr. Donziger waived or forfeited that claim by failing to raise it until the first day of trial.  The Supreme Court instructs that "one who makes a <u>timely</u> challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief."[496]  Here, any defect in the Special Prosecutors' appointment would have (or at the very least should have) been apparent from the outset of this case, <u>i.e.</u>, from the moment the Special Prosecutors were appointed by Judge Kaplan on July 31, 2019.  Federal Rule of Criminal Procedure Rule 12(b)(3) requires certain "defenses, objections, and requests" to "be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."[497]  Failure to do so renders such a motion "untimely."[498]  Yet, for reasons unknown, Mr. Donziger tarried for nearly two years

---

(continued from previous page)
administrative officer's appointment may be forfeited if it is not raised in the relevant administrative proceedings.  <u>See</u> <u>Gonnella v. United States Sec. & Exch. Comm'n</u>, 954 F.3d 536, 544 (2d Cir. 2020); <u>see also</u> <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 514 (2006) (observing that issues of subject-matter jurisdiction "can never be forfeited or waived").

[496] <u>Lucia v. SEC</u>, 138 S. Ct. 2044, 2055 (2018) (quotation marks omitted) (emphasis added).

[497] FED. R. CRIM. P. 12(b)(3).

[498] FED. R. CRIM. P. 12(c)(3).

before raising this issue, notwithstanding the Court-approved February 27, 2020 deadline for filing pretrial motions.[499] Because his Appointments Clause contention alleges "a defect in instituting the prosecution,"[500] Mr. Donziger waived or forfeited that challenge by failing timely to raise it.[501]

Third, even if Mr. Donziger did not waive or forfeit his Appointments Clause challenge, he has never suggested that the Special Prosecutors are "principal (noninferior) officers of the United States" who must be appointed by the President with "Advice and Consent of the Senate."[502]   To the contrary, Mr.

---

[499] (See Memo Endorsement, dated Feb. 25, 2020 [dkt. no. 59] at 1.)

[500] FED. R. CRIM. P. 12(b)(3)(A); see also Shotwell Mfg. Co. v. United States, 371 U.S. 341, 362 (1963) (finding motion untimely despite motion not being among those enumerated in Rule 12).

[501] See United States v. Suescun, 237 F.3d 1284, 1287 (11th Cir. 2001) ; see also Yakus v. United States, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").  Moreover, had the Appointments Clause issue been raised timely, it was "capable of determination without the trial of the general issue (whether he was guilty of the charged offenses)." Suescun, 237 F.3d at 1286.

[502] Edmond v. United States, 520 U.S. 651, 659 (1997); see also U.S. Const., Art. II, § 2, cl. 2  ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law . . . .").

Donziger explicitly recognizes that the Special Prosecutors are
so-called "inferior officers."[503]  Unlike principal officers,
"[i]nferior officers Congress may allow to be appointed by the
President alone, by the heads of departments, or by the
Judiciary."[504]  That is precisely what happened in this case.
Federal Rule of Criminal Procedure 42 ("Rule 42") authorized--in
fact, mandated--Judge Kaplan to appoint an attorney to prosecute
the criminal contempt charges against Mr. Donziger.[505]

The Supreme Court has stressed the importance of a federal
court's power to appoint a private attorney to prosecute a
contempt:

> Courts cannot be at the mercy of another Branch in
> deciding whether such proceedings should be initiated.
> The ability to appoint a private attorney to prosecute
> a contempt action satisfies the need for an
> independent means of self-protection, without which

---

[503] (Appointments MTD at 2 ("Ms. Glavin was appointed as
. . . a free-floating 'inferior officer' exercising federal
executive power without any of the constraints of supervision by
the President or a 'superior officer' nominated by the President
and confirmed by the Senate.").)

[504] Morrison v. Olson, 487 U.S. 654, 670 (1988); see also
U.S. Const., Art. II, § 2, cl. 2 ("[B]ut the Congress may by Law
vest the Appointment of such inferior Officers, as they think
proper, in the President alone, in the Courts of Law, or in the
Heads of Departments.").

[505] See FED. R. CRIM P. 42(a)(2) ("The court must request that
the contempt be prosecuted by an attorney for the government,
unless the interest of justice requires the appointment of
another attorney. If the government declines the request, the
court must appoint another attorney to prosecute the
contempt.").

courts would be mere boards of arbitration whose judgments and decrees would be only advisory.[506]

Arthrex did not purport to call Young into question in any way,[507] and the Supreme Court has repeatedly instructed lower courts to leave to it "the prerogative of overruling its own decisions."[508]  Judge Kaplan's appointment of the Special Prosecutors was constitutionally permissible.[509]

Fourth, Mr. Donziger's suggestion that the Special Prosecutors are "free-floating"--i.e., not subject to "supervision" by the DOJ--is inconsistent with the relevant legal framework established by Congress and the Supreme Court. As concededly inferior officers, the Special Prosecutors' work must be "directed and supervised at some level by others who

---

[506] Young, 481 U.S. at 796 (quotation marks omitted) (emphasis added).  Mr. Donziger's motion to dismiss does not even mention Young, which is somewhat surprising given that he cites that case liberally in his post-trial briefing for other propositions that he asserts support his view of this case. (See, e.g., Def. I/II/III Br. at 14 ¶ 9.)

[507] Arthrex does not cite or even mention Young.

[508] Agostini v. Felton, 521 U.S. 203, 237 (1997).  Even so, Mr. Donziger has never questioned Young's foundation or argued that it should be overruled, not even to preserve that issue for any possible appeal.

[509] That appointment was expressly compelled by Rule 42(a)(2), which was promulgated by the Supreme Court and adopted by Congress pursuant to The Rules Enabling Act, 28 U.S.C. § 2072.  To the extent that Mr. Donziger views his challenge to be directed to the face of that Rule, and to the extent that he has not waived it already, he should direct his argument to that Court.

were appointed by Presidential nomination with the advice and consent of the Senate."[510]  Here, that supervisory authority logically can rest with only two sources: (1) Judge Kaplan or (2) the Attorney General.  Rule 42 does not provide the answer, and the Supreme Court has never definitively resolved the question either.  But, for several reasons, the Court finds it evident that the Special Prosecutors can be supervised, in the constitutional sense, by the Attorney General.

In Rule 42, Congress authorized only a method of appointment for inferior officers.  It did not shift an entire category of criminal prosecutions from the Executive Branch to the federal judiciary.  Nor could it.  "Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both."[511]  For that reason, "[p]rivate attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated."[512]  Federal law provides that, "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States . . . is a party, or is interested, . . . is

---

[510] Edmond, 520 U.S. at 663.

[511] Bloom v. Illinois, 391 U.S. 194, 201 (1968).

[512] Young, 481 U.S. at 804.

142

reserved to officers of the Department of Justice, under the direction of the Attorney General,"[513] and "[a] criminal contempt prosecution in federal court, however styled," is a case "in which the United States is interested."[514]  Although the Special Prosecutors may have been appointed by Judge Kaplan, they are exercising Executive Power and are subject to the Attorney General's control and supervision.

The Appointments Clause "admits of no limitation on interbranch appointments," and Congress retains "significant discretion to determine whether it is 'proper' to vest the appointment of . . . executive officials in the 'courts of Law.'"[515]  Such a system of appointment by the Judiciary but oversight by the Executive Branch is hardly foreign to our system of constitutional governance.  Consider, for example, that federal law authorizes district courts, when confronted with a vacancy atop the local United States Attorney's Office, to appoint an interim U.S. Attorney until the vacancy is

---

[513] 28 U.S.C. § 516.

[514] United States v. Providence J. Co., 485 U.S. 693, 708 n.11 (1988); see also id. at 701 ("Congress is familiar enough with the language of separation of powers that we shall not assume it intended, without saying so, to exclude the Judicial Branch when it referred to the 'interest of the United States.'").

[515] Morrison, 487 U.S. at 673

filled.[516]  Although that appointment would be made by the
federal judiciary, no one would reasonably suggest that the
interim U.S. Attorney would operate free from control or
influence by the Attorney General.[517]  So too here.  Rule 42
provides no basis to suggest that the same principle does not
hold true in the context of private attorneys appointed to
prosecute criminal contempt charges.

The Supreme Court's decisions in Young and Providence
Journal are not to the contrary.  Although there is some
language in those cases that seemingly equates the appointment
of a special prosecutor with judicial prosecution,[518] that
language is dicta.[519]  Those cases did not present the

---

[516] See 28 U.S.C. § 546(d).

[517] (See Appointments Reply at 3 ("[S]urely no one would
claim that such a judicially appointed United States Attorney
was not part of the executive branch subject to the supervision
requirements reiterated in Arthrex.").)

[518] See, e.g., Providence J. Co., 485 U.S. at 701-02 ("The
ability to punish disobedience to judicial orders is regarded as
essential to ensuring that the Judiciary has a means to
vindicate its own authority without complete dependence on other
Branches." (quoting Young, 481 U.S. at 796)).

[519] Dicta, which are statements in judicial opinions that
are not necessary to support the judgment reached, are not
binding on lower courts.  That principle has ancient roots.  See
Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 399 (1821) ("It is a
maxim not to be disregarded, that general expressions, in every
opinion, are to be taken in connection with the case in which
those expressions are used.  If they go beyond the case, they
may be respected, but ought not to control the judgment in a
subsequent suit when the very point is presented for
decision.").

"supervision" argument that Mr. Donziger advances here.  But

even so, those cases also contain language that suggests that

what the Supreme Court thought critical was federal courts'

authority to initiate criminal contempt proceedings, not to

prosecute them.[520]  For example, Young recognized that, while a

federal court's power to appoint a private attorney to prosecute

contempt "satisfies the need for an independent means of self-

protection,"[521] the appointed prosecutor nevertheless "exercises

considerable discretion in matters" that are "critical to the

conduct of a prosecution . . . outside the supervision of the

court."[522]

     The following example illustrates the point well.  Assume

for a moment that the USAO had accepted Judge Kaplan's request

to prosecute this case.  The United States Attorney and her

deputies are unquestionably subject to the Attorney General's

---

[520] See, e.g., Young, 481 U.S. at 796 ("Courts cannot be at
the mercy of another Branch in deciding whether such proceedings
should be initiated.").

[521] Young, 481 U.S. at 796.

[522] Young, 481 U.S. at 807 (emphasis added).  Those matters
could include "determination of which persons should be targets
of investigation, what methods of investigations should be used,
what information will be sought as evidence, which persons should
be charged with what offenses, which persons should be
utilized as witnesses, whether to enter into plea bargains and
the terms on which they will be established, and whether any
individuals should be granted immunity."  Id.

supervision and control.[523]  By accepting Judge Kaplan's
referral, Rule 42 would not thereby have shifted control over
the USAO's decisions in prosecuting this matter--including trial
strategy, etc.--to Judge Kaplan.  The Court sees no principled
reason why the USAO's declining Judge Kaplan's request should
alter that framework.[524]  To the contrary, recognizing that the
DOJ and Attorney General have a role to play in criminal
contempt prosecutions provides an important check on federal
courts' contempt power, "a potent weapon"[525] that can in certain
circumstances be "liable to abuse."[526]  That is especially
important because "the United States Code itself contemplates

---

[523] See In re Persico, 522 F.2d 41, 54 (2d Cir. 1975) ("[The
Attorney General] has supervision of all litigation in which the
United States is a party and is commanded to 'direct all United
States Attorneys, assistant United States Attorneys, and special
attorneys . . . in the discharge of their respective duties.'"
(quoting 28 U.S.C. § 519)); see also 28 U.S.C. § 518(b) ("When
the Attorney General considers it in the interests of the United
States, he may personally conduct and argue any case in a court
of the United States in which the United States is interested,
or he may direct the Solicitor General or any officer of the
Department of Justice to do so.").

[524] The USAO "respectfully decline[d] on the ground that the
matter would require resources that we do not readily have
available."  (Order of Appointment, dated July 31, 2019 [dkt.
no. 2277 in 11-CV-691] at 1.)  Contrary to what Mr. Donziger
implies, (see, e.g., Def. I/II/III Br. at 3-4 ¶ 1 & n.2), the
USAO expressed no view on the merits of the criminal contempt
charges.

[525] Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia
Marine Trade Ass'n, 389 U.S. 64, 76 (1967).

[526] Bloom, 391 U.S. at 202.

that a Judge will preside over a criminal contempt case in which he filed the charge."[527]

With the understanding that the Constitution affords the Executive Branch a crucial role in the prosecution of criminal contempt, it is patent that Mr. Donziger's case is different-in-kind from Arthrex.  In Arthrex, the governing statutory framework explicitly restricted both (1) review of the APJs' decisions and (2) their removal by officials accountable to the President.[528]  Rule 42, of course, provides no such limitations; it discusses only the process for appointment.[529]  The Court is aware of no legal rule that would in any way prevent the DOJ or the USAO from reviewing the Special Prosecutors' decisions or removing them from office.  In that sense, the typical Executive Branch baseline remains in place.  The email on which Mr. Donziger hangs his entire Appointments Clause theory--which, again, states only that "the Department decline[d] to intervene

---

[527] United States v. Brennan, 395 F.3d 59, 76 (2d Cir. 2005).

[528] See Arthrex, 141 S. Ct. at 1988.

[529] See FED. R. CRIM. P. 42(a)(2) ("The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney.  If the government declines the request, the court must appoint another attorney to prosecute the contempt.").

in the federal-court initiated contempt proceedings"--does not even put a dent in the governing legal scheme.[530]

Fifth, Mr. Donziger's assertion that this prosecution is constitutionally infirm because the DOJ has not, in fact, actively supervised the Special Prosecutors is meritless.[531]  As the Supreme Court made clear mere weeks ago, a superior officer "need not review every decision of" an inferior officer.[532]  That is entirely sensible.  To require supervision by a principal officer of all decisions by line prosecutors would grind the DOJ to a screeching halt.  Instead, "what matters is that [a superior officer] have the discretion to review decisions" by the inferior officer.[533]  In the Appointments Clause context, the standard is "cannot," not "did not."  As set forth above, Rule 42 does not, in any way, limit the Attorney General's discretion to review the Special Prosecutors' decisions or remove them from their posts.  The fact that the DOJ or USAO may not have

---

[530] (Carlin Email at 1.)

[531] (See Appointments MTD at 2-3 ("To the extent that Ms. Glavin's appointment could have been constitutionally mitigated by active supervision of the Department of Justice, Ms. Glavin never sought to cure the constitutional infirmity discussed herein and it appears from all the facts that both the Department of Justice and the U.S. Attorney for the Southern District of New York have refused . . . to join Ms. Glavin's prosecutorial crusade.").)

[532] Arthrex, 141 S. Ct. at 1988.

[533] Arthrex, 141 S. Ct. at 1988 (emphasis added).

supervised the Special Prosecutors to Mr. Donziger's satisfaction--or the possibility that DOJ's supervision is simply not visible to Mr. Donziger--is of no moment.

For these reasons, the Court concludes that Mr. Donziger's post-trial brief as well as the June 3 and June 23 letter motions to dismiss have not raised a factual or legal basis sufficient to convince the Court that it reached an erroneous conclusion when denying Mr. Donziger's motion to dismiss at trial.[534]  Accordingly, the Court adheres to its prior ruling, and Mr. Donziger's post-trial letter motions to dismiss are denied.

### 4.  **Various Discovery Requests**

Continuing on, Mr. Donziger takes issue with the Court's denying him various forms of discovery related to, among other things: (1) the Special Prosecutors' communications, if any, with Judge Kaplan; (2) what Mr. Donziger terms as Judge Kaplan's "likely" contacts and communications with the Court; (3) other supposed interactions among the Court, Judge Kaplan, the Special Prosecutors, GDC, and others; (4) the origins of this case, including how the case arrived before the Court and Judge Kaplan's written advice to the Assignment Committee; (5) Judge Kaplan's appointment of the Special Prosecutors; (6) the Special

---

[534] See Shrader, 70 F.3d at 257.

Prosecutors' relationship to Chevron; and (7) the USAO's declining to prosecute this case.[535]   In one of his post-trial letter motions to dismiss, Mr. Donziger even goes so far as to accuse the Court, without any factual citation, of suppressing facts and "knowingly participating, joining in, creating, and permitting an unconstitutional conviction for the benefit of Chevron."[536]

The Court has done no such thing.  Mr. Donziger has made several previous requests for a wide variety of discovery, including related to many (or all) of the topics above.[537]   The

_____

[535] (Def. I/II/II Br. at 2; see also June 3 Letter MTD at 1-2.)  Indeed, in his reply, Mr. Donziger catalogues dozens of questions, the answers to which he claims are critically important. (See June 25 Reply at 6-9.)  Tellingly, however, Mr. Donziger cites almost no legal authority to explain why he is entitled to that discovery.

[536] (June 3 Letter MTD at 2.)  Again, In re Giuliani, 146 N.Y.S.3d at 269, might apply.

[537] (See, e.g., Letter, dated Dec. 30, 2019 [dkt. no. 49] at 1-2 (seeking discovery related to Seward's ties to Chevron and the oil industry as well as the Special Prosecutors' contacts with Judge Kaplan); Pretrial Motions at 16, 33-37 (seeking information regarding how this case arrived before the Court as well as communications between the Special Prosecutors and GDC attorneys); Letter, dated Aug. 21, 2021 [dkt. no. 131] (seeking discovery related to communications between the Special Prosecutors and Judge Kaplan); Vindictive Pros. MTD at 10-11 (seeking unspecified discovery in aid of claims of vindictive and selective prosecution); Letter, dated May 5, 2021 [dkt. no. 292] at 1 (seeking wide-ranging discovery related to past criminal contempt prosecutions in this district, records from the U.S. Attorney's Office and GDC, information from former U.S. Attorney Geoffrey Berman, and billing and fee information from
(continued on following page)

Court has repeatedly rejected those requests, finding that Mr.

Donziger had no legal entitlement to discovery.[538]  Those rulings

recognized that "federal criminal discovery is far more limited

_____

(continued from previous page)
Seward).)  Mr. Donziger also served five subpoenas on GDC and
four of its partners seeking wide-ranging discovery.  (See
Subpoena of Gibson Dunn, dated Oct. 15, 2020 [dkt. no. 283-1];
Subpoena of Randy Mastro, dated Oct. 15, 2020 [dkt. no. 283-2];
Subpoena of Andrea Neuman, dated Oct. 15, 2020 [dkt. no. 283-3];
Subpoena of William Thompson, dated Oct. 15, 2020 [dkt. no. 283-
4]; Subpoena of Anne Champion, dated Oct. 15, 2020 [dkt. no.
283-5].)

    [538] (See, e.g., Transcript of Oral Argument, dated Jan. 6,
2020 [dkt. no. 52] at 18:13-23 ("With respect to Mr. Frisch's
request for additional disclosure, in my view the items that he
has set out at Nos. 1 and 2 on page 2 of his January 5 letter
are way too attenuated to require any additional disclosure.
. . .  With respect to contacts with Judge Kaplan, I am
satisfied with the prosecutor's representations with respect to
that."); Pretrial Motion Order at 12 n.3 (denying Mr. Donziger's
request that the Court "'disclose how Judge Kaplan transferred
[this] case and what information was relayed in doing so"
because "there is no rule of law that entitles a defendant to
serve discovery demands on the presiding judge"); id. at 24
("Mr. Donziger's speculation that the universe is conspiring
against him is not a basis for compelling disclosure."); Order
("Discovery Order"), dated Aug. 28, 2020 [dkt. no. 150] at 1
("There is no provision permitting the disclosure requested by
Mr. Donziger, and he cites to none."); Vindictive Pros. Order at
24 ("Indeed, Mr. Donziger's moving papers point to absolutely
nothing--only innuendo and conjecture--that would entitle him to
the vast swath of discovery that he seeks."); Memorandum & Order
("Subpoena Order"), dated May 9, 2021 [dkt. no. 301] at 24-25
("In short, the lion's share of the Subpoenas' requests are
paradigmatic 'fishing expeditions,' and for some Mr. Donziger
has brought especially heavy tackle.  But because Nixon makes
clear that Rule 17(c) cannot be put to that purpose, the Court
will not allow Mr. Donziger to use the Subpoenas to end-run
around the rules governing discovery in criminal cases."
(citation omitted)).)

than federal civil discovery."[539]  Under those rules, Mr. Donziger "is only entitled to disclosure of statements expressly authorized by Rule 16 or otherwise discoverable as exculpatory under Brady, or as impeaching under 18 U.S.C. § 3500."[540]  The Court has already reminded Mr. Donziger and his counsel of those legal standards at least three times.[541]  Yet, Mr. Donziger's post-trial brief and letter motions have not offered any legal rule applicable in criminal cases--not one--that would entitle Mr. Donziger to the vast swaths of discovery he seeks.  The mere fact that Mr. Donziger may very much like to obtain information about a wide variety of topics does not change the governing legal rules.  Because Mr. Donziger has not identified any fact or legal authority that the Court overlooked in its prior discovery orders, the Court adheres to its prior rulings.[542]

---

[539] United States v. Sampson, 898 F.3d 270, 280 (2d Cir. 2018).

[540] United States v. Souza, No. 06-CR-806 (SLT), 2008 WL 753736, at *2 (E.D.N.Y. Mar. 19, 2008); see also United States v. Miranda, 526 F.2d 1319, 1324 (2d Cir. 1975) ("In a criminal case, the Government plainly has the obligation to make available to the defense evidentiary material in its possession which is disclosable under the due process safeguards of Brady v. Maryland, or the requirements of Fed. R. Crim. P. 16 or the Jencks Act." (citations omitted)).

[541] (See, e.g., Pretrial Motion Order at 24; Discovery Order at 1; Subpoena Order at 25 n.12.)

[542] See Shrader, 70 F.3d at 257.

## 5. <u>Judge Kaplan's Alleged Animosity</u>

Mr. Donziger maintains that Judge Kaplan "has expressed disdain for Mr. Donziger and praise for Chevron," which necessitates dismissal of the charges.[543]  Less than a month before trial, Mr. Donziger raised that same argument in a motion to dismiss on the grounds of vindictive and selective prosecution.[544]  That motion pointed to many of the same news articles and other out-of-court statements by attorneys--which have not been admitted into evidence and which are obviously hearsay statements that cannot be considered for their truth[545]-- that Mr. Donziger now relies upon in his post-trial briefing.[546] The Court rejected his argument, finding that Mr. Donziger's "assertions of vindictiveness and selectivity" condensed simply "to his disagreement with several of Judge Kaplan's decisions

---

[543] (Def. I/II/III Br. at 2; <u>see also</u> <u>id.</u> at 5 ¶ 2 ("Judge Kaplan, who initiated this proceeding after the regular Federal prosecutor refused to prosecute Mr. Donziger, has maintained a hostile attitude toward Mr. Donziger for years.  Irrespective of whether the hostility is factually-grounded or derived from impressions internal or external to the legal matters over which he presided, Judge Kaplan's hostility itself is plain and has been evident to numerous independent observers.").)

[544] (<u>See</u> Vindictive Pros. Notice at 1; <u>see also</u> Vindictive Pros. MTD at 5-7 (outlining what Mr. Donziger maintained was Judge Kaplan's animus towards him).)

[545] <u>See</u> FED. R. EVID. 802.

[546] (<u>Compare</u> Def. I/II/III Br. at 5 n.4 (citing, among other things, two news articles and a statement by Mr. Donziger's former counsel) <u>with</u> Vindictive Pros. MTD at 5, 6 nn.1-2 (citing that same statement and those same articles).)

(or comments) in the underlying civil proceedings."[547]  Because
Mr. Donziger points to no legal authority or facts supported by
admissible evidence that the Court overlooked in its order
denying his motion to dismiss on the grounds of vindictive or
selective prosecution, the Court adheres to that prior ruling.[548]

Mr. Donziger also claims that Judge Kaplan's refusal to
recuse himself from the case warrants dismissal.[549]  But, as the
Court has already held at least once, Judge Kaplan was under no
requirement to recuse himself from this case because Rule 42
only mandates recusal where the "contempt involves disrespect or
criticism of a judge,"[550] not where "the charges flow from an
allegedly willful disobedience of court orders."[551]  Again,
because Mr. Donziger points to no facts or law that the Court
overlooked in reaching that conclusion, the Court adheres to its
prior ruling.[552]

---

[547] (Vindictive Pros. Order at 17.)

[548] See Shrader, 70 F.3d at 257.

[549] (See Def. I/II/III Br. at 2.)

[550] (Pretrial Motion Order at 11 (quoting FED. R. CRIM. P.
42(a)(3)).)

[551] (Pretrial Motion Order at 11 (citing Goldfine v. United
States, 268 F.2d 941, 947 (1st Cir. 1959)).)

[552] See Shrader, 70 F.3d at 257.

### 6. <u>The "Uniqueness" of This Case</u>

Penultimately, Mr. Donziger suggests that he "is the only lawyer in U.S. history to be prosecuted for criminal contempt after inviting the court to impose a civil contempt so he could have a direct appeal of a discovery order," a path he claims, without factual citation, that "[h]undreds" or "even thousands of lawyers" take each year.[553]  Mr. Donziger also posits that he is "the only lawyer in U.S. history to be charged with criminal contempt after completely complying with a civil order upon which it is based" and that this case is the first criminal prosecution by a private prosecutor in the history of the Southern District of New York.[554]

Mr. Donziger fails to offer <u>any</u> legal rule that so much as suggests that the supposed "uniqueness" of this case somehow provides a ground for dismissal.  The Court is aware of no such authority either.  Additionally, the key assumption undergirding Mr. Donziger's theory--that thousands of contemnors annually invite civil contempt to obtain review of challenged discovery orders--runs counter to binding precedent from the Court of Appeals.  That authority recognizes that, in the mine run of

---

[553] (Def. I/II/III Br. at 3; <u>see also</u> June 3 Letter MTD at 2 ("Prior to trial, the defense made allegations that there has never been a case like this in the entire history of the United States." (emphasis omitted)).)

[554] (Def. I/II/III Br. at 3.)

disputes involving discovery orders, merely going into civil contempt is not enough to obtain appellate review.  That is so because "a party to a pending proceeding"--as Mr. Donziger was in the civil case before Judge Kaplan--"may not appeal from an order of civil contempt except as part of an appeal from a final judgment."[555]  By contrast, only an "order of _criminal_ contempt" is immediately appealable.[556]  In other words, the only way for a party to obtain pre-compliance appellate review of an ordinary discovery order is to suffer a criminal contempt sanction.

In short, Mr. Donziger is not entitled to dismissal of the criminal contempt charges based on the putative "uniqueness" of this case.

### 7. The Court's Recusal

Finally, in his June 3 Letter Motion, Mr. Donziger again requests that the Court recuse itself from this case, primarily based (1) on how the case arrived before the Court, (2) the Court's supposed "personal involvement" with the Special Prosecutors (and presumably Ms. Glavin in particular), and (3) its rulings denying Mr. Donziger access to various forms of discovery.[557]  The Court already has entertained at least four

---

[555] United States v. Johnson, 801 F.2d 597, 599 (2d Cir. 1986).

[556] Dinler v. City of New York (In re City of New York), 607 F.3d 923, 934 (2d Cir. 2010).

[557] (See June 3 Letter MTD at 1-2.)

such requests for its recusal, several of which raised these very arguments.[558]  For three reasons, the Court will not reconsider its prior recusal rulings.

First, the Court already rejected how Mr. Donziger's case came before the Court as a basis for recusal for two reasons: (1) the S.D.N.Y. Rules for the Division of Business Among District Judges ("RDB") do not vest any rights in litigants; and (2) there was nothing improper about Judge Kaplan's transferring this case to the Court under RDB 14.[559]  Second, the Court already rejected--citing both Canon 4 of the Code of Conduct of United States Judges and several cases--Mr. Donziger's argument that its involvement with the FLAA Board, of which Ms. Glavin is also one of more than 100 members, provides any basis whatsoever for recusal.[560]  And third, although Mr. Donziger accuses the Court of suppressing facts critical to his defense,[561] the Court merely has refused, as has been shown above, to sanction Mr. Donziger's proposed discovery fishing expedition because he has no legal entitlement to that discovery.  In that sense, Mr.

---

[558] (See Def. Pretrial Motions at 15-16; Letter Motion to Recuse Judge Preska, dated Sept. 14, 2020 [dkt. no. 171]; Vindictive Pros. Notice at 1; Letter Motion, dated Apr. 19, 2021 [dkt. no 267] at 3.)

[559] (See Pretrial Motion Order at 10-12 & n.3.)

[560] (See Vindictive Pros. Order at 25.)

[561] (June 3 Letter MTD at 2.)

Donziger's last contention merely condenses to his disagreement with several of the Court's rulings, which the Court has already found is not a proper basis for recusal.[562]

Like Mr. Donziger's other "structural" arguments, Mr. Donziger has not pointed to any facts or legal authority the Court overlooked in its prior recusal decisions such that reconsideration is warranted.[563]  The Court will not give Mr. Donziger a second (or third or fourth or fifth) bite at this apple.

### 8. Conclusion

In sum, the Court has already considered, and rejected, all of these arguments.  The actual evidence received at trial does not convince the Court that reconsideration of its prior rulings is warranted.  The Court, of course, understands that Mr. Donziger disagrees with its conclusions, but that is insufficient to merit reconsideration.[564]  Mr. Donziger may pick any bone he likes with the Court of Appeals.  To the extent any

---

[562] (See 9/16/20 Order at 2 ("It is black letter law, however, that a party's unhappiness with the judge's decisions is not a basis for recusal.").)

[563] See Shrader, 70 F.3d at 257.

[564] See United States v. Lisi, No. 15 Cr. 457 (KPF), 2020 WL 1331955, at *2 (S.D.N.Y. Mar. 23, 2020) ("The Second Circuit has made clear that a motion for reconsideration 'is not a vehicle for relitigating old issues, presenting the case under new theories . . . or otherwise taking a second bite at the apple.'" (quoting Analytical Survs., Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012)).

of Mr. Donziger's "structural" arguments has not been raised and rejected before, the Court finds them to be meritless. Accordingly, the Court will not dismiss the contempt charges against Mr. Donziger, and Mr. Donziger's two post-trial letter motions to dismiss the charges are denied.

### b. Collateral Bar Rule

Next, the Court addresses Mr. Donziger's argument that the Court improperly applied the collateral bar rule at trial.

### 1. Legal Standards

The collateral bar rule flows from the "basic proposition that all orders and judgments of courts must be complied with promptly."[565]  The Supreme Court has long established a clear baseline rule regarding litigants' obligations to obey court orders:

> If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.  Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.[566]

Based on those principles, "[i]t is well established that a defendant generally is barred from collaterally attacking the constitutionality of a court order as a defense to his criminal

---

[565] Maness v. Meyers, 419 U.S. 449, 458 (1975).

[566] Maness, 419 U.S. at 458 (emphasis added).

contempt prosecution."[567]  Instead, the proper course of action is to "move to vacate or modify the order, or seek relief in" the Court of Appeals.[568]

The Court of Appeals has recognized two exceptions to the collateral bar rule: a contemnor may challenge the legality of the disobeyed order in the ensuing criminal contempt case if (1) the order was "transparently invalid" or (2) it "exceeded the district court's jurisdiction."[569]  The "transparently invalid" exception is exceedingly narrow, encompassing only those orders that are "so far in excess of the court's authority that it had no right to expect compliance."[570]  Moreover, to avail oneself of that exception, the contemnor "must make some good faith effort to seek emergency relief from the appellate court or show compelling circumstances, such as a need to act immediately,

---

[567] Terry, 17 F.3d at 579; see also Walker, 388 U.S. at 320 ("[N]o person charged with its observance under an order or decree may disregard or violate the order or the decree with immunity from a charge of contempt of court; and he may not raise the question of its unconstitutionality in collateral proceedings on appeal from a judgment of conviction for contempt of the order or decree. . . .").

[568] United States v. Cutler, 58 F.3d 825, 832 (2d Cir. 1995).

[569] Cutler 58 F.3d at 832.

[570] Terry, 17 F.3d at 579 (cleaned up).

excusing the decision not to seek some kind of emergency relief."[571]

In addition to these exceptions, United States v. Ryan appears to endorse an avenue to obtain pre-compliance review of an order to produce information--most quintessentially, a subpoena duces tecum--whereby a litigant "may refuse to comply" with a court order and litigate the lawfulness of that order "in the event that contempt or similar proceedings are brought against him."[572]  Other circuits have relied on Ryan and its progeny (most notably Maness) to fashion exceptions to the collateral bar rule for orders where (1) the contemnor had no "adequate and effective remedies" for obtaining "orderly review of the challenged ruling" or (2) complying with an order would "require an irretrievable surrender of constitutional guarantees" or other protected rights or privileges.[573]  Although

---

[571] Cutler, 58 F.3d at 832 (cleaned up).

[572] United States v. Ryan, 402 U.S. 530, 532 (1971); see also Maness, 419 U.S. at 460 ("We have consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal." (alteration omitted)).

[573] E.g., In re Novak, 932 F.2d 1397, 1401 & n.7 (11th Cir. 1991) (citing, inter alia, Maness, 419 U.S. at 460); United States v. Dickinson, 465 F.2d 496, 511 (5th Cir. 1972)).  Other
(continued on following page)

the Second Circuit does not appear expressly to have adopted or

rejected those exceptions, Ryan distinguished Walker--the

Supreme Court's seminal case on the collateral bar rule--because

appellate review of the claims in Walker was available "at an

earlier stage" of the litigation.[574]

### 2. **Discussion**

Before trial, the Special Prosecutors moved in limine to

preclude Mr. Donziger from collaterally attacking the validity

and lawfulness of Judge Kaplan's orders underlying the criminal

contempt charges.[575]  Crediting Mr. Donziger's position advanced

---

(continued from previous page)
courts have expressly declined to extend Maness beyond its
facts.  See In re Establishment Inspection of Hern Iron Works,
Inc., 881 F.2d 722, 728-29 (9th Cir. 1989) (refusing to extend
Maness, a Fifth Amendment self-incrimination case, to a contempt
case where the order to be challenged allegedly violated the
Fourth Amendment); see also Fid. Mortg. Invs. v. Camelia
Builders, Inc., 550 F.2d 47, 58 (2d Cir. 1976) ("[T]he Maness
decision specifically affirmed that lawyers can be cited for
contempt for advising clients to disregard court orders.  The
Maness decision does carve out an exception to this rule in
certain cases raising fifth amendment issues.  However, there
are no such fifth amendment interests involved in this case and,
thus, Attorney Hubbard has no basis for resisting the contempt
citation on the authority of Maness." (citation omitted)).

[574] Ryan, 402 U.S. at 532 n.4 (emphasis added); see also
Walker, 388 U.S. at 320 ("[N]o person charged with its
observance under an order or decree may disregard or violate the
order or the decree with immunity from a charge of contempt of
court; and he may not raise the question of its
unconstitutionality in collateral proceedings on appeal from a
judgment of conviction for contempt of the order or
decree. . . .").

[575] (See Government's Motions in Limine, dated July 15, 2021
[dkt. no. 105] at 22-25.)

in his opposition to the motion,[576] the Court "agree[d] that the appropriate course [wa]s to defer ruling on the collateral bar issue until trial, when the Court w[ould] have the benefit of a fuller factual record."[577]

In his opposition to the Special Prosecutors' motion <u>in limine</u>, Mr. Donziger indicated that "[b]efore or during trial [he] w[ould] present a trial brief outlining his view of the collateral bar doctrine and how it does and does not apply to the facts of his case."[578]  On April 30, 2021, the Court directed Mr. Donziger's counsel, to the extent Mr. Donziger still wished to file such a brief, to "inform the Court no later than May 3 at noon"--in advance of the May 10 trial date--"when such briefing w[ould] be filed."[579]  Mr. Donziger never informed the Court that he intended to file a brief, and he did not file or request to file a brief either before trial or at trial.  In the interim, on March 4, 2021, the Court of Appeals disposed of Mr. Donziger's appeals of several of Judge Kaplan's orders,

---

[576] (<u>See</u> Opposition to Motion in Limine ("Limine Opp."), dated Aug. 8, 2020 [dkt. no. 110] at 5 ("The exceptions to the collateral bar rule are largely fact-based and dependent on factual context. . . .  The prosecution's motion should be denied without prejudice to its ability to raise these arguments at trial.").)

[577] (Order, dated Oct. 24, 2020 [dkt. no 191] at 2.)

[578] (Limine Opp. at 10.)

[579] (Order, dated Apr. 30, 2021 [dkt. no. 276] at 1.)

including the Contempt Order.[580]  Because Mr. Donziger failed to challenge the Protocol or the Passport Order in that appeal, and thus they were not altered by the Court of Appeals, the entire collateral bar argument is largely academic.

In his post-trial briefing, Mr. Donziger makes two collateral-bar-related arguments: (1) the Court improperly applied the collateral bar rule at trial; and (2) if the Court had not applied the collateral bar rule, the evidence that would have been admitted would have shown that the Protocol and the Passport Order were unlawful.[581]  The Court will address each in turn.

### A. Application of the Collateral Bar Rule

Mr. Donziger avers that the Court erroneously imposed the collateral bar rule to limit cross-examination related to facts surrounding his decision to pursue appellate review "by way of 'contempt jurisdiction' (or token or symbolic contempt)."[582]  For that reason, that argument necessarily applies only to Counts I, II, and III.[583]  In order to challenge the validity of the orders

---

[580] See Donziger, 990 F.3d at 192 (disposing of Appeal Nos. 18-855, 18-2191, and 19-1584).

[581] (See Def. I/II/III Br. at 18-23 ¶ 14.)

[582] (Def. I/II/III Br. at 18 ¶ 14.)

[583] Counts IV, V, and VI relate to potential contempt of the RICO Judgment, which was affirmed in full by the Court of Appeals.  (See GX 1914 at 127 ("We have considered all of the
(continued on following page)

underlying those counts--*i.e.*, the Protocol and the Passport

Order--Mr. Donziger must show that one of the exceptions to the

collateral bar rule applies.  Although Mr. Donziger does not

explain in his post-trial briefing exactly what he believes was

erroneous about the Court's application of the collateral bar

rule, Mr. Donziger asserted three primary collateral-bar-rule

arguments at trial: (1) Mr. Donziger's pending appeal of the

Contempt Order relieved him of his obligation to comply with the

Protocol and the Passport Order;[584] (2) the Protocol and the

Passport Order were transparently invalid because the post-

judgment discovery proceedings were based solely on an invalid

theory under the RICO Judgment;[585] and (3) several cases that Mr.

Donziger cited in a previous motion to dismiss, namely <u>Ryan</u> and

---

(continued from previous page)
arguments of Donziger and the LAP Representatives on this appeal
and have found in them no basis for dismissal or reversal.").)
The Supreme Court denied Mr. Donziger's petition for certiorari.
<u>See</u> <u>Donziger</u>, 137 S. Ct. at 2268.

[584] (<u>See</u>, <u>e.g.</u>, Trial Tr. at 526:1-8 ("THE COURT: Counsel,
give me an example -- by the way, is it your position that the
collateral -- that Mr. Donziger was excused from following Judge
Kaplan's orders because he had filed a notice of appeal and had
an appeal pending?  Is that your position?  MS. TRIVEDI: In
addition --  THE COURT: Is that your position?  MS. TRIVEDI:
Yes.").)

[585] (<u>See</u>, <u>e.g.</u>, Trial Tr. at 526:19-24 ("MS. TRIVEDI: Your
Honor, if the entire discovery campaign was based on an invalid
theory of filing the RICO judgment, which the Second Circuit has
--  THE COURT: Let's just say, I think you're arguing the
transparently invalid exception, which of course was talked
about in <u>Teran</u> and in the <u>Providence Journal</u> case.").)

Maness, support his argument that the collateral bar rule does not prevent him from challenging the validity of the Protocol and the Passport Order in this case.[586]

Mr. Donziger's first position is wholly undercut by governing Supreme Court precedent.  Maness makes crystal clear that "[i]f a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal."[587] Here, the evidence received at trial shows that Mr. Donziger's obligations to comply with the Protocol and the Passport Order were not stayed by either Judge Kaplan or the Court of Appeals.[588]  The fact that Mr. Donziger noticed an appeal,

---

[586] (See Trial Tr. at 523:24-524:11 ("In December, the defense filed a motion to dismiss Counts I, II, and III, based exactly on the case law that is relevant to your Honor's inquiry, which are cases that deal specifically with the obligations on a litigant in the post-judgment discovery context.  And those cases -- your Honor may disagree with the legal argument we made for dismissal at that time, but I do not think your Honor can disagree that those cases say that in the post-judgment discovery context, if a litigant wishes not to ring an unringable bell -- and disclosure is an unringable bell -- that they should seek a contempt finding that is reviewable on appeal. That is exactly the thing that Mr. Donziger sought."); see also Memorandum of Law in Support of Steven Donziger's Motion to Dismiss Counts 1, 2, and 3 of the Court's July 31, 2019 Order to Show Cause, dated Dec. 16, 2020 [dkt. no. 225-1] at 3-5 (invoking, inter alia, Ryan and Maness).)

[587] Maness, 419 U.S. at 458.

[588] (See GX 2254 at 3 (denying Mr. Donziger's motion for a stay pending appeal "in all other respects" and clarifying that
(continued on following page)

166

therefore, did not in any way discharge his obligation to comply with those orders.[589]  The Court properly rejected this contention.[590]

The Court also correctly found that Mr. Donziger could not rely on the "transparently invalid" exception.[591]  To avail oneself of that exception, the Court of Appeals requires the would-be contemnor to "make some good faith effort to seek emergency relief from the appellate court or show compelling circumstances, such as a need to act immediately, excusing the decision not to seek some kind of emergency relief."[592]  The evidence shows that Mr. Donziger did not seek any emergency relief from the Court of Appeals--whether in the form of a stay pending appeal, a petition for a writ of mandamus, or even a

---

(continued from previous page)
Mr. Donziger "remain[ed] obligated to comply fully with paragraphs 4 and 5 of the Protocol and to surrender his passport(s) to the Clerk as previously directed").)

[589] See Maness, 419 U.S. at 458.

[590] (See Trial Tr. at 526:9-10 ("THE COURT: OK.  Denied. That is insufficient to avoid the obligation to follow the orders.").)

[591] (See Trial Tr. at 527:4-10 ("Even if that's what Mr. Donziger is arguing, the Second Circuit in the Cutler case says that a defendant may not avail himself of the transparently invalid exception without some, quote, good-faith effort to seek emergency relief from the appellate court, close quote.  That did not happen here, so he is not entitled to rely on the transparently invalid exception.").)

[592] Cutler, 58 F.3d at 832 (cleaned up).

request for expedited briefing[593]--and he also has not offered a valid excuse for why he could not seek such relief.[594]  Nor could he.  Even if Mr. Donziger "might have been unlikely to obtain a writ of mandamus" or a stay pending appeal, that "does not mean he should not have tried."[595]

As for Mr. Donziger's Ryan-and-Maness-based contention, that too misses the mark.  In contrast to caselaw from other circuits,[596] the Court of Appeals has not explicitly interpreted Ryan and Maness to establish an exception to the collateral bar rule.  But even assuming that those cases do establish such an

---

[593] (See GX 7 (observing no docket entries seeking such relief); GX 8 (same); GX 9 (same); see also Trial Tr. at 654:11-20 ("Q. And in the time period that I had focused you on during the course of your direct, which would be February 28th of 2018 to September 30th of 2019, did Mr. Donziger ever seek a stay in the Second Circuit?  A. No, he did not.  Q. Did he ever seek mandamus relief in that time period in the Second Circuit?  A. No, he did not.  Q. Did he ever seek expedited briefing in the Second Circuit?  A. No, he did not.").)

[594] The only potential excuse to which Mr. Donziger's counsel even alluded was that asking for such relief would be futile.  (See Trial Tr. at 727:8-14 ("I just want to know whether this witness is aware of any case where that's actually happened in the Second Circuit.  THE COURT: I'm aware that's the question.  What's the relevance?  MR. KUBY: The relevance is, in fact, if the answer is no, that would tend to suggest it would be futile for Mr. Donziger to make that request. . . .").)

[595] Cutler, 58 F.3d at 833.

[596] See, e.g., Novak, 932 F.2d at 1401 & n.7.

exception applicable in this context,[597] that exception plainly
would operate to ensure that a litigant can obtain pre-
compliance appellate review of an otherwise unappealable
order.[598]  Mr. Donziger's counsel recognized as much at trial.[599]
Mr. Donziger unquestionably had the opportunity to obtain such
review from the Court of Appeals following the Contempt Order.[600]
Yet, when confronted with the opportunity to obtain the very
appellate review he claimed to have "relentlessly sought" in

---

[597] That is far from clear based on the thin caselaw,
especially because Mr. Donziger has not asserted that he refused
to comply with the Protocol or Passport Order on Fifth Amendment
self-incrimination grounds.  See Fid. Mortg. Invs., 550 F.2d at
58 ("[T]here are no such fifth amendment interests involved in
this case and, thus, Attorney Hubbard has no basis for resisting
the contempt citation on the authority of Maness." (citation
omitted)).

[598] See Maness, 419 U.S. at 460 ("[W]e have consistently
held that the necessity for expedition in the administration of
the criminal law justifies putting one who seeks to resist the
production of desired information to a choice between compliance
with a trial court's order to produce prior to any review of
that order, and resistance to that order with the concomitant
possibility of an adjudication of contempt if his claims are
rejected on appeal." (emphasis added)); Ryan, 402 U.S. at 532-33
(same).

[599] (See Trial Tr. at 520:17-19 ("But, your Honor, Walker is
about review; it is about seeking review of the orders that have
been imposed on you by a judge.").)

[600] See, e.g., Latino Officers Ass'n City of New York, Inc.
v. City of New York, 558 F.3d 159, 163 (2d Cir. 2009) ("[W]here,
as in this case, civil contempt proceedings are instituted after
the conclusion of the principal action rather than during the
pendency of the action, the order disposing of the contempt
proceedings is appealable as a final decision of a district
court under 28 U.S.C. § 1291." (quotation marks omitted)).

order to protect his and his client's rights,[601] Mr. Donziger

passed.[602]  Whether that was by strategic choice or for some

other reason is unclear, but it does not matter.  As a result of

that choice, the Court of Appeals expressly affirmed all of

Judge Kaplan's contempt findings, save for the finding regarding

Mr. Donziger's selling interests in the Ecuadorian Judgment

other than his own contingent fee interests.[603]  Mr. Donziger's

failure to challenge the Protocol and the Passport Order in his

already-decided appeal of the Contempt Order precludes his

attacking the validity of those orders in this proceeding.

## B. **The Protocol & the Passport Order**

More fundamentally, even if Mr. Donziger's case did fit

within one of the exceptions to the collateral bar rule, he

still would have to establish that the Protocol and the Passport

Order actually were legally infirm.  Mr. Donziger's argument

---

[601] (GX 2184 at 11.)

[602] In briefing to the Court of Appeals, Mr. Donziger
elected not to challenge the validity or foundation of either
the Protocol or the Passport Order.  (See GX 317 at 8 (statement
of the issues); id. at 9-31 (substantive arguments); see also
Trial Tr. at 650:2-653:10 (describing some of the issues that
Mr. Donziger did and did not challenge on appeal).)

[603] See Donziger, 990 F.3d at 214; see also id. at 212-13
("Nor does it question in any way the district court's
conclusions that Donziger acted in contempt of the Injunction
that resulted from the RICO Judgment in numerous ways.  Indeed,
except with respect to the very specific alleged violation of
the Injunction discussed in this Opinion, Donziger does not even
attempt to challenge the district court's findings of his
contumacious conduct.").

regarding the unlawfulness of the Protocol and the Passport
Order proceeds in two steps.[604]  First, the Protocol "was
expressly designed to force the production of documents relevant
to what Judge Kaplan called the 'judgment compliance' claims,'"
i.e., Chevron's assertions that Mr. Donziger had violated the
RICO Judgment.[605]  And second, because the Court of Appeals
determined that Judge Kaplan's contempt finding regarding Mr.
Donziger's selling interests in the Ecuadorian Judgment other
than his own was not sufficiently definite to merit a civil
contempt sanction, discovery in furtherance of that finding and
related coercive contempt sanctions must also have been
unlawful.[606]

　　　Mr. Donziger trips at the first step because he incorrectly
suggests that the Protocol was relevant only to Mr. Donziger's
alleged noncompliance with the RICO Judgment.  Rather, the post-

---

[604] (See Def. I/II/III Br. at 18-20 ¶ 14(a).)

[605] (See Def. I/II/III Br. at 18 ¶ 14(a)(i).)

[606] (See Def. I/II/III Br. at 20 ¶ 14(a)(ii) ("Because Judge
Kaplan's contempt finding regarding 'judgment compliance' was
unlawful as a matter of law, discovery orders in furtherance of
that finding were also unlawful."); id. at 24 ¶ 16 ("The
Passport Order was intended, expressly and exclusively, to
coerce compliance with paragraph 5 of the March 5 Order prior to
completion of the appellate review that Mr. Donziger permissibly
sought by way of voluntary civil contempt.  Because Mr.
Donziger's decision to seek this review was not unlawful or
contemptuous, the effort to coerce compliance was inappropriate
and/or unlawful." (citation omitted)).)

judgment discovery proceedings, from which the Protocol and the Passport Order spawned, encompassed discovery requests both (1) related to RICO Judgment compliance and (2) in aid Chevron's enforcing the Money Judgment.[607]  Federal Rule of Civil Procedure 69 and New York Civil Law & Practice Rules Section 5223 authorized Chevron to seek a wide variety of information--from various sources, including third parties--related to Mr. Donziger's assets, sources of income, financial dealings, etc. in aid of enforcing the Money Judgment.[608]  Judge Kaplan was

---

[607] The Document Requests and the Information Subpoena were both issued in aid of enforcing the Money Judgment.  (See GX 1989-1A at 1-2; GX 1989-1B at 1-2; see also GX 2009 at 1 (observing that, "[i]n the main, the discovery requests are directed to identifying assets with respect to which the judgment may be enforced and related matters" but noting that "[s]ome requests, however, seek information with respect to whether Donziger has violated paragraph 5 of the March 4, 2014 judgment in this case").)

[608] Rule 69 provides that "[i]n aid of the judgment or execution, the judgment creditor . . .  may obtain discovery from any person--including the judgment debtor--as provided in these rules or by the procedure of the state where the court is located."  Fed. R. Civ. P. 69(a)(2).  New York law similarly provides that "the judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment" through "serving upon any person a subpoena."  N.Y. C.P.L.R. 5223 (emphasis added).  One leading treatise describes Section 5223 as "a broad criterion authorizing investigation through any person shown to have any light to shed on the subject of the judgment debtor's assets or their whereabouts."  DAVID D. SIEGEL & PATRICK M. CONNORS, NEW YORK PRACTICE § 509 (6th ed. 2021) (emphasis added).  Applying those rules, the Court of Appeals has recognized "that broad post-judgment discovery in aid of execution is the norm in federal and New York state courts" and that it would not be uncommon for those proceedings to involve
(continued on following page)

172

justified in rejecting Mr. Donziger's arguments to the

contrary.[609]  Put simply, the Money Judgment provided a

legitimate basis for post-judgment discovery, including the

Protocol.  A fortiori, Mr. Donziger's alleged noncompliance with

the Protocol serves as a permissible basis for the Passport

Order's coercive sanctions.[610]

Finally, Mr. Donziger also avers that implementation of the

Protocol would have resulted in irreparable harm to him and

others, principally because Chevron would have "essentially

unlimited access to Mr. Donziger's documents" even though many

of the documents were protected from disclosure by attorney-

---

(continued from previous page)
requests for "discovery from third parties" or "related to
assets held outside the jurisdiction of the court where the
discovery request is made." EM Ltd. v. Republic of Argentina,
695 F.3d 201, 207-08 (2d Cir. 2012).

[609] (See GX 2009 at 2 ("Donziger's suggestion that Chevron
is entitled to nothing more than 'a short summary of [his]
financial condition and assets, backed up by supporting
documents' is without merit.  As the record in this case
discloses, millions of dollars have passed through Donziger's
hands over the years.  Much of it is unaccounted for.  He has
had years in which to move assets around. . . .  Thus, there
already is a record of willingness on the part of Donziger to
shift assets in which he has an interest into foreign locations
to avoid what he may regard as judicial 'interference.'"
(citation and footnote omitted)).)

[610] The Court finds persuasive the Seventh Circuit's
recognition that requiring the surrender of a passport is a
permissible civil contempt sanction.  See Herbstein v. Bruetman,
241 F.3d 586, 589 (7th Cir. 2001).

client privilege or the First Amendment.[611]  That argument
appears more relevant to whether the collateral bar rule applies
than to whether the order to be challenged is unlawful.[612]
Nevertheless, to the extent Mr. Donziger challenges the validity
of the Protocol or post-judgment discovery proceedings on those
grounds, the Court rejects his arguments.

Mr. Donziger's assertion that the Protocol would grant
Chevron unfettered access to his documents is contradicted by
the Protocol's text in several ways.  First, the Protocol made
clear that Chevron's Forensic Expert was, "[a]t no time," to
have access to Mr. Donziger's original devices or accounts
"absent further Court Order."[613]  Second, before Mr. Krehel
produced any information to Chevron's Forensic Expert, he was to
create a "Person/Entity Report," which Mr. Donziger could then
review and designate any person or entity appearing therein as
"Highly Confidential and Personal."[614]  Third, after Mr. Krehel
ran the search terms, he would log any responsive documents
designated as "Highly Confidential and Personal" and provide

---

[611] (Def. I/II/III Br. at 21-23 ¶ 14(b).)

[612] See, e.g., Novak, 932 F.2d at 1401 (outlining exceptions
to the collateral bar rule for orders where (1) "adequate and
effective remedies" do not "exist for orderly review of the
challenged ruling or (2) the order "require[s] an irretrievable
surrender of constitutional guarantees").

[613] (GX 2172 at 2 ¶ 5.)

[614] (See GX 2172 at 3-4 ¶ 6.)

that log to Chevron and Mr. Donziger, who would then have an
opportunity to object to those documents being subject to
further review.[615]  Fourth, although some (but not all)
information would then be provided to Chevron's Forensic Expert
for review,[616] Judge Kaplan established a supervision protocol
under which Chevron's Forensic Expert was to conduct large
portions of that review:

> Supervision for purposes of this tasks <u>and others in
> this Protocol that call for the same</u> requires the
> following.  First, Chevron's Forensic Expert <u>shall not
> access or search</u> the Donziger images at any time in
> any manner <u>without the Neutral Forensic Expert's
> oversight</u>.  This oversight may take place either
> locally or on an electronic discovery platform.  The
> methodology of review of searches conducted by
> Chevron's Forensic Expert shall be recorded in a
> detailed log (the "Search Log") along with a
> description of what files were reviewed or searched
> and when that review or search occurred.  <u>A copy of
> the Search Log shall be provided to Donziger</u>.  The
> Neutral Forensic Expert and Chevron's Forensic Expert
> shall retain their own copies of the Search Log.[617]

Fifth, any pre-production coding for responsiveness Chevron's
counsel was ordered to complete was directed to "be conducted on
an 'attorney's eyes only' basis."[618]  And sixth, after Mr. Krehel
made a document production to Chevron and Mr. Donziger, the

---

[615] (<u>See</u> GX 2172 at 4 ¶ 7(b).)

[616] (<u>See</u> GX 2172 at 5 ¶ 7(d); <u>id.</u> at 6 ¶ 7(e).)

[617] (GX 2172 at 5-6 ¶ 7(d)(i).)

[618] (GX 2172 at 6 ¶ 7(e).)

documents would remain confidential for fourteen days,[619] which
was to afford Mr. Donziger the opportunity (1) to designate any
documents produced as "confidential" and (2) to claw back any
information produced in error or that was not otherwise
responsive.[620]  In short, although the Protocol would have
permitted Chevron and its Forensic Expert to access a variety of
Mr. Donziger's documents[621]--which is hardly shocking given "that
broad post-judgment discovery in aid of execution is the norm in
federal . . . courts"[622]--in no sense would that access be

---

[619] (See GX 2172 at 6 ¶ 7(e) ("The Document Production(s)
will be treated as 'confidential' pursuant to the Protective
Order for a period of fourteen (14) calendar days.").)

[620] (See GX 2172 at 7 ¶ 8(a)-(b).)

[621] The Court heard testimony at trial both about Ms.
Champion's and Mr. Krehel's understandings of how certain
portions of the Protocol, most notably Paragraphs Six through
Ten, would operate.  (See Trial Tr. 319:19-320:1 (Ms. Champion);
id. at 810:2-824:18, 830:12-23 (Mr. Krehel).)  For at least two
reasons, the Court does not credit either Ms. Champion's or Mr.
Krehel's testimony on that point.  First, as is clear from the
discussion above, the Protocol is in evidence.  (See generally
GX 2172).  The Court is perfectly capable of reading the
Protocol for itself and determining what it requires.  And
second, Mr. Krehel never had the opportunity to produce any
information to Chevron under the protocol.  (See Trial Tr. at
803:6-13 ("Q. Okay. And with respect to paragraph six, did you
ever get to the stage where you would perform the duties set
forth in paragraph six?  A. No.  Q. With respect to paragraph
seven did you ever get to the stage where you would perform the
duties set forth in paragraph seven?  A. No.").)

[622] EM Ltd., 695 F.3d at 207.

"unlimited" or provide Mr. Donziger with no recourse to lodge legitimate objections.[623]

As for Mr. Donziger's privilege and First Amendment contentions related to the Protocol, the Court sees no reason to disturb Judge Kaplan's relevant rulings from which the Protocol

---

[623] Mr. Donziger's counsel also asserted that some of Ms. Champion's testimony regarding the Protocol was "patently false." (Trial Tr. at 826:24-25.) The Court is not convinced that is so. As best the Court can discern, the portion of Ms. Champion's testimony with which Mr. Donziger's counsel took issue was the following exchange regarding what information the Protocol would ultimately allow to be communicated to Chevron:

Q. Now, Ms. Champion, did Judge Kaplan's forensic protocol, which is Government Exhibit 2172, allow Chevron to get control of Mr. Donziger's electronic devices in any way or at any point?

A. No.

Q. Did the forensic protocol allow Chevron to have full access to the images taken of Mr. Donziger's electronic devices?

A. No.

(Trial Tr. 319:19-320:1.)

Regarding the first response, the Protocol does not appear to authorize Chevron to "get control of" Mr. Donziger's devices. Paragraph Five of the Protocol provides, in relevant part, that "[a]t no time shall Chevron's Forensic Expert have access to the original Devices or to live Media accounts absent further Court order." (GX 2172 at 3 ¶ 5.) Rather, any information to be shared with Chevron would come from Mr. Krehel's mirror images of Mr. Donziger's devices. As for the second answer, Paragraphs Six, Seven, and Eight make clear that Chevron would have access only to certain subsets of the images taken from Mr. Donziger's devices, not the whole enchilada so to speak. (See id. ¶¶ 6-8.) While the Court can understand Mr. Donziger's disagreement with Ms. Champion's characterization of the Protocol, this is not a case of false testimony. And, as explained above, the Court does not rely on Ms. Champion's characterization as to how the Protocol would have operated had things progressed that far.

emerged.   Judge Kaplan was entirely within his discretion in
finding that Mr. Donziger, by repeatedly failing to produce a
privilege log, waived or forfeited any claim of attorney-client
privilege over documents responsive to the Document Requests and
Information Subpoena.[624]  After all, the Local Rules are clear
that privilege logs "shall"--not "should" or "may" or "can"--"be
furnished in writing at the time of the response to such
discovery or disclosure, unless otherwise ordered by the
Court."[625]  And Judge Kaplan's rulings rejecting Mr. Donziger's
various First-Amendment-premised arguments, which essentially
attempted to assert the associational rights of any third party
"allies and supporters of the cause of environmental justice in

---

[624] (See GX 2108 at 2 ("As Donziger has failed to comply
with Fed. R. Civ. P. 26(b)(5) and S.D.N.Y. Civ. R. 26.2--and as
(a) this is not the first time he has ignored the requirements
or those rules, and (b) Donziger failed to comply even after
Chevron asserted that his prior failure should result in waiver
of any otherwise applicable privileges--the Court holds that
Donziger has waived or forfeited any claim of privilege to
responsive documents that otherwise might have applied."
(citations omitted)); see also Trial Tr. at 269:11-17 ("Q. And
had Mr. Donziger produced any privilege log to you at least as
of his deposition on June 25th, 2018?  A. No.  Q. Did Mr.
Donziger ever produce a privilege log to Chevron with respect to
documents he was withholding on privilege grounds?  A. No.").)

[625] S.D.N.Y LOCAL CIV. R. 26.2(b) (emphasis added).

the Ecuadorian Amazon,"[626] are sound and grounded in the

governing caselaw.[627]

---

[626] (Def. I/II/III Br. at 22 ¶ 14(b)(ii).)

[627] Two points, each of which is independently sufficient to reject Mr. Donziger's position, are especially strong.

First, Judge Kaplan was within his discretion to find that Mr. Donziger waived or forfeited his First Amendment objection to Chevron's discovery requests. (See GX 2045 at 21-22.) Chevron served those requests on April 16, 2018, (see GX 1989-1A at 18; GX 1989-1B at 16), but Mr. Donziger did not raise his First Amendment argument until two months later when he moved for a protective order, (see GX 119 at DONZIGER_103547; GX 2026 at 23-24). In the interim, Mr. Donziger objected at least twice to Chevron's requests with nary a mention of the First Amendment. (See generally GX 112 (objections to opposing counsel); GX 2002 (opposition to Chevron's motion to compel).) "[S]tructural constitutional claims"—like other non-jurisdictional claims—"have no special entitlement to review," i.e., they can be waived or forfeited. Freytag, 501 U.S. at 893 (Scalia, J., concurring in part and concurring in the judgment); see also Yakus, 321 U.S. at 444 ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").

And second, Judge Kaplan reasonably concluded that Mr. Donziger lacked standing to assert the First Amendment rights of third parties. (See GX 2045 at 22-23, 32-33.) "In the absence of a claim of privilege[,] a party usually does not have standing to object to a subpoena directed to a non-party witness." Langford v. Chrysler Motors Corp., 513 F.2d 1121, 1126 (2d Cir. 1975). Even though Mr. Donziger would have liked to prevent Chevron from obtaining information from third parties, he did not have standing to contest subpoenas issued to those third parties unless he had some personal interest in the information sought. Moreover, although the Supreme Court has recognized than an organization may have standing to assert the rights of its members, see, e.g., United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 551-52 (1996), that authority is inapposite. Mr. Donziger is plainly not "an organization," and the facially amorphous group of persons on

(continued on following page)

### 3. <u>Conclusion</u>

In sum, Mr. Donziger has not established that an exception to the collateral bar rule authorizes him to challenge the lawfulness of the Protocol or the Passport Order in this criminal contempt proceeding.  And even if Mr. Donziger could somehow evade the collateral bar rule, the evidence he proffers would not have established that those orders were unlawful anyway.  Mr. Donziger's suggestion that Judge Kaplan "could have simply stayed [the] proceedings and sought Mr. Donziger's compliance, if appropriate, upon conclusion of the appeal" does not change that calculus.[628]  And, in any event, the appeal has been decided, and Mr. Donziger <u>still</u> has not complied with some

_____

(continued from previous page)
whose behalf he purported to assert First Amendment rights is an undefined array of supporters, not a discrete membership.  <u>See</u> <u>NAACP v. Alabama ex rel. Patterson</u>, 357 U.S. 449, 459-60 (1958) (finding associational standing where organization "and its members [we]re in every practical sense identical" and there was a "reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected if production [wa]s compelled").

[628] (Def. I/II/III Br. at 23 ¶ 15.)

of Judge Kaplan's orders,[629] notwithstanding his representation

that he would do so.[630]

### c. **The Criminal Contempt Charges**

Finally, the Court considers whether the Special

Prosecutors have sustained their burden of proof on the criminal

contempt charges.

### 1. **Legal Standards**

Mr. Donziger is charged with six counts of criminal

contempt in violation of 18 U.S.C. § 401(3), which gives a

federal court the power to impose criminal sanctions for

"[d]isobedience or resistance to its lawful writ, process, rule,

decree, or command."  "To secure a conviction for criminal

contempt of a court order," the Special Prosecutors "must prove

(1) the issuance of the order, (2) the defendant's disobedience

---

[629] (See Trial Tr. at 803:23-804:6 ("Q. Did Mr. Donziger ever surrender any devices to you, Mr. Krehel, for imaging?  A. No.  Q. He didn't do it in June?  A. No.  Q. Didn't do it in July?  A. Correct.  Q. And as you sit here today, has that happened?  A. Did not happen."); id. at 566:16-24 ("Q. Was there any other record indicating that Mr. Donziger had ever surrendered his passport to the Clerk of the Court at any point in time after June 11th of 2019, as directed by the court order?  A. After June 13th or --  Q. After June 11th, the date of the order, at any point in time?  A. I did not see any indication that a passport was received by the clerk's office.").)

[630] (See GX 133 at DONZIGER_101980 ("At some point Judge Kaplan will find me in contempt and I will appeal.  As I have also made clear to Chevron and the court, if the appellate court ultimately affirms Judge Kaplan's merits ruling on the authorizing motion and his overall handling of the post-judgment proceedings, then I will cooperate with the order of the court as is my obligation as a citizen and resident of New York.").)

or disregard of the order, and (3) the defendant's knowledge and willfulness in disobeying the order."[631]  Those elements must be proven "beyond a reasonable doubt,"[632] not "beyond all possible doubt."[633]

Regarding the first element, "[a] defendant cannot be held in contempt absent a definite and specific order of which he had notice."[634]  "[T]he clarity of an order must be evaluated by a reasonableness standard, considering both the context in which

---

[631] United States v. Vezina, 165 F.3d 176, 178 (2d Cir. 1999).  Occasionally, the caselaw prescribes four elements: "(1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful."  Cutler, 58 F.3d at 834.  Under either test, the facts that must be proven are identical.

[632] Cutler, 58 F.3d at 834.

[633] 1A KEVIN F. O'MALLEY, JAY E. GRENIG, & HON. WILLIAM C. LEE, FEDERAL JURY PRACTICE & INSTRUCTIONS § 12:10 (6th ed. 2021).  The Court of Appeals has repeatedly approved of this treatise's instruction on the definition of reasonable doubt.  See, e.g., United States v. Delibac, 925 F.2d 610, 614 (2d Cir. 1991) (per curiam) ("Once again, a district court has failed to heed our repeated warnings against embellishing upon the standard instruction recommended in 1 Devitt & Blackmar, Federal Jury Practice and Instructions . . . ."); United States v. Gatzonis, 805 F.2d 72, 74 (2d Cir. 1986) (per curiam) ("[A]s we have previously stated, trial judges 'would be exceedingly well advised to use [the model instruction in 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 11.14 (3d ed. 1977)] rather than improvise variations upon it.'").

[634] Cutler, 58 F.3d at 834 (quotation marks omitted); see also United States v. Int'l Brotherhood of Teamsters, 899 F.2d 143, 146 (2d Cir. 1990) ("An unclear order provides insufficient notice to justify a sanction as harsh as contempt.").

it was entered and the audience to which it was addressed."[635]
When assessing an order's clarity, courts require a lower degree
of specificity for orders directed at lawyers than for those
directed at laypersons.[636]

"The willfulness element of the offense requires proof of
'a volitional act done by one who knows or should reasonably be
aware that his conduct is wrongful.'"[637]  That standard does not
require proof of "bad intent in order to prove willfulness."[638]
In the context of criminal contempt, "[w]illfulness merely
requires a specific intent to consciously disregard an order of
the court," and "[e]ven godly motivation does not cancel this
intent."[639]  Again, the Court of Appeals "hold[s] attorneys to a
higher standard of conduct than . . . lay persons," permitting
an inference of "willfulness from [a lawyer's] reckless

---

[635] Cutler, 58 F.3d at 835.

[636] See, e.g., Cutler, 58 F.3d at 835 (noting that "courts
can expect lawyers to comply with less specific orders than
laymen"); United States v. Turner, 812 F.2d 1552, 1565 (11th
Cir. 1987) ("[I]t may well be necessary that the specificity of
orders directed at laypersons be greater than that of orders to
lawyers.").

[637] Rojas v. United States, 55 F.3d 61, 63 (2d Cir. 1995)
(per curiam) (quoting United States v. Greyhound Corp., 508 F.2d
529, 531-32 (7th Cir. 1974)).

[638] United States v. Remini, 967 F.2d 754, 758 (2d Cir.
1992).

[639] United States v. Lynch, 162 F.3d 732, 735 (2d Cir.
1998).

disregard for his professional duty."[640]  "Willfulness for
criminal contempt may, as in other areas of criminal law, be
inferred from the facts and circumstances in proof."[641]

### 2. Issuance of Orders

As discussed above, three orders are relevant to the
criminal contempt charges: (1) the RICO Judgment; (2) the
Protocol; and (3) the Passport Order.[642]  To satisfy the first
element of a criminal contempt charge, the Special Prosecutors
must prove three things: (1) the issuance of those orders, (2)
that Mr. Donziger had notice of those orders, and (3) that the
orders were reasonably definite and specific.[643]  The Special
Prosecutors have proven the first two sub-elements beyond any
doubt.  Judge Kaplan issued the RICO Judgment, the Protocol, and
the Passport Order to the public docket in the underlying civil
case.[644]  By doing so, Mr. Donziger, who had filed a notice of

---

[640] Cutler, 58 F.3d at 837 (quotation marks omitted).

[641] Greyhound, 508 F.2d at 532; see also United States v.
Hall, 346 F.2d 875, 881 (2d Cir. 1965) ("The requirement of
willfulness was satisfied despite lack of direct proof that the
defendants actually knew the order was signed, for in those
cases, as in Hall's, there was a multiple strand of cumulated
circumstantial evidence to establish mens rea.").

[642] (See Order to Show Cause at 1-10 ¶¶ 1-21.)

[643] See Cutler, 58 F.3d at 834.

[644] Each order's exhibit number corresponds to the relevant
docket entry in 11-CV-691.  (See GX. 1875; GX 2172; GX 2232.)

appearance in the underlying civil case,[645] received a notification that those orders had been issued.[646]  Moreover, Mr. Donziger filed numerous pro se motions and letters related to each of those orders, which conclusively evidences his awareness of their existence.[647]  The Court will address the specificity sub-element on an order-by-order basis.

### A. Counts IV & V

Counts IV and V charge Mr. Donziger with two violations of Paragraph One of the RICO Judgment related to his failure to transfer the 2011 Contingent Fee and the 2017 Contingent Fee.[648] Recall that Paragraph One of the RICO Judgment provides that:

> The Court hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal

---

[645] (See GX 1147 at 1.)

[646] (See Trial Tr. at 80:22-:81:2 ("Q. And when an attorney enters a notice of appearance on a docket in a case, what, if anything, does that mean in terms of an attorney receiving any filings in that case?  A. From that point, the attorney would receive ECF notifications, electronic case filing system automatic notifications of anything that gets posted to the docket.").)

[647] (See generally, e.g., GX 123 (Donziger email sending certain assignment forms related to the 2011 Contingent Fee and Amazonia shares); GX 1986 (Donziger opposition to Chevron's contempt application); GX 1986-1 (Donziger letter to Chevron's counsel indicating that he would not transfer his Amazonia shares); GX 2018 (Donziger motion for declaratory relief related to Paragraph Five of RICO Judgment); GX 2051 (Donziger response related to transfer of 2017 Contingent Fee); GX 2184 (Donziger opposition to Chevron's Protocol-based contempt application); GX 2234 (Donziger motion to stay coercive contempt sanctions, including those imposed by Passport Order).)

[648] (See Order to Show Cause at 6-9 ¶¶ 10-18.)

185

or real, tangible or intangible, vested or contingent,
that Donziger has received, or hereafter may receive,
directly or indirectly, or to which Donziger now has,
or hereafter obtains, any right, title or interest,
directly or indirectly, that is traceable to the
Judgment or the enforcement of the Judgment anywhere
in the world including, without limitation, all rights
to any contingent fee under the Retainer Agreement and
all stock in Amazonia.  Donziger shall transfer and
forthwith assign to Chevron all such property that he
now has or hereafter may obtain.[649]

Although Paragraph One's language would encompass a wide variety
of property interests, the Court finds that it is sufficiently
definite and specific in the context of the 2011 Contingent Fee
and the 2017 Contingent Fee.

When evaluating the clarity of a court order, the Court
must apply "a reasonableness standard, considering both the
context in which it was entered and the audience to which it was
addressed."[650]  The context here shows that a reasonable litigant
would have understood Paragraph One to require the assignment of
the 2011 Contingent Fee and the 2017 Contingent Fee.  For one,
although Paragraph One's language is broad, it expressly
enumerates "all rights to any contingent fee under the [2011]
Retainer" as an example of the very property that Mr. Donziger
was required to "transfer and forthwith assign."[651]  Moreover,
the RICO Opinion--issued alongside the RICO Judgment--explained

---

[649] (GX 1875 at 1-2 ¶ 1.)

[650] Cutler, 58 F.3d at 835.

[651] (GX 1875 at 2 ¶ 1.)

that Mr. Donziger's "right to a contingent fee and the fee itself are property subject to execution and attachment and certainly to the imposition of a constructive trust."[652]  Mr. Donziger, a Harvard-educated attorney,[653] cannot credibly suggest that the 2011 Contingent Fee and 2017 Contingent Fee were not clearly subject to Paragraph One's constructive trust.[654]

Mr. Donziger maintains that the Special Prosecutors "failed to prove beyond a reasonable doubt that [Paragraph One of] the RICO Injunction was sufficiently clear and unambiguous as to leave no doubt in [his] mind that he was required to take unilateral action" to transfer the 2011 Contingent Fee and the 2017 Contingent Fee.[655]  The Court disagrees for two reasons. First, the Special Prosecutors only had to prove beyond a

---

[652] (GX 1874 at 477 (footnote omitted); see also id. at 475-77 ("The imposition of a constructive trust on Donziger's right to a contingent fee, among other property traceable to the Judgment, and the other defendants' rights to recovery fits this mold to a tee. . . .  [T]he Judgment is the indispensable predicate of his right to collect a contingent fee with respect to the Lago Agrio case.  That Judgment is the direct result of fraud by Donziger.").)

[653] (See Trial Tr. at 653:22-25 ("Are you aware of statements by Mr. Donziger in his briefs or testimony in connection with the civil litigation that he is a graduate of Harvard Law School?  A. I'm familiar with such statements, yes.").)

[654] See Cutler, 58 F.3d at 835 (noting that "courts can expect lawyers to comply with less specific orders than laymen").

[655] (Def. IV/V/VI Br. at 3 ¶ 11, 5 ¶ 18.)

reasonable doubt that Paragraph One was reasonably definite and specific; the Special Prosecutors need not have proven the clarity of Paragraph One beyond all doubt.[656]  For the reasons set forth above, they have done so.  And second, Mr. Donziger's contention runs counter to Paragraph One's plain text, which instructed that "Donziger shall transfer and forthwith assign to Chevron" any property subject to the constructive trust.[657]  Paragraph One does not require Chevron to do anything at all; the onus for compliance was squarely and exclusively on Mr. Donziger.  That command would have been reasonably clear to any litigant, let alone to an attorney.  Judge Kaplan's refusal to require Mr. Donziger to sign an assignment "with respect to unidentified, undescribed property" does not alter that conclusion.[658]  Nor does Judge Kaplan's suggestion that Mr. Donziger would "be compelled, if necessary, to comply with" his obligation to transfer to Chevron property subject to Paragraph One's constructive trust.[659]  Thus, the Special Prosecutors have

---

[656] See Cutler, 58 F.3d at 835 ("[T]he clarity of an order must be evaluated by a reasonableness standard . . . .").

[657] (GX 1875 at 2 ¶ 1 (emphasis added).)

[658] (GX 2072 at 9.)  Specifically, Judge Kaplan did not see the point in the execution of such a broad assignment when "such an instrument would leave entirely unclear what had been transferred and assigned."  (Id.)

[659] (GX 2072 at 9 (emphasis added).)

proven beyond a reasonable doubt that Paragraph One of the RICO Judgment is reasonably definite and specific.

### B. Count VI

Count VI charges Mr. Donziger with violating Paragraph Five of the RICO Judgment by pledging a portion of his interest in the Ecuadorian Judgment to David Zelman in exchange for personal services.[660]  Paragraph Five of the RICO Judgment orders as follows:

> Donziger and the LAP Representatives, and each of them, is hereby further enjoined and restrained from undertaking any acts to monetize or profit from the Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein.[661]

Like Paragraph One, even though its language is also quite broad, Paragraph Five is sufficiently definite and specific in the context of Mr. Donziger's personal interest in the Ecuadorian Judgment.  While Paragraph Five expressly bars Mr. Donziger from taking any action to profit from the Ecuadorian Judgment, it also lists several examples of conduct that would violate its terms, including, most relevantly, "pledging" any interest.[662]  The RICO Opinion contemporaneously solidified Paragraph Five's thrust:

---

[660] (See Order to Show Cause at 9-10 ¶¶ 19-21.)

[661] (GX 1875 at 3 ¶ 5.)

[662] (GX 1875 at 3 ¶ 5.)

> The decision in the Lago Agrio case was obtained by corrupt means.  The defendants here <u>may not be allowed to benefit from that in any way</u>.  The order entered today will prevent them from doing so.[663]

Paragraph Five certainly forbade Mr. Donziger from taking <u>any</u> action to benefit <u>personally</u> from the Ecuadorian Judgment.

Mr. Donziger maintains that the Special Prosecutors have not proven that Paragraph Five was "sufficiently clear and unambiguous as to leave no doubt in [his] mind that [the] alleged conduct was enjoined" because the Stay Order introduced ambiguity into what conduct the RICO Judgment proscribed.[664]  The Court disagrees.  To the extent the Stay Order introduced ambiguity as to Paragraph Five's reach, that ambiguity certainly did not relate to Mr. Donziger's ability to sell, assign, pledge, or otherwise encumber <u>his own interest</u> in the Ecuadorian Judgment.  The Stay Order confirmed as much:

> The point of paragraph 5 . . . was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing <u>on their interests</u> in the Lago Agrio Judgment . . . .[665]

Instead, as the Court of Appeals aptly recognized, "[t]o a reasonable reader, that statement [ ] would confirm what [Judge Kaplan] said was the point of this portion of the [RICO

---

[663] (GX 1874 at 485 (emphasis added).)

[664] (Def. IV/V/VI Br. at 7 ¶ 23.)

[665] (GX 1901 at 10.)

Judgment]: to prohibit Donziger from monetizing <u>his</u> contingent fee interest in the judgment."[666]

Nevertheless, Mr. Donziger maintains that "the Court erroneously and repeatedly prevented the defense from exploring the implications of the Second Circuit analysis on cross-examination," which would have established "that Chevron and the Gibson Dunn attorneys . . . were aware that Judge Kaplan's 2014 Stay Order limited the anti-monetization paragraph of the RICO Injunction to RICO defendants' treatment of funds received on a 'collection.'"[667]  Although it is unclear why Chevron's or GDC's interpretation of Paragraph Five is at all relevant, there is a more fundamental problem with Mr. Donziger's argument:  <u>His understanding</u> was not that Paragraph Five was limited solely to "collections."  Rather, the evidence shows that Mr. Donziger

---

[666] <u>Donziger</u>, 990 F.3d at 209.  Mr. Donziger asserts that "the Second Circuit never squarely addressed the issue of whether the 2014 Stay Order also rendered the purported injunction against Mr. Donziger's monetization of his own interest (outside of a collection context) insufficiently clear and unambiguous for purposes of criminal contempt."  (Def. IV/V/VI Br. at 8 ¶ 23.)  Strictly speaking, that is true, almost surely because Mr. Donziger did not challenge the Contempt Order's finding regarding the Zelman transaction on appeal. (<u>See</u> GX 317 at 8 (statement of the issues); <u>id.</u> at 9-31 (substantive arguments).)  Even so, the Court wholly accepts and agrees with the Court of Appeals' observation that Paragraph Five of the RICO Judgment, even considered in light of the Stay Order, still made clear that Mr. Donziger could not profit from his personal interest in the Ecuadorian Judgment.  <u>See</u> <u>Donziger</u>, 990 F.3d at 209.

[667] (Def. IV/V/VI Br. at 7 n.1)

knew that Paragraph Five forbade him from monetizing his own
interest in the Ecuadorian Judgment, even absent a collection.[668]
Indeed, one of Mr. Donziger's primary arguments against post-
judgment discovery regarding his litigation-fundraising efforts
was that Chevron had not shown that he was monetizing his own
interest in the Ecuadorian Judgment.[669]  In other words, Mr.
Donziger's own statements belie the notion that it was somehow
unclear to him that Paragraph Five forbade him from monetizing

---

[668] (See, e.g., GX 2010 at 18:2-3, 18:23-19:1 ("I am
allowed, if I sell the shares of my clients, to get paid for my
work on this case. . . .  I'm selling, as an intermediary, the
points or the aspects of the judgment that are held by my
clients.  I am not selling my own shares, because that is
obviously prohibited by your Honor's RICO judgment."  emphasis
added)); GX 2018 at 2 ("So long as the litigation finance
agreements do not involve Mr. Donziger pledging, assigning,
committing, or otherwise collateralizing his specific
contingency interest . . . [,] the NY Judgment does not have any
impact."); GX 2051 at 2 ("It remains that Chevron has not
presented even a scintilla of evidence that I have sold any of
my interests in the Ecuador judgment--the only operative factual
question at issue that could provide a basis for a contempt
finding on the judgment compliance issue.").)

[669] (See GX 2010 at 21:5-7 ("What evidence have they
presented to show I have sold a single piece of my interest?
Zero.  And it hasn't happened.  I'll make that representation
right now."); id. at 26:3-4 ("I'm not selling my shares; I'm
selling my clients' shares."); id. at 31:5-7 ("How do we know he
hasn't sold his shares?  Well, I'm a lawyer and I'm representing
to you as an officer of the court right now I have not sold my
shares."); id. at 31:13-14 ("[A]gain, I'm not selling my shares,
I'm selling their shares."); id. at 32:18-23 ("But if there's
anything that might be arguably legit about what they're
seeking, it's something related to the narrow issue of am I
selling my own shares.  And if you're not going to accept my
representation, I can prove to you that I have not sold my own
shares, and that's what it should be limited to.").)

or profiting--pre- or post-collection--from his own interest in
the Ecuadorian Judgment.  Accordingly, the Special Prosecutors
have proven beyond a reasonable doubt that Paragraph Five of the
RICO Judgment is reasonably definite and specific.

### C. Count I

Count I charges Mr. Donziger with violating Paragraph Four
of the Protocol, between March 8, 2019 and May 28, 2019, by
failing to provide Mr. Krehel and Chevron's Forensic expert with
sworn lists of his electronic devices and accounts.[670]  Paragraph
Four of the Protocol provides, in relevant part, that:

> Within three (3) business days of entry of this
> Protocol, defendant Steven Donziger ("Donziger") shall
> provide to both the Neutral and Chevron's Forensic
> Experts via email a representation listing under
> penalty of perjury all devices he has used to access
> or store information or for communication since March
> 4, 2012 – including, but not limited to, personal
> computers, tablets, phones, and external storage
> devices, such as external hard drives and thumb drives
> -- (the "Devices"), indicating for each of the Devices
> whether he has possession, custody, or control of the
> Devices and, if not, stating the reasons why that is
> so, i.e., whether they were destroyed, lost, etc. and
> the present location of the Devices.  Additionally,
> Donziger shall produce under penalty of perjury a list
> of all accounts – including, but not limited to, email
> accounts (including web-based email accounts);
> accounts (including web- or cloud-based) related to
> any document management services, such as Dropbox; and
> accounts related to any messaging services, such as
> WhatsApp, Facebook Messenger, instant messages, etc. -
> Donziger has used since March 4, 2012 (the "Media"),
> indicating whether he presently has the ability to

---

[670] (See Order to Show Cause at 1-3 ¶¶ 1-3.)

access those accounts and, if not, stating the reasons
why that is so.[671]

The Court finds that Paragraph Four is more than specific enough
to put Mr. Donziger on notice of what he was required to do.
That Paragraph specified that Mr. Donziger was to provide two
lists to Mr. Krehel and Chevron's Forensic Expert--one of his
"Devices" and one of his "Media"--and it provided detailed
definitions for both "Devices" and "Media," offering numerous
examples of each.[672]  Further, Paragraph Four provided detailed
instructions for what Mr. Donziger was to do in the event that
he no longer had possession, custody, control, or access to any
"Devices" or "Media."  And finally, Paragraph Four explicitly
detailed (1) how the lists were to be provided (i.e., by email),
(2) that the lists were to be sworn under penalty of perjury,
and (3) that Mr. Donziger had a three-day period to send the
lists to Mr. Krehel and Chevron's Forensic Expert.  Put plainly,
Paragraph Four provides detailed, comprehensive instructions for
how Mr. Donziger was to prepare two basic lists.  This is hardly
rocket science.

Mr. Donziger posits that the Special Prosecutors failed to
prove that the Protocol "was sufficiently clear and unambiguous

---

[671] (GX 2172 at 1-2 ¶ 4.)

[672] Judge Kaplan also included communications accounts that
he had understood, from the record in the civil case, Mr.
Donziger to have used.  (See GX 2172 at 2 ¶ 4(a)-(c).)

(as required by law) as to leave no doubt in [his] mind that he was required to comply with paragraph 4 independently" of Paragraph Five, which he intended to resist.[673]  That does not pass the smell test, especially given Mr. Donziger's background as a lawyer.[674]  Mr. Donziger's intention to invite contempt on Paragraph Five does not make Paragraph Four's commands any less clear.  Moreover, Paragraphs Four and Five of the Protocol plainly order Mr. Donziger to do two distinct things.  If Judge Kaplan had entered Paragraph Four and Paragraph Five as two separate orders, under Mr. Donziger's own theory he would unquestionably have been obligated to comply with the separate Paragraph Four order despite his resistance to the separate Paragraph Five order.  It borders on the absurd to suggest that Judge Kaplan's deciding to save a few trees by including both directives in the same document somehow mandates a different result.  Thus, the Special Prosecutors have proven beyond a reasonable doubt that Paragraph Four of the Protocol is reasonably definite and specific.

---

[673] (Def. I/II/III Br. at 14-15 ¶ 10.)

[674] See Cutler, 58 F.3d at 835 ("[T]he clarity of an order must be evaluated by a reasonableness standard, considering both the context in which it was entered and the audience to which it was addressed.").

### D. **Count II**

Penultimately, Count II charges Mr. Donziger with violating Paragraph Five of the Protocol by refusing to surrender his devices to Mr. Krehel for imaging.[675]  Paragraph Five of the Protocol provides, in relevant part:

> The Neutral Forensic Expert shall take possession of Donziger's Devices and have access to his Media for the purpose of making a mirror image of those Devices and Media.  The Devices shall be surrendered to the Neutral Forensic Expert at Donziger's address at 245 West 104th Street, #7D, New York, NY 10025.  The Neutral Forensic Expert shall take possession, custody, and control of the Devices and transport them directly to its offices for the imaging described herein.  The devices shall be surrendered to the Neutral Forensic Expert at 12:00 pm at 245 West 104th Street, #7D, New York, NY 10025 on March 18, 2019.[676]

The Court finds that directive to be perfectly straightforward.  By its plain text, Paragraph Five informed Mr. Donziger (1) precisely what he was to provide to Mr. Krehel, and (2) the exact date, time, and place at which he was to surrender the "Devices."  And, as explained above, Paragraph Four of the Protocol set forth a comprehensive definition of what was included in term "Devices."[677]  Based on that, Paragraph Five's directive would been obvious to any litigant, especially a

---

[675] (See Order to Show Cause at 3-5 ¶¶ 4-6.)

[676] (GX 2172 at 2 ¶ 5.)

[677] (See GX 2172 at 1-2 ¶ 4 (defining the term and listing numerous examples).)

lawyer.[678]  Tellingly, Mr. Donziger does not even suggest that Paragraph Five of the Protocol was insufficiently specific.[679] Thus, the Special Prosecutors have proven beyond a reasonable doubt that Paragraph Five of the Protocol is reasonably definite and specific.

### E. Count III

Last but not least, Count III charges Mr. Donziger with disobeying the Passport Order by failing to surrender his passport(s) to the Clerk of the Court.[680]  The Passport Order provided, in relevant part, that:

> Donziger, on or before June 12, 2019 at 4 p.m., shall surrender to the Clerk of the Court each and every passport issued to him by each and every nation to have issued a passport to him, the Clerk to retain possession thereof unless and until this Court determines that Donziger has complied fully with paragraphs 4 and 5 of the Protocol.[681]

The Court finds that the Passport Order's text was entirely unambiguous as to what it demanded.  The Passport Order, in no uncertain terms, informed Mr. Donziger of (1) exactly what he was required to do, (2) by when he was required to do it, and

---

[678] See Cutler, 58 F.3d at 835 (noting that "courts can expect lawyers to comply with less specific orders than laymen").

[679] (See Def. I/II/III Br. at 15-24 ¶¶ 11-15 (cataloguing Mr. Donziger's contentions as to Count II).)

[680] (See Order to Show Cause at 6 ¶¶ 7-9.)

[681] (GX 2232 at 2.)

(3) to whom he was to turn over his passport(s).  Mr. Donziger
does not even imply otherwise.[682]  The Special Prosecutors have
proven beyond a reasonable doubt that the Passport Order is
reasonably definite and specific.

### 3. Disobedience

Next, the Court considers whether the Special Prosecutors
have proven that Mr. Donziger disobeyed the RICO Judgment, the
Protocol, and the Passport Order.

### A. Count IV

Count IV charges Mr. Donziger with disobeying Paragraph One
of the RICO Judgment between March 4, 2014 and September 3, 2018
by refusing to assign to Chevron the 2011 Contingent Fee.[683]
Paragraph One plainly required Mr. Donziger to assign that
interest "forthwith," i.e., immediately following the RICO
Judgment's entry on March 4, 2014.[684]  Mr. Donziger
unquestionably did not do so, despite the RICO Judgment's and
the RICO Opinion's clear holding that the 2011 Contingent Fee
was a property interest subject to Paragraph One's constructive

---

[682] (See Def. I/II/III Br. at 24-25 ¶¶ 16-18 (laying out Mr.
Donziger's contentions as to Count III).)

[683] (See Order to Show Cause at 6-8 ¶¶ 10-14.)

[684] (GX 1875 at 2 ¶ 1.)

198

trust.[685]  Instead, the evidence shows that more than four years

passed before Mr. Donziger executed an assignment of any kind.[686]

But even then, that assignment did not comport with Judge

Kaplan's subsequent order--entered following extensive efforts

to secure Mr. Donziger's long-overdue compliance--outlining a

specific process by which Mr. Donziger was to complete the

transfer.  That order mandated that Mr. Donziger execute and

send two sets of original assignment forms by overnight courier:

(1) an unnotarized set by August 22, 2018 and (2) a notarized

set by August 29, 2018.[687]  Although Mr. Donziger sent the

unnotarized set by August 22, he sent it by email rather than

overnight courier, i.e., he did not send the originals as

---

[685] (See GX 1875 at 1-2 ¶ 1 ("The Court hereby imposes a
constructive trust for the benefit of Chevron on all property,
. . . including, without limitation, all rights to any
contingent fee under the Retainer Agreement . . . ." (emphasis
added)); GX 1874 at 477 ("[Mr. Donziger's] right to a contingent
fee and the fee itself are property subject to execution and
attachment and certainly to the imposition of a constructive
trust." (footnote omitted)); see also id. at 475-77 ("The
imposition of a constructive trust on Donziger's right to a
contingent fee, among other property traceable to the Judgment,
and the other defendants' rights to recovery fits this mold to a
tee. . . .  [T]he Judgment is the indispensable predicate of his
right to collect a contingent fee with respect to the Lago Agrio
case.  That Judgment is the direct result of fraud by
Donziger.").)

[686] Mr. Donziger did not execute any assignment of the 2011
Contingent Fee until August 22, 2018.  (See GX 123 at
DONZIGER_106017-18 (email and executed form).)

[687] (See GX 2079 at 5-6.)

ordered.[688]  And Mr. Donziger did not complete and send the
notarized forms until September 4, days after the deadline.[689]
The Special Prosecutors have proven beyond a reasonable doubt
Mr. Donziger's disobedience of Paragraph One of the RICO
Judgment with respect to the 2011 Contingent Fee.

## B. Count V

Count V alleges a similar violation of Paragraph One of the
RICO Judgment, this time related to Mr. Donziger's refusal,
between November 1, 2017 and May 27, 2019, to assign to Chevron
the 2017 Contingent Fee.[690]  Paragraph One required Mr. Donziger
to assign that interest, which he acquired after the issuance of
the RICO Judgment, "forthwith," i.e., without delay following
its acquisition.[691]  Yet, despite its being obvious that a
contingent fee interest in the Ecuadorian Judgment was subject
to Paragraph One's constructive trust,[692] Mr. Donziger did not

---

[688] (See GX 123 at DONZIGER_106017-18 (email and executed
form); see also id. at DONZIGER_106021 ("Again, . . . originals
will be provided as soon as possible as practicable, but no
later than September 4, 2018." (emphasis added)).)

[689] (See GX 2085-1 at 1-2 (executed form); see also GX 123
at DONZIGER_106021 ("Again, notarized versions . . . will be
provided as soon as possible as practicable, but no later than
September 4, 2018." (emphasis added)).)

[690] (See Order to Show Cause at 8-9 ¶¶ 15-18.)

[691] (GX 1875 at 2 ¶ 1.)

[692] In addition to Judge Kaplan's helpful explanations in
the RICO Judgment and RICO Opinion regarding what property was
                              (continued on following page)

assign that interest until May 28, 2019, more than eighteen months later.[693]  It took Judge Kaplan's finding Mr. Donziger to be in civil contempt and imposing a series of coercive fines to spur Mr. Donziger to action;[694] a February 21, 2019 order directing him to assign the 2017 Contingent Fee by February 28, 2019 did not do the trick.[695]  The Special Prosecutors have proven beyond a reasonable doubt that Mr. Donziger disobeyed Paragraph One of the RICO Judgment by refusing to assign to Chevron the 2017 Contingent Fee until May 28, 2019.

Mr. Donziger counters that he is not guilty of Count V because his assignment of the 2011 Contingent Fee encompassed any interest he received under the 2017 Retainer.[696]  Not so.  To support his contention, Mr. Donziger points to language in his August 22, 2018 assignment form, which states that the

---

(continued from previous page)
subject to Paragraph One's constructive trust, (see GX 1875 at 1-2 ¶ 1; GX 1874 at 475-77), throughout much of the alleged period of noncompliance Mr. Donziger was also litigating his obligation to transfer the 2011 Contingent Fee.  On August 7, 2018--before Mr. Donziger assigned the 2011 Contingent Fee--Judge Kaplan put Mr. Donziger on notice that Chevron could move to hold him in contempt for failing to assign the 2017 Contingent Fee.  (See GX 2064 at 2.)  To suggest that Mr. Donziger was somehow unaware of his obligation to assign to Chevron the 2017 Contingent Fee strains credulity.

[693] (See GX 2216-1 at 1.)

[694] (See GX 2209 at 69-70.)

[695] (See GX 2165 at 3.)

[696] (See Def. IV/V/VI Br. at 4-5 ¶¶ 14-16.)

assignment encompasses "all right, title, and interest . . . to any contingent fee under that certain Retainer Agreement, dated as of January 5, 2011, . . . together with its successors and assigns and all successors to and predecessors of the Retainer Agreement."[697]  But the text of the 2011 Retainer and 2017 Retainer, which were between different parties,[698] shows that 2017 Retainer is not a successor agreement.  Under the 2011 Retainer, Mr. Donziger's law firm (Donziger & Associates, PLLC) was entitled to receive a contingent fee from the LAPs.[699]  By contrast, the 2017 Retainer entitled Mr. Donziger personally to receive a contingent fee from ADF.[700]  The two agreements differ in one of their most central obligations: who was liable to pay a contingent fee and who was entitled to receive it.  That matters.

More fundamentally, even if Mr. Donziger were correct that the 2017 Retainer was a successor agreement, it does not follow that he did not disobey the RICO Judgment.  Mr. Donziger entered

---

[697] (GX 123 at DONZIGER_106018 (emphasis added).)

[698] The 2011 Retainer was between the LAPs, ADF, ADAPT, and Donziger & Associates PLLC. (See GX 1978-6 at 1.)  The 2017 Retainer was between only ADF and Mr. Donziger personally.  (See GX 120 at DONZIGER_107415.)

[699] (See GX 1978-6 at 1, 3-4.)

[700] (See GX 120 at DONZIGER_107415, 107417.)

into the 2017 Retainer as of November 1, 2017,[701] yet he did not assign the 2011 Contingent Fee until, at the absolute earliest, August 22, 2018.[702]  Under no circumstance was that assignment, made nearly a year later, completed "forthwith" as Paragraph One required.[703]  Thus, the Special Prosecutors have proven beyond a reasonable doubt Mr. Donziger's disobedience of Paragraph One of the RICO Judgment with respect to the 2017 Contingent Fee.

### C. Count VI

The Special Prosecutors have proven beyond a reasonable doubt Mr. Donziger's disobedience of Paragraph Five of the RICO Judgment related to the Zelman transaction.  The communications between Mr. Donziger and Mr. Zelman confirm it:

> In exchange for you providing me with $11,000 worth of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected.  The amount pledged is based on a pro rata proportion of the latest investment round in the case, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron.  Your interest thus will be valued equally with this round based on an investment of $11,000. The actual amount that will be paid to you will be based on the total amount collected.  To be more specific, your amount under this agreement will be

---

[701] (See GX 120 at DONZIGER_107417.)

[702] (See GX 123 at DONZIGER_106017-18 (email and executed form).)

[703] (GX 1875 at 2 ¶ 1.)

11/250 of an eighth of a point of whatever is
recovered of the total claim.[704]

Mr. Zelman testified that he hoped that Mr. Donziger would be

paid his fees from the Ecuadorian Judgment,[705] even though he

understood the likelihood of recovery to be a "long shot."[706]

And Mr. Zelman confirmed that this agreement was not merely

illusory or a matter of charity:  He did not provide (or even

offer) any services to Mr. Donziger for free.[707]  Although Mr.

Zelman understandably may have been hoping not to create any

difficulties for Mr. Donziger, that does not alter the substance

of the agreement that they reached.  Nor does Mr. Zelman's

---

[704] (GX 110 at DONZIGER_013102 (emphasis added); see also GX
105 at DONZIGER_013098 (using nearly identical language in an
earlier message).)

[705] (See Trial Tr. 620:15-18 ("Q. And isn't it true, Mr.
Zelman, that you were hoping that Mr. Donziger would get paid
his fees from the Ecuadorian judgment so that you would get
paid; isn't that true?  A. Yes.").)

[706] (Trial Tr. at 617:18-19 ("Q. Fair to say that it was a
long shot, Mr. Zelman?  A. Absolutely.").)

[707] (See Trial Tr. 620:2-9 ("Q. Okay. You did not do this
services [sic] with Mr. Donziger for free; isn't that correct?
A. That's correct.  Q. And isn't it true that you never offered
to Mr. Donziger to give him your services for free; isn't that
correct?  A. That is correct.  Q. Your answer is that is
correct?  A. Yes.").)

acknowledgement that he understood that the RICO Judgment might one day be set aside.[708]

Mr. Donziger suggested, when opposing Chevron's motion to hold him in contempt in the underlying civil case, "that neither Mr. Zelman nor [he] ever understood the agreement to be legally binding, but rather an expression of the sentiment that his generosity in providing services to me pro bono at a critical transition point in my professional life would be matched with generosity by me in the event I received a significant monetary recovery."[709]  In light of Mr. Zelman's testimony, that theory is not credible for at least two reasons.  First, Mr. Zelman did not, in fact, provide his services pro bono:  Mr. Donziger paid him $2,000 cash in addition to pledging his interest.[710]  And second, if there was never any binding legal agreement, there would have been absolutely no need to cancel it.  Yet, that's

---

[708] (See Trial Tr. at 625:20-22 ("Q. And was it your understanding that the RICO judgment might be set aside one day? A. Yes.").)

[709] (GX 2184 at 7-8; see also supra note 707.)

[710] (See Trial Tr. at 576:4-8 ("Q. Was there a cash component of your agreement as well?  A. Yes.  Q. What was that, the cash component of your agreement with Mr. Donziger?  A. Steven paid me 2,000 cash of the $14,000.").)

precisely what Mr. Zelman did after Mr. Donziger informed him that the agreement could pose a problem.[711]

Mr. Donziger also argues that the Special Prosecutors failed to prove that Mr. Zelman provided him with "personal services"--as opposed to "professional" ones--which Mr. Donziger claims was "an element of the crime as charged."[712]  Mr. Donziger slices things far too finely.  The "personal services" language used in the Order to Show Cause did not alter the elements that the Special Prosecutors had to prove,[713] and Paragraph Five of the RICO Judgment forbid Mr. Donziger from monetizing his interest in the Ecuadorian Judgment for <u>any</u> reason, whether

---

[711] (<u>See</u> GX 135 at DONZIGER_119100 ("Due to all the complications regarding our financial arrangement, I am cancelling our deal.  Therefore, we have NO agreement going forward from this date."); Trial Tr. at 591:1-10 ("Q. So what were the -- I've asked you to explain what prompted you to send this email.  A. He told me there was a problem that might result in something like this.  And I said that was never the intent, and let's just cancel the agreement.  Q. And you meant that was -- when you just said that was never the intent, what did you mean by that?  A. I don't think either one of us had an idea that the agreement that we entered into somehow would create a problem of this nature.").)

[712] (Def. IV/V/VI Br. at 7 ¶¶ 21-22.)

[713] To establish as violation of 18 U.S.C. 401(3), the Special Prosecutors "must prove (1) the issuance of the order, (2) the defendant's disobedience or disregard of the order, and (3) the defendant's knowledge and willfulness in disobeying the order."  <u>Vezina</u>, 165 F.3d at 178.  That's it.

personal or professional.[714]  In any event, even if Mr. Zelman's

services were targeted at helping Mr. Donziger in his

professional affairs, those services were undoubtedly provided

to Mr. Donziger personally.[715]  That Mr. Zelman's coaching

services may have been targeted at improving Mr. Donziger's

professional skills does not change the fact that it was Mr.

Donziger who personally benefitted.[716]

---

[714] (See GX 1875 at 3 ¶ 5 ("Donziger and the LAP
Representatives, and each of them, is hereby further enjoined
and restrained from undertaking any acts to monetize or profit
from the Judgment, as modified or amended, or any New Judgment,
including without limitation by selling, assigning, pledging,
transferring or encumbering any interest therein." (emphasis
added)).)

[715] Mr. Zelman provided the services to Mr. Donziger in the
form of one-on-one sessions, consistent with the Transitions
Process plan.  (See Trial Tr. at 570:7-11 ("What does The
Transitions Process consist of that you offer?  A. Typically,
it's four sessions, each approximately a month apart.  Each
session consists of approximately four hours of dialogue between
myself and the client."); id. at 577:5-9 ("Did Mr. Donziger
complete other modules of the transitions program? I think you
referred to the first module.  A. He completed sessions one
through three in the four-hour segments.  And the fourth session
was sort of spread out over a number of smaller sessions.").)

[716] (Cf., e.g., Trial Tr. at 610:1-6 ("Q. Mr. Zelman, isn't
it true that the services you provided Mr. Donziger were solely
in furtherance of the enforcement of the Ecuador judgment?  A.
The range of topics that we covered were many but I would say
that the intent was always to further his ability to function in
that way."); id. at 613:6-14 ("Q. Isn't it true, Mr. Zelman,
that your feedback was directed at the success of the
enforcement effort?  . . .  A. I'm not trying to make split
hairs in the background.  That's always the intent.  And in the
foreground, it's just to communicate for effectively."); id. at
613:19-24 ("Q. Me too. Mr. Zelman, isn't true that you at times
(continued on following page)

Mr. Donziger also argues that his agreement with Mr. Zelman "was not prohibited by the RICO injunction" because what Mr. Donziger actually pledged was a contingent interest predicated on "the setting aside of the RICO judgment by way of Rule 60 motion for relief from a Judgment or Order."[717]  That argument is betrayed by the evidence for two reasons.

First, Mr. Donziger's communications with Mr. Zelman indicate that the amounts Mr. Donziger pledged were "based on a pro rata proportion of the <u>latest investment round in the case</u>, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron."[718]  Of course, Mr. Donziger was not selling what he describes in his post-trial briefing as "Rule 60-contingent future interest[s]" to outside investors.[719]  Instead, he was fundraising using his <u>clients'</u> <u>non-restrained interests in the Ecuadorian Judgment,</u>[720] and those

---

(continued from previous page)
would encourage Mr. Donziger to move away from a personal narrative and more towards a more professional one?  A. I actually don't remember the specifics of those conversations but that would be the kind of thing I might offer.").)

[717] (Def. IV/V/VI Br. at 10 ¶¶ 26-27.)

[718] (GX 105 at DONZIGER_013098 (emphasis added); GX 110 at DONZIGER_013102 (emphasis added).)

[719] (Def. IV/V/VI Br. at 11 ¶ 29.)

[720] Mr. Donziger admitted to such fundraising at a hearing before Judge Kaplan on May 8, 2018.  (<u>See</u> GX 2010 at 18:23-24 ("I'm selling, as an intermediary, the points or the aspects of
(continued on following page)

investors could be paid with collections from foreign judgment-enforcement proceedings should any prove successful.[721]  It simply does not make any sense for Mr. Zelman's "Rule 60-contingent future interest"--if that were really what it was--to be priced at the same value as investment-grade interests in the Ecuadorian Judgment.  Instead, the logical and reasonable inference is that Mr. Donziger pledged to Mr. Zelman a garden-variety portion of his contingent fee interest in the Ecuadorian Judgment, whose value would naturally coincide with the shares of the Ecuadorian Judgment offered for sale to outside investors.

And second, although Mr. Zelman testified that his agreement with Mr. Donziger was "contingent" on future events, the evidence shows that the contingency to which Mr. Zelman referred related to Mr. Donziger's collecting his fees, not to

---

(continued from previous page)
the judgment that are held by my clients."); see also id. at 26:3-4 ("I'm not selling my shares; I'm selling my clients' shares."); id. at 31:13-14 ("[A]gain, I'm not selling my shares, I'm selling their shares.").)

[721] The RICO Judgment only enjoined Mr. Donziger and the two LAPs who appeared in the underlying civil suit; it did not forbid the other LAPs from monetizing or profiting from the Ecuadorian Judgment.  (See GX 1875 at 3 ¶ 5.)  Moreover, nothing in the RICO Judgment "enjoin[ed], restrain[ed] or otherwise prohibit[ed] Donziger, the LAP Representatives, or any of them, from . . . filing or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment, or any for prejudgment seizure or attachment of assets based in courts outside the United States."  (Id. at 3 ¶ 6 (emphasis added).)

the RICO Judgment possibly being set aside pursuant to a Rule 60

motion.[722]  Mr. Donziger's communications with Mr. Zelman simply

refer to an uncertainty of future collection and indicate that

any recovery of Mr. Zelman's fees would necessarily depend on

Mr. Donziger's recouping his.[723]  Nowhere in any communications

with Mr. Zelman did Mr. Donziger so much as reference Rule 60 or

explain that it would be necessary for the RICO Judgment to be

set aside for Mr. Zelman ever to recover any fees.  Given that,

it is entirely unsurprising that Mr. Zelman did not know, at the

time he agreed to provide the executive-coaching services, that

Mr. Donziger was barred by the RICO Judgment from collecting

fees.[724]  All of this suggests that, at the time the agreement

---

[722] (See, e.g., Trial Tr. at 589:8-12 ("What did I
understand him to mean.  There was a judgment for, I don't know,
$9.5 billion, that I know that he was attempting to collect
that.  And if so, then there would be some fees that he would
receive as part of that, but that was just my understanding.").)

[723] (See, e.g., GX 105 at DONZIGER_013098 ("Should my
personal fees not be recovered from the Ecuador case, you will
not be entitled to any recovery of the $14,000.  Should a
proportion of my fees be recovered, but not the full amount,
your recovery will be decreased on a pro rata basis equal to the
overall decrease affecting my fees."); GX 110 at (similar).)

[724] Mr. Zelman testified to that fact on both direct and
cross examination.  (See Trial Tr. at 587:16-23 ("Q. Prior to
Mr. Donziger sending you this email on March 27, 2018, had Mr.
Donziger told you that he was barred by court order from
collecting fees on the matter?  A. I don't think he ever used
that language.  Q. And when you say you don't think he ever used
that language, had he ever indicated to you that a court order
prevented him from collecting the fees, his fees?  A. I don't
(continued on following page)

was formed, the parties understood that what Mr. Donziger had pledged was a standard contingency interest tied to the recovery of the Ecuadorian Judgment, not some nebulous, "highly contingent interest[]" for which "the market . . . is typically non-existent."[725]

For these reasons, the Special Prosecutors have proven beyond a reasonable doubt that Mr. Donziger disobeyed Paragraph Five of the RICO Judgment by pledging a portion of his own interest in the Ecuadorian Judgment to Mr. Zelman in exchange for executive-coaching services.

### D. Count I

The Special Prosecutors have proven beyond a reasonable doubt that Mr. Donziger disobeyed Paragraph Four of the Protocol between March 8, 2019 and May 28, 2019.  Despite Paragraph Four's clear command to provide sworn lists of his "Devices" and "Media" to Mr. Krehel and Chevron's Forensic Expert within three

---

(continued from previous page)
believe so. I don't believe so."); id. at 617:20-618:5 ("Q. Mr. Zelman, did there come a time when Mr. Donziger informed you that he was barred by court order from collecting fees on this matter?  A. I saw an e-mail between himself and myself. I don't know what the date was but, yes.  Q. But you knew that prior to that e-mail, didn't you, Mr. Zelman?  A. That -- sorry. What did I know?  Q. That there had been a court order related to Mr. Donziger's ability to collect fees in this matter?  A. I don't think I knew that prior to that email.").)

[725] (Def IV/V/VI Br. at 11 ¶ 29.)

211

business days of the Protocol's entry,[726] Mr. Donziger did not

provide any sworn list until nearly three months later.[727]  Mr.

Donziger did not disclose to Mr. Krehel that he even had any

devices until March 18, 2019, at that point only informing Mr.

Krehel orally that he used a MacBook Air and an iPhone.[728]  In an

email on March 11, 2019 and an April 8, 2019 filing with the

Court, Mr. Donziger indicated that he was planning to invite

contempt sanctions in order to obtain appellate review of the

_____

[726] (See GX 2172 at 1 ¶ 4.)

[727] (See GX 138 at DONZIGER_105038-40; see also Trial Tr. at
792:22-793:5 ("Q. And Mr. Krehel, with respect to this list that
Mr. Donziger was directed to provide to you of his devices and
accounts within three business days of entry of this protocol,
did that occur?  A. No.  Q. You did not receive a list from Mr.
Donziger of his devices and/or his accounts within three days of
the business days of entry of the protocol?  A. That is correct,
I did not."); id. at 806:2-5 ("Before you received this email
from Mr. Donziger on May 29, of 2019, had you received from Mr.
Donziger any list of his electronic devices or accounts?  A.
No.").)

[728] (See Trial Tr. at 800:2-8 ("Q. And did Mr. Donziger give
you a response?  A. Yes, he did.  Q. What do you recall him
saying to you?  A. To my recollection he mentioned that he has
an iPhone and MacBook Air and potentially he might have had some
other devices but he mentioned that they would not be related
matter.  They would be more like a storage devices."); GX 134 at
DONZIGER_101970 ("Verbally, when asked, Mr. Donziger provided
list of devices: one iPhone and one MacBook Air system."); see
also Trial Tr. at 806:6-10 ("Q. Was the only information that
you received from Mr. Donziger prior to this May 29, 2019 email
about Mr. Donziger's devices, what Mr. Donziger told you in the
lobby of the apartment building on March 18 of 2019?  A. That is
correct.").)

Protocol.[729]  Although Mr. Donziger changed his mind at some point regarding his intent to resist Paragraph Four,[730] he still did not produce a sworn list of his devices until May 29, 2019,[731] i.e., after Judge Kaplan had already found him to be in civil contempt and after coercive fines began to run.[732]  It would be an understatement to say that Mr. Donziger's disobedience of Paragraph Four of the Protocol was patent.

### E. Count II

The Special Prosecutors have proven beyond any shadow of a doubt that Mr. Donziger disobeyed Paragraph Five of the Protocol by refusing to surrender his electronic devices to Mr. Krehel at

---

[729] (See GX 133 at DONZIGER_101980 ("I clearly have stated that I will voluntarily go into civil contempt of the legally unfounded orders in order to obtain proper appellate review."); GX 2184 at 4-5 ("[A]s I have made clear, my responses have been limited by the fact that it is my intention to go into voluntary contempt as a matter of principle rather than submit to the review process prior to achieving any appellate review.").)

[730] (See GX 2352 at 7:21-24 ("I have a draft affidavit that I sent in good faith to Chevron to work with them to get in compliance.  I intend to get in compliance on paragraph 4.").)

[731] (See GX 138 at DONZIGER_105038-40.)  Mr. Donziger ultimately had to supplement that declaration and did so on June 5, 2019.  (See GX 140 at DONZIGER_105028-31.)

[732] (See GX 2209 at 70 ("[Mr. Donziger] shall pay a coercive civil fine to the Clerk of Court with respect to May 28, 2019 and each subsequent day from that date until the date on which he fully purges himself of this contempt by doing so.").)  Contrary to his suggestion in his post-trial briefing, Mr. Donziger did not "come into compliance with paragraph 4 of the March 5 Order . . . within the time allotted by Judge Kaplan in the Contempt Opinion." (Def. I/II/III Br. at 14 ¶ 10.)

12:00 pm on March 18, 2019.[733]  Mr. Krehel's testimony
established not only that Mr. Donziger did not surrender his
devices at the time Judge Kaplan specified[734] but also that Mr.
Donziger had <u>still not surrendered</u> the devices as of the date of
trial,[735] notwithstanding that the Court of Appeals' decision on
which he hung his hat was rendered some two months before
trial.[736]  That testimony is wholly consistent with Mr.
Donziger's repeated insistence that he would invite a contempt
sanction in order to seek appellate review of the Protocol.[737]

---

[733] (<u>See</u> GX 2172 at 2 ¶ 5.)

[734] Mr. Krehel arrived at Mr. Donziger's apartment, as
scheduled, before 12:00 p.m., but Mr. Donziger was not there.
(<u>See</u> Trial Tr. at 796:8-798:3; GX 134 at DONZIGER_101970.)  Mr.
Krehel remained in the lobby until around 1:00 p.m. when Mr.
Donziger showed up carrying a cup of coffee.  (<u>See</u> Trial Tr. at
798:4-13.)  At that time, Mr. Donziger told Mr. Krehel that he
would not surrender any devices for imaging.  (<u>See</u> <u>id.</u> at
798:14-17 ("Q. Can you tell us what he said to you and you said
to him.  A. From my recollection, Mr. Donziger told me that he
will not surrender any devices, and that basically we will not
receive any devices that day from him."); GX 134 at
DONZIGER_101970 ("Mr[.] Donziger met LIFARS Forensic Team in the
building lobby, and did not provide LIFARS Forensic Team any
devices.").)

[735] (<u>See</u> Trial Tr. at 803:23-804:6 ("Q. Did Mr. Donziger
ever surrender any devices to you, Mr. Krehel, for imaging?  A.
No.  Q. He didn't do it in June?  A. No.  Q. Didn't do it in
July?  A. Correct.  Q. And as you sit here today, has that
happened?  A. Did not happen.").)

[736] <u>See</u> <u>Donziger</u>, 990 F.3d at 192 (deciding appeal on March
4, 2021).

[737] (<u>See</u>, <u>e.g.</u>, GX 133 at DONZIGER_101980 ("I clearly have
stated that I will voluntarily go into civil contempt of the
                              (continued on following page)

214

Of course, to invoke what Mr. Donziger terms "contempt jurisdiction"--even if only intending to invite a civil contempt sanction--disobedience of the order to be challenged is an indispensable prerequisite.[738]  Any desire on Mr. Donziger's part to seek appellate review could bear only on whether his disobedience was <u>willful</u>, not whether it occurred at all.  The Court will consider the extensive proof of Mr. Donziger's willfulness in detail below.

### F. Count III

The evidence unequivocally establishes Mr. Donziger's disobedience of the Passport Order beyond any doubt whatsoever. As explained above, the Passport Order's directive was crystal clear: Mr. Donziger was to surrender any passport in his possession to the Clerk of Court by June 12, 2019 at 4:00 p.m.[739]

---

(continued from previous page)
legally unfounded orders in order to obtain proper appellate review."); GX 2184 at 4-5 ("[A]s I have made clear, my responses have been limited by the fact that it is my intention to go into voluntary contempt as a matter of principle rather than submit to the review process prior to achieving any appellate review.").)

[738] <u>See</u>, <u>e.g.</u>, <u>Maness</u>, 419 U.S. at 460 ("We have consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal." (alteration omitted).)

[739] (<u>See</u> GX 2232 at 2.)

Yet, despite stating on June 10, 2019 that he would "voluntarily surrender [his] passport until [he] c[ould] deal with it at the Second Circuit,"[740] Mr. Donziger did not do so.[741]  In lieu of complying, Mr. Donziger instead moved for an emergency stay of the Passport Order's sanctions.[742]  Yet, even after Judge Kaplan denied the motion in relevant part[743]--and despite Mr. Donziger's informing Judge Kaplan that he was "immediately turning to the task of preparing an emergency stay to the Circuit"[744]--Mr. Donziger never sought _any_ relief from the Court of Appeals.[745] Mr. Donziger (who has vigorously maintained that he is not a flight risk) even requested that this Court permit him to keep

---

[740] (GX 2352 at 16:8-9.)

[741] As Mr. Ng confirmed at trial, the Clerk's Office's records indicate that Mr. Donziger _never_ surrendered his passports to the Clerk of the Court.  (See Trial Tr. at 566:16-24 ("Q. Was there any other record indicating that Mr. Donziger had ever surrendered his passport to the Clerk of the Court at any point in time after June 11th of 2019, as directed by the court order?  A. After June 13th or --  Q. After June 11th, the date of the order, at any point in time?  A. I did not see any indication that a passport was received by the clerk's office.").)

[742] (See GX 2234 at 15 n.6.)

[743] (See GX 2254 at 4.)

[744] (GX 2234 at 15 n.6.)

[745] (See Trial Tr. at 657:3-9 ("Q. Did Mr. Donziger notice an appeal of this order with the Second Circuit?  A. No, he did not.  Q. Did he seek a stay of this order with the Second Circuit?  A. No, he did not.  Q. Did he seek mandamus relief with the circuit?  A. No, he did not.").)

216

his passport--notwithstanding the Passport Order--at his initial appearance to answer the criminal contempt charges.[746]  The upshot?  Mr. Donziger did not comply with the Passport Order. Full stop.

Mr. Donziger disagrees, averring that he "is innocent" of Count III because the Special Prosecutors did not prove that his "failure to turn over his passport caused any harm or obstructed, disrupted or interfered with the administration of justice in any way."[747]  He is wrong.  The Special Prosecutors did not have to prove harm to sustain the criminal contempt charges under 18 U.S.C. § 401(3).  As the Court has already stated several times, "[t]o secure a conviction for criminal contempt of a court order," the Special Prosecutors need only "prove (1) the issuance of the order, (2) the defendant's disobedience or disregard of the order, and (3) the defendant's knowledge and willfulness in disobeying the order."[748]  The cases that Mr. Donziger cites are inapposite because they involve

_____

[746] (See Trial Tr. at 831:22-832:3 ("But what I would propose, because I don't think this is a normal kind of case, given the long history of my particular role in this case, is to allow me to keep my passport for me to propose when I want to travel to another place that I would inform the Court or inform pretrial services or whatever the process is, get permission to go for a certain period of time and be allowed to return.").)

[747] (Def. I/II/III Br. at 24-25 ¶ 17.)

[748] Vezina, 165 F.3d at 178 (emphasis added).

contempt occurring in the presence of the court,[749] which is governed by a different statutory provision.[750]  Whether Mr. Donziger's noncompliance with the Passport Order caused harm or interfered with the administration of justice is entirely irrelevant.  Accordingly, the Special Prosecutors have proven beyond a reasonable doubt Mr. Donziger's disobedience of the Passport Order.

### 4. **Willfulness**

Finally, the Court takes up whether the Special Prosecutors have established the willfulness of Mr. Donziger's disobedience of the RICO Judgment, the Protocol, and the Passport Order.

---

[749] In re Williams, 509 F.2d 949, 960 (2d Cir. 1975) (considering contempt case involving alleged in-court misbehavior); In re Kirk, 641 F.2d 684, 687-88 (9th Cir. 1981) (noting that the facts underlying the two contempt convictions involved conduct occurring before two different judges); United States v. Seale, 461 F.2d 345, 369 (7th Cir. 1972) (considering a § 401(1) prosecution).  Indeed, Mr. Donziger's counsel left out of his quotation of Kirk a relevant citation to 18 U.S.C. § 401(1), the provision governing contempts in the presence of a court.  See Kirk, 641 F.2d at 687 ("Moreover, there can be no conviction for criminal contempt under 18 U.S.C. § 401 or 28 U.S.C. § 636(d) unless there has been such a '[m]isbehavior . . . as to obstruct the administration of justice' (§ 401(1)), a 'material disruption or obstruction' of justice . . . ." (emphasis added)).

[750] See 18 U.S.C. § 401(1) ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice.")

## A. Counts IV & V

The Special Prosecutors have proven beyond a reasonable
doubt the willfulness of Mr. Donziger's disobedience of
Paragraph One of the RICO Judgment.  As the Court has already
found above, the RICO Judgment and the RICO Opinion made clear
to Mr. Donziger that the 2011 Contingent Fee and the 2017
Contingent Fee were property subject to the constructive trust.
Yet, as shown above, Mr. Donziger did not assign those interests
forthwith, instead doing so only after years of litigation.
Why?  The evidence suggests one obvious reason: Mr. Donziger did
not want to forfeit his right to receive a nine-figure payday
should efforts to enforce the Ecuadorian Judgment prove
successful in other jurisdictions.[751]  Mr. Donziger essentially
admitted as much when he declined, despite Judge Kaplan's order
to the contrary, to transfer his Amazonia shares to the Clerk of
the Court pending his appeal of the RICO Judgment:

> The upshot is that a simple transfer to the clerk's
> office of my Amazonia shares would in practice mean
> the complete divestiture--and potentially
> irretrievable loss--of more than two decades of labor
> on the part of me and some of my colleagues . . . .[752]

---

[751] Simple arithmetic shows that Mr. Donziger's 6.3%
share of the $8.6 billion Ecuadorian judgment, if collected
in full, would have entitled him to a fee of more than $540
million.

[752] (GX 1986-1 at 2 (emphasis added); see also GX 2051 at 2
("Holding the status quo seeks to prevent forfeiture
(dissipation) of my interest entirely--a result that Chevron
(continued on following page)

As the Court has already observed,[753] Mr. Donziger's conduct related to the Amazonia shares is relevant because Judge Kaplan, Chevron, and Mr. Donziger grouped and equated the Amazonia shares together with the 2011 Contingent Fee.

Over the ensuing years, Mr. Donziger repeatedly refused to transfer his shares in Amazonia, the 2011 Contingent Fee, and the 2017 Contingent Fee, despite several subsequent orders from Judge Kaplan. Consider the following examples:

- On February 28, 2018, Judge Kaplan observed that Mr. Donziger "arguably [wa]s in contempt of the final judgment of permanent injunction" for failing to transfer his shares in Amazonia.[754] Notwithstanding that warning, Mr. Donziger did not even attempt to transfer his Amazonia shares for months.

- In May 2018, despite his previous assertion that Chevron's pursuit of the Amazonia shares was "a fake issue,"[755] Mr. Donziger included an "Addendum of Understandings" to his first assignment of the Amazonia shares, stating, inter alia, that the share transfer form was being executed (1) "upon the specific threat of imposition of 'contempt of court' sanctions" and (2) in violation of Amazonia's Articles of Association.[756] Judge Kaplan found that

---

(continued from previous page)
itself should be wary of, given that it claims ownership of my interest through this Court's judgment." (emphasis added)).)

[753] (See supra note 109.)

[754] (See GX 1963 at 17.)

[755] (GX 2010 at 29:14.)

[756] (GX 2003-3 at 1.)

Addendum to have been targeted at negating the
transfer.[757]

- On May 16, 2018, Judge Kaplan indicated that Chevron
  had raised a new possible basis for contempt: Mr.
  Donziger's failure to assign the 2011 Contingent
  Fee.[758]  Despite that heads up, Mr. Donziger still
  did not transfer the 2011 Contingent Fee.[759]

- Following a motion to compel filed by Chevron,[760]
  Judge Kaplan ordered Mr. Donziger to execute a
  notarized assignment of the 2011 Contingent Fee by
  August 21, 2018.[761]  Because Mr. Donziger was
  traveling, Judge Kaplan extended the time to comply
  and instead required Mr. Donziger to complete two
  sets of assignment forms, one notarized and one
  not.[762]  Although Mr. Donziger did ultimately execute
  those forms, he did not do so consistently with
  Judge Kaplan's instructions.[763]

- After exhausting his appeals of the RICO Judgment,
  Mr. Donziger nevertheless entered into the 2017
  Retainer.[764]  But Mr. Donziger did not disclose the

---

[757] (See GX 2006 at 12.)

[758] (See GX 2006 at 14-15.)

[759] (See Trial Tr. at 150:20-151:2 ("And after Judge Kaplan
issued that opinion, that May 16th opinion, did Mr. Donziger
execute an assignment to Chevron of his right to the contingent
fee as granted in the 2011 retainer agreement?  A. Not
immediately, no.  Q. And in the next four or five weeks after
that opinion, did he execute an assignment of his contingent fee
interest?  A. No.").)

[760] (See generally GX 2047.)

[761] (See GX 2072 at 9.)

[762] (See GX 2079 at 5-6.)

[763] (See GX 123 at DONZIGER_106017-18 (sending executed form
by email rather than overnight courier); GX 2085-1 at 1-2
(executing notarized form as of September 4, 2018 despite being
ordered to do so by August 29, 2018).)

[764] (See GX 120 at DONZIGER_107417.)

existence of that agreement until he appeared for a
deposition on June 25, 2018.[765]  Mr. Donziger also
did not assign that interest to Chevron until May
28, 2019,[766] despite Judge Kaplan's February 21, 2019
order directing him to do so by February 28, 2019.[767]

Collectively, that evidence easily proves beyond a reasonable

doubt that Mr. Donziger "consciously disregard[ed]" Paragraph

One of the RICO Judgment by refusing to assign to Chevron the

2011 Contingent Fee and the 2017 Contingent Fee.[768]

Mr. Donziger argues that he is not guilty of Count IV

because "the scope and terms" of his "obligation to transfer or

assign the contractual rights were the subject of bona fide,

good faith dispute, negotiation, and litigation."[769]  Not so.  As

the Court has already recognized, Paragraph One placed the onus

for compliance on Mr. Donziger; it did not order Chevron to do

anything.[770]  Contrary to what Mr. Donziger necessarily

suggests,[771] Chevron was under no obligation to request that Mr.

---

[765] (See GX 201 at 28:22-29:5 ("Are you familiar with this
document, Mr. Donziger, your retainer agreement from January 5th
of 2011?  A. Yes.  Q. Is this agreement still operative?  A. I
think there has been a subsequent agreement.").)

[766] (See GX 2216-1 at 1.)

[767] (See GX 2165 at 3.)

[768] Lynch, 162 F.3d at 735.

[769] (Def. IV/V/VI Br. at 2 ¶ 2.)

[770] (See GX 1875 at 1-2 ¶ 1.)

[771] (See Def. IV/V/VI Br. at 2 ¶ 3.)

Donziger transfer the 2011 Contingent Fee or to propose any specific form(s) of assignment.  Nor did Judge Kaplan's declining to force Mr. Donziger to sign an assignment form with respect to unidentified and undescribed property excuse Mr. Donziger's failure to assign the 2011 Contingent Fee, a discrete and identified property interest.[772]  And even though Mr. Donziger is correct that Judge Kaplan did not direct him to complete specific transfer forms until August 15, 2018,[773] Mr. Donziger fails to acknowledge that he did not even comply timely with that order.[774]  Mr. Donziger's attempts to pass the buck for Paragraph One compliance to Chevron do not negate the other evidence proving his conscious disregard of Paragraph One as well as Judge Kaplan's subsequent orders.

As for Count V, Mr. Donziger maintains that he is not guilty because "the need for and propriety of a transfer of rights to the November 1 Agreement was also the subject of bona fide litigation."[775]  Again, the Court disagrees.  Mr. Donziger's assertion that the 2017 Retainer did not grant him a new

---

[772] (See Def. IV/V/VI Br. at 2 ¶ 4 (arguing that "Mr. Donziger prevailed on the 'scope' issue as reflected in Judge Kaplan's Order dated August 15, 2018" (emphasis omitted)).)

[773] (See Def. IV/V/VI Br. at 3 ¶ 5; see also GX 2072 at 9 (ordering Mr. Donziger to complete specific transfer forms related to the Amazonia shares and the 2011 Contingent Fee).)

[774] (See Def. IV/V/VI Br. at 3 ¶¶ 6-10.)

[775] (Def. IV/V/VI Br. at 5 ¶ 19.)

interest is inconsistent with both (1) the language of the 2011 Retainer and the 2017 Retainer[776] and (2) his June 25, 2018 deposition testimony confirming that the 2017 Retainer granted him "a percentage interest" in the Ecuadorian Judgment.[777] Moreover, as the Court recognized above, (1) Mr. Donziger's assignment of the 2011 Contingent Fee did not encompass the 2017 Contingent Fee,[778] and (2) even if it did, Mr. Donziger still disobeyed the RICO Judgment between when he signed the 2017 Retainer and, at the earliest, August 22, 2018.[779]  And ultimately, Judge Kaplan resolved any questions surrounding the 2017 Contingent Fee by directly ordering Mr. Donziger to assign that interest to Chevron by February 28, 2019.[780]  Yet, Mr.

---

[776] As noted above, those agreements were among different parties and differed in what persons or entities were liable to pay a contingent fee and what persons or entities were entitled to receive such a fee.  (Compare GX 1978-6 at 1, 3-4 (entitling Donziger & Associates PLLC to contingent fee from the LAPs), with GX 120 at DONZIGER_107415, 107417 (entitling Mr. Donziger personally to contingent fee from ADF).)

[777] (GX 201 at 59:12-22 ("Q. Does the agreement that you signed with the FDA in the last couple of years, the retainer agreement, give you a percentage interest in the judgment, the Ecuadorian judgment?  A. Yes.  Q. What is that percentage interest in the FDA retainer?  A. It's the same percentage interest that I have always had, to the best of my knowledge, 6.3 percent.").)

[778] (See supra notes 696 to 700 and accompanying text.)

[779] (See supra notes 701 to 703 and accompanying text.)

[780] (See GX 2165 at 3.)

Donziger did not do so until May 28, 2019,[781] and then only after Judge Kaplan found him to be in civil contempt and imposed a series of coercive fines.[782]  If that does not prove willfulness, it is hard to imagine what would.

In sum, the Special Prosecutors have proven beyond a reasonable doubt that Mr. Donziger willfully disobeyed Paragraph One of the RICO Judgment by (1) refusing between March 4, 2014 and September 3, 2018 to assign to Chevron the 2011 Contingent Fee and (2) refusing between November 1, 2017 and May 27, 2019 to assign to Chevron the 2017 Contingent Fee.

### B. Count VI

The Special Prosecutors have also proven beyond a reasonable doubt that Mr. Donziger's disobedience of Paragraph Five of the RICO Judgment was willful.  The record is replete with evidence that Mr. Donziger knew that he was forbidden to profit from the Ecuadorian Judgment.[783]  Cognizant of that fact, Mr. Donziger represented to Judge Kaplan, when attempting to

---

[781] (See GX 2216-1 at 1.)

[782] (See GX 2209 at 69-70.)

[783] (See, e.g., GX 2018 at 2 ("So long as the litigation finance agreements do not involve Mr. Donziger pledging, assigning, committing, or otherwise collateralizing his specific contingency interest . . . [,] the NY Judgment does not have any impact."); GX 2051 at 2 ("It remains that Chevron has not presented even a scintilla of evidence that I have sold any of my interests in the Ecuador judgment--the only operative factual question at issue that could provide a basis for a contempt finding on the judgment compliance issue.").)

prevent post-judgment discovery, that he was "not selling [his] own shares, because that obviously [wa]s prohibited by your Honor's RICO judgment."[784]  Mr. Donziger made that representation despite having pledged a portion of his contingency fee interest in the Ecuadorian Judgment to Mr. Zelman.[785]  Then, notwithstanding Chevron's moving on March 19, 2018 to hold him in contempt for allegedly monetizing the Ecuadorian Judgment related to litigation fundraising,[786] Mr. Donziger agreed on March 26, 2018 to pledge a further interest to Mr. Zelman in consideration for $2,000 of additional executive-coaching services.[787]

---

[784] (GX 2010 at 18:24-19:1 (emphasis added); see also id. at 21:5-7 ("What evidence have they presented to show I have sold a single piece of my interest?  Zero.  And it hasn't happened.  I'll make that representation right now."); id. at 26:3-4 ("I'm not selling my shares; I'm selling my clients' shares."); id. at 31:5-7 ("How do we know he hasn't sold his shares?  Well, I'm a lawyer and I'm representing to you as an officer of the court right now I have not sold my shares."); id. at 31:13-14 ("[A]gain, I'm not selling my shares, I'm selling their shares."); id. at 32:18-23 ("But if there's anything that might be arguably legit about what they're seeking, it's something related to the narrow issue of am I selling my own shares.  And if you're not going to accept my representation, I can prove to you that I have not sold my own shares, and that's what it should be limited to.").)

[785] (See GX 105 at DONZIGER_013098; GX 110 at DONZIGER_013102.)

[786] (See GX 1966 at 14-16; see also GX 1968 at 2 (ordering Chevron to serve its ex parte motion on Mr. Donziger).)

[787] (See GX 110 at DONZIGER_013102 ("You and I agree that consistent with the terms below, I have delivered an additional
(continued on following page)

Almost immediately thereafter, Mr. Donziger informed Mr.

Zelman out of the blue for the first time that he was "barred by

court order in the U.S. from collecting fees on the matter."[788]

For three months after that, Mr. Donziger did not produce to

Chevron his communications with Mr. Zelman,[789] even though (1)

those communications were responsive to Document Request No.

---

(continued from previous page)
$2000 worth of consulting services which entitles me to 2/250 of
an eighth of a point of whatever is collected of the total
claim."); id. ("Let me confirm the calculation.  Agree in
concept.  Thanks!").)

[788] (GX 111 at DONZIGER_013103.)

[789] (See Trial Tr. at 355:8-11 ("Q. These exhibits -- 105,
106, 109, 110, 111 -- were they provided to you at any point by
Steve Donziger in the discovery process?  A. No."); id. at
583:1-14 ("Q. So Mr. Zelman, this particular email, you received
a subpoena from Gibson Dunn for some documents; correct?  A.
Yeah.  Q. And this is one of the documents that you produced; is
that correct?  A. I would suppose so.  Q. And when you collected
documents to provide to Gibson Dunn, did you review your emails
and print them out?  A. Yes.  Q. Okay. And this would have been
one of the emails that you've printed out or viewed; correct?
A. Yes.  Q. And provided to Gibson Dunn; correct?  A.
Correct.").)

Mr. Donziger was not Mr. Zelman's attorney, and "Mr. Zelman
was not and never has been an investor in the [Lago Agrio]
case."  (GX 2184 at 7.)  No claim of privilege would pertain to
those documents, and Mr. Donziger's First Amendment objection--
which he tied to Chevron's discovery of litigation funders--
would be similarly inapplicable.  At base, there was no
principled reason for Mr. Donziger to have withheld those
documents other than his not wanting to turn them over to
Chevron.

30[790] and (2) Judge Kaplan had ordered him to comply with that request by June 15, 2018.[791]  In direct contravention of Judge Kaplan's order, Mr. Donziger claimed the Request No. 30 "appear[ed] to be a Compliance Request."[792]  Nevertheless, Mr. Donziger represented that he had "not attempted nor completed any sale or assignment of [his] interest in the Ecuador Judgment at any point since March 4, 2014."[793]  Collectively, the evidence proves that (1) Mr. Donziger pledged a portion of his contingency fee interest to Mr. Zelman, (2) even though he knew that doing so contravened Paragraph Five of the RICO Judgment, and (3) he subsequently did not produce to Chevron documents evidencing the transaction despite being ordered to do so by

---

[790] (See GX 1989-1A at 15 ¶ 30 ("ALL DOCUMENTS evidencing or relating to any attempted or completed sale, assignment, or transfer of rights, title, claims or interest of any proceeds or other interest held by YOU, whether directly or indirectly, in the ECUADOR JUDGEMNT or the ECUADOR ENFORCEMENT ACTIONS, whether or not such attempt was successful.").)

[791] (See GX 2009 at 1 n.1 ("The specific document requests that the Court characterizes as Money Judgment Discovery are Requests 1 through 17 19, 23 through 28 and 30."); id. at 3 ("The Donziger Defendants, on or before June 15, 2018, shall comply fully with all of the Money Judgment Requests, as modified by this order, that are contained in Chevron's First Set of Requests for Production of Documents in Aid of the Supplemental Judgment ('the RFP').  Full compliance includes, but is not limited to, production of all responsive documents within their possession, custody or control.").)

[792] (GX 119 at DONZIGER_103461.)

[793] (GX 119 at DONZIGER_103461.)

228

Judge Kaplan.  The Special Prosecutors have met their burden of proof beyond a reasonable doubt.

Even assuming, <u>arguendo</u>, that Mr. Donziger may have lacked foresight into the possible consequences of his actions--given his suggestions that his agreement with Mr. Zelman was <u>de minimis</u>[794]--the Court rejects any notion that Mr. Donziger thought that pledging a portion of his interest in the Ecuadorian Judgment was somehow permissible under the RICO Judgment.  Judge Kaplan had made crystal clear to Mr. Donziger that he "may not be allowed to benefit from [the Ecuadorian Judgment] in any way,"[795] and Paragraph Five of the RICO Judgment explicitly forbade Mr. Donziger from "pledging . . . any interest" in the Ecuadorian Judgment for any reason.[796]  Yet, Mr. Donziger received more than $14,000 worth of services from Mr. Zelman,[797] and he offered consideration for those services in the

---

[794] (GX 2184 at 8 ("The Zelman issue is obviously <u>de minimis</u>."); <u>see also</u> <u>id.</u> at 7 ("I understand how the agreement with Mr. Zelman can be seen as a monetization of my interest in the Ecuador Judgment arguably in conflict with the Court's interpretation of the terms of the RICO Judgment, although to be clear I do not concede that it is in conflict.  I did not fully appreciate this at the time these services were provided, for reasons I do not specifically recall . . . .").)

[795] (GX 1874 at 485.)

[796] (GX 1875 at 3 ¶ 5.)

[797] (<u>See</u> Trial Tr. at 581:12-15 ("So over the period of several months, we had several meetings which would have extended past the four hours that the fourth session was already
(continued on following page)

form of $2,000 in cash coupled with a portion of his contingent

fee interest.[798]  If Mr. Donziger was ignorant of Paragraph

Five's strictures, he was willfully so.  That undoubtedly shows

"conscious[ ] disregard" of Paragraph Five of the RICO

Judgment,[799] especially considering that the Court of Appeals

"hold[s] attorneys to a higher standard of conduct than . . .

lay persons."[800]

### C. Counts I & II

The Court finds that the Special Prosecutors have proven

beyond a reasonable doubt that Mr. Donziger's disobedience of

Paragraphs Four and Five of the Protocol was willful.  After the

Protocol was issued, Mr. Donziger repeatedly, and almost

immediately, broadcast his intent not to comply.  For example,

---

(continued from previous page)
contracted for. So that's what was being represented in this
email.").)

[798] (See GX 105 at DONZIGER_013098 ("In exchange for you
providing me with $14,000 worth of such services, I pledge to
you an interest in the Ecuador judgment from my fees should they
be collected."); GX 110 at DONZIGER_013102 ("You and I agree
that consistent with the terms below, I have delivered an
additional $2000 worth of consulting services which entitles me
to 2/250 of an eighth of a point of whatever is collected of the
total claim."); Trial Tr. at 576:4-8 ("Q. Was there a cash
component of your agreement as well?  A. Yes.  Q. What was that,
the cash component of your agreement with Mr. Donziger?  A.
Steven paid me 2,000 cash of the $14,000.").)

[799] Lynch, 162 F.3d at 735.

[800] Cutler, 58 F.3d at 837.

in an email Mr. Donziger sent less than a week after the

Protocol was entered, Mr. Donziger did not pull punches:

> I have explained this to Judge Kaplan on repeated
> occasions beginning almost one year ago. . . .  I
> clearly have stated that I will voluntarily go into
> civil contempt of the legally unfounded orders in
> order to obtain proper appellate review.  Judge Kaplan
> and Chevron have known this long before starting the
> pointless process of having you appointed and crafting
> a review protocol, etc.  So I hope you have not
> cleared your schedule to work on this matter, because,
> as Chevron knows, I will not be producing documents
> until my due process rights are respected.[801]

Less than a month later, Mr. Donziger again did not beat around

the bush:

> This has already been briefed to some extent, although
> as I have made clear, my responses have been limited
> by the fact that it is my intention to go into
> voluntary contempt as a matter of principle rather
> than submit to the review process prior to achieving
> any appellate review.  Accordingly, I have not
> dedicated my limited time and resources to
> articulating challenges to the bewilderingly and
> unnecessarily complex review protocol drafted by
> Chevron and ordered, in essentially the same form, by
> the Court. Nor can I dedicate much additional time to
> the issue here, in light of the limited time available
> to respond to the motions.  I will nonetheless observe
> that, on account of a number of unavoidable facts, the
> review protocol, for all its supposed protections,
> merely disguises a de facto authorization for Chevron
> to rifle through my files largely as it wishes.[802]

Those statements carried forward Mr. Donziger's repeated efforts

to stave off discovery based on attorney-client privilege and

---

[801] (GX 133 at DONZIGER_101980 (emphasis added).)

[802] (GX 2184 at 4-5.)

the First Amendment,[803] which Judge Kaplan had squarely rejected

more than once[804] and which, ironically, had necessitated the

entry of the Protocol in the first place.[805]   In essence, despite

knowing that his obligation to comply with Paragraphs Four and

Five of the Protocol was not stayed pending appeal,[806] Mr.

---

[803] (See, e.g., GX 2067 at 1 (arguing that Judge Kaplan's "refusal to offer protective and/or injunctive relief necessary to protect the associational rights of myself and others under the First Amendment is unconstitutional"); GX 2118 at 1, 3 n.1 (informing Judge Kaplan that "I will be unable to comply with the order dated October 18, 2018 directing me to produce a potentially massive quantity of confidential and privileged documents and communications to Chevron" and also suggesting that the discovery requests "work[] a clear violation of the First Amendment right to association"); GX 2131 at 2 ("I am not ethically able to comply with the Court's order to produce mountains of confidential and privileged material to Chevron under a wholly improper purported privilege waiver ruling and before the Court has even ruled on the core issue in Chevron's original contempt motion.").)

[804] (See, e.g., GX 2045 at 20-35 (rejecting First Amendment arguments for protective order); GX 2108 at 2 (finding waiver of attorney-client privilege due to repeated failures to produce a privilege log as required by Federal Rules of Civil Procedure and the Local Rules); GX 2352 at 18:25-19:8 (rejecting attempt to relitigate foundational objections to post-judgment discovery).)

[805] (See GX 2171 at 2 ("Above all, however, it is necessary to bear in mind that the imaging and examination of Donziger's electronic devices has been necessitated only by his obdurate refusal to make any serious, good faith effort to produce documents he has been ordered to produce.  He has brought this on himself.").)

[806] (See GX 2149 at 13:24-14:1 ("I know you have an appeal pending in the Second Circuit.  I know their brief is due sometime in March.  That's the way it goes.  You don't have a stay." (emphasis added)).)  Mr. Donziger never sought emergency relief from the Court of Appeals.  (See GX 7 (no docket entries
(continued on following page)

Donziger openly admitted that he had absolutely no intention of complying until he could assert his objections to the Court of Appeals, which he thereafter either failed to do or did unsuccessfully.  The law put Mr. Donziger to the choice of complying with the Protocol or resisting with the "concomitant possibility of an adjudication of contempt."[807]  He made that choice willfully and deliberately.

Mr. Donziger argues that his disobedience of the Protocol was not willful because "he was seeking appellate review of the lawfulness of the entire order at the time," pursuant to what describes as "well-trodden" path to obtain pre-compliance review of a discovery order.[808]  Mr. Donziger suggests that the Special Prosecutors "have failed to prove beyond a reasonable doubt that any of Mr. Donziger's resistance to the March 5 Order was willful disobedience as opposed to an effort to comply via a

_____

(continued from previous page)
seeking emergency relief); GX 8 (same); GX 9 (same); see also Trial Tr. at 654:11-20 ("Q. And in the time period that I had focused you on during the course of your direct, which would be February 28th of 2018 to September 30th of 2019, did Mr. Donziger ever seek a stay in the Second Circuit?  A. No, he did not.  Q. Did he ever seek mandamus relief in that time period in the Second Circuit?  A. No, he did not.  Q. Did he ever seek expedited briefing in the Second Circuit?  A. No, he did not.").)

[807] Maness, 419 U.S. at 460.

[808] (Def. I/II/III Br. at 15 ¶ 10.)

legally available pathway that included appellate review."[809]
Mr. Donziger's conduct, he avers, "was consistent with a
reasonable interpretation of the court's order (albeit an
interpretation different from the one applied by the court
imposing the contempt) or at worst a good faith pursuit of a
plausible though mistaken alternative."[810]  Finally, Mr. Donziger
suggests that "[t]he permissibility of [his] seeking appellate
review of discovery orders in a post-judgment context by way of
'contempt jurisdiction' (or token or symbolic contempt) without
incurring <u>criminal</u> contempt liability is clear as a matter of
law."[811]  The Court disagrees for at least three reasons.

First, Mr. Donziger is wrong that a litigant can invoke
"contempt jurisdiction" without the possibility of facing
criminal sanctions.  It is well-established that the same
"conduct can amount to both civil and criminal contempt"[812] and
that "the choice of sanctions--civil or criminal--is vested in
the discretion of the District Court," not the would-be
contemnor.[813]  In reality, it is ordinarily <u>necessary</u> for a party

---

[809] (Def. I/II/III Br. at 17 ¶ 13.)

[810] (Def. I/II/III Br. at 17 ¶ 13 (quotation marks and
footnotes omitted).)

[811] (Def. I/II/III Br. at 18 ¶ 14.)

[812] <u>United States v. United Mine Workers of Am.</u>, 330 U.S.
258, 299 (1947).

[813] <u>Dinler</u>, 607 F.3d at 934.

seeking to obtain pre-compliance review of a discovery order to suffer a criminal contempt sanction.[814]  The Court is aware of no authority to the contrary.[815]

Second, the Court rejects Mr. Donziger's assertion that his conduct was "consistent with a reasonable interpretation" of Paragraphs Four and Five of the Protocol.  Paragraph Four and Paragraph Five ordered Mr. Donziger to do two distinct things. It is not reasonable to interpret Paragraph Four and Paragraph Five somehow not to require compliance with their plain directives.  Likewise, the Court does not accept Mr. Donziger's assertion that his conduct constituted a "good faith pursuit of a plausible though mistaken alternative."[816]  Almost definitionally, defying a court order to seek appellate review

---

[814] See, e.g., Dinler, 607 F.3d at 934 (observing that a party "can only appeal a civil contempt sanction after a final judgment").

[815] In fact, although the Supreme Court did not explicitly state as much, the contempt charged in Maness--which Mr. Donziger invoked in his collateral-bar-rule arguments--appears to have been of the criminal variety.  See Maness, 419 U.S. at 455, 457 (noting that the trial court "fixed punishment . . . at 10 days' confinement and a $200 fine" and that "the penalty" was later changed "to a $500 fine with no confinement" (emphasis added)); see also Bagwell, 512 U.S. at 828-29 (stating that "a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a completed act of disobedience" and observing a similar rule for "flat, unconditional fine[s]" (quotation marks omitted)).

[816] Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., 62 B.R. 723, 731 n.6 (S.D.N.Y. 1986) (alteration omitted).

of that order is making a conscious choice not to comply, not undertaking a good faith effort to do so. Indeed, based on the evidence, the Court finds it obvious that Mr. Donziger's goal was to avoid ever having to comply with the Protocol (or at least with Paragraph Five).

And third, Mr. Donziger's argument has a more fundamental problem. Even if Mr. Donziger's intentions in disobeying the Protocol were pure,[817] or "[e]ven godly," that does not matter.[818] The Special Prosecutors did not have to prove Mr. Donziger's "bad intent in order to prove willfulness."[819] The law of criminal contempt provides no safe harbor for conscientious objectors. All that the Special Prosecutors had to prove beyond a reasonable doubt to prove willfulness was Mr. Donziger's "specific intent to consciously disregard" Paragraphs Four and Five of the Protocol.[820] They have done that in spades.

---

[817] It is not at all clear that Mr. Donziger was refusing to comply with Paragraphs Four and Five of the Protocol in order to obtain appellate review, as opposed to merely attempting to stonewall discovery. After all, when he was afforded the opportunity to obtain the very appellate review of the Protocol that he purportedly sought, Mr. Donziger elected not to challenge the validity of the Protocol or Judge Kaplan's related contempt findings. (See GX 317 at 8 (statement of the issues); id. at 9-31 (substantive arguments).) Sometimes, actions speak louder than words.

[818] Lynch, 162 F.3d at 735.

[819] Remini, 967 F.2d at 758.

[820] Lynch, 162 F.3d at 735.

In short, the Special Prosecutors have proven beyond a reasonable doubt that Mr. Donziger willfully disobeyed Paragraphs Four and Five of the Protocol, even if his reason for doing so was to pursue (ultimately unsuccessfully) appellate review.

### D. Count III

Finally, the Court finds that the Special Prosecutors have proven beyond a reasonable doubt that Mr. Donziger's disobedience of the Passport Order was willful.  On July 12, 2019--despite knowing that he was required to surrender his passports and even after indicating that he would do so voluntarily to seek appellate review[821]--Mr. Donziger elected instead to inform Judge Kaplan that he would not "comply with the Court's deadline of 4 p.m. today in the Passport Order" due to his "pending motion for emergency relief and the severe and irreparable harm as articulated in th[at] motion."[822]  Despite Mr. Donziger's representation to Judge Kaplan that he was "immediately turning to the task of preparing an emergency stay

---

[821] (See GX 2352 at 16:8-9 ("I will voluntarily surrender my passport until I can deal with it at the Second Circuit.").)

[822] (GX 2234 at 15 n.6.)

to the Circuit,"[823] Mr. Donziger never followed through.[824]  Even
if Mr. Donziger did not disobey the Passport Order with <u>mala
fides</u>, the evidence plainly proves beyond a reasonable doubt
that he chose to "consciously disregard" that order.[825]  That is
all the law demands.[826]

### 5. <u>Young & the Court's Discretion</u>

Throughout his post-trial briefing, Mr. Donziger maintains
that this Court should exercise its discretion and decline to
impose criminal sanctions because Judge Kaplan's employing the
criminal contempt power is inconsistent with <u>Young</u>.[827]  In <u>Young</u>,
the Supreme Court observed that a court's use of its contempt
"authority must be restrained by the principle that only the
least possible power <u>adequate to the end proposed</u> should be used
in contempt cases."[828]  A court's vindicating its authority by

---

[823] (GX 2234 at 15 n.6.)

[824] (<u>See</u> Trial Tr. at 657:3-9 ("Q. Did Mr. Donziger notice
an appeal of this order with the Second Circuit?  A. No, he did
not.  Q. Did he seek a stay of this order with the Second
Circuit?  A. No, he did not.  Q. Did he seek <u>mandamus</u> relief
with the circuit?  A. No, he did not.").)

[825] <u>Lynch</u>, 162 F.3d at 735.

[826] <u>See</u> <u>Remini</u>, 967 F.2d at 758 ("[T]he government did not
have to show Remini's bad intent in order to prove willfulness
in criminal contempt . . . .").

[827] (<u>See</u> Def. I/II/III Br. at 25 ¶ 18; Def. IV/V/VI Br. at 4
¶ 12, 6 ¶ 20, 11-12 ¶ 30.)

[828] <u>Young</u>, 481 U.S. at 801 (cleaned up) (emphasis added).

punishing past violations of its orders is such a permissible end,[829] however, and it is hornbook law that the same contemptuous act can subject a contemnor to both civil and criminal sanctions.[830]  Here, the charges are all directed at Mr. Donziger's extensive and continuous laundry list of past violations of Judge Kaplan's orders, not at securing his future compliance with those orders.[831]  And, as the Court has already

---

[829] See, e.g., United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 661 (2d Cir. 1989) ("Criminal contempt, however, serves the much different purpose of vindicating the court's authority.  It serves to punish individuals or corporations for past violations of a court order." (citation omitted)).

[830] See, e.g., In re Grand Jury Witness, 835 F.2d 437, 440 (2d Cir. 1987) ("Refusal to obey a court order may subject a person to both civil and criminal contempt for the same acts."); SEC v. Am. Bd. of Trade, Inc., 830 F.2d 431, 439 (2d Cir. 1987) ("When a district court's order has been violated, the court may impose either civil contempt remedies or criminal contempt sanctions, or both."); Universal City Studios, Inc. v. N.Y. Broadway Int'l Corp., 705 F.2d 94, 96 (2d Cir. 1983) ("Though the use of judicial power to secure future compliance with a court order involves civil contempt remedies, the use of such power in the aftermath of past violations can take the form of either civil contempt remedies or criminal contempt punishments, or both." (citations omitted)); In re Weiss, 703 F.2d 653, 664 (2d Cir. 1983) ("If conduct is tantamount to a willful refusal to obey an order of the court, and the contemnor has the power to end his contumacy, a court may impose criminal contempt sanctions, or civil contempt sanctions, or both."); In re Irving, 600 F.2d 1027, 1031 (2d Cir. 1979) ("In responding to a single contemptuous act, a court may well impose both criminal and civil sanctions--wishing to vindicate its authority and to compel compliance.").

[831] (See Order to Show Cause at 2-3 ¶ 3, 5 ¶ 6, 6 ¶ 9, 8 ¶ 14, 9 ¶¶ 18, 21 (each specifying the relevant time period for the contemptuous conduct).)

held, "[t]he fact that Mr. Donziger ultimately acquiesced to [some of] Judge Kaplan's orders before he was criminally charged does not mean that Judge Kaplan was then forced to ignore the years of noncompliance up to the purges."[832]  Because the Court discerns no abuse of discretion in Judge Kaplan's charging criminal contempt, the Court will not decline to impose criminal sanctions based on Young.

### IV.  **Conclusion**

The Court does not question the sincerity of Mr. Donziger's espousal of his clients' cause.  Nor does it quarrel with the sincerity of his belief that he has been treated unfairly by Chevron.  But "a lawyer, of all people, should know that in the face of a perceived injustice, one may not take the law into his own hands."[833]  By repeatedly and willfully defying Judge Kaplan's orders, that is precisely what Mr. Donziger did.  It's time to pay the piper.

Because the Special Prosecutors have proven each element of criminal contempt of a court order beyond a reasonable doubt, the Court finds and renders a verdict of GUILTY on each of the six counts of criminal contempt charged in the Order to Show Cause.[834]  In addition, Mr. Donziger's two post-trial letter

---

[832] (Order, dated May 7, 2021 [dkt. no. 299] at 9.)

[833] Cutler, 58 F.3d at 840.

[834] (See Order to Show Cause at 1-10 ¶¶ 1-21.)

motions seeking dismissal of the criminal contempt charges [dkt. nos. 324 & 330] are <u>DENIED</u>. Contrary to Mr. Donziger's assertion that his conviction was "pre-ordained,"[835] the Court finds him guilty on each count for one reason and one reason only: Mr. Donziger did that with which he is charged. Period.

The parties shall confer and indicate their views, by joint letter, regarding: (1) a briefing schedule for any sentencing-related submissions; and (2) counsel's availability for sentencing in this matter. That letter shall be filed no later than three business days from the date of this order's entry. In conferring, the parties should keep in mind Mr. Donziger's repeated requests to be released from pre-trial home confinement, although the length of the pre-trial proceedings was prolonged almost exclusively by Mr. Donziger's requests for trial adjournments.

This opinion is being issued one week after the conclusion of all post-trial briefing on counsel's agreed-upon schedule.

**<u>SO ORDERED.</u>**

Dated:     July 26, 2021
           New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge

---

[835] (Def. I/II/III Br. at 8 ¶ 5.)